JLS

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

18    4920

**DESIGNATION FORM**
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: _____ 1600 Walters Mill Road, Somerset, PA 15510 _____

Address of Defendant: _____

Place of Accident, Incident or Transaction: _____ Philadelphia _____

THIS CASE IS RELATED TO:  18-130

CIVIL ACTION NO.  18-4920
CRIMINAL NO.

ASSIGNED TO:  Judge Schmehl

Date Terminated: _____

| | | | | |
|---|---|---|---|---|
| ne year | Yes | ☐ | No | ☐ |
| rior suit | Yes | ☐ | No | ☐ |
| lier | Yes | ☐ | No | ☐ |
| rights | Yes | ☐ | No | ☐ |

pending or within one year previously terminated action in

DATE: 11/13/2018 _____ *Danl McConl*
*Attorney-at-Law / Pro Se Plaintiff*          *Attorney I.D. # (if applicable)*

---

**CIVIL: (Place a √ in one category only)**

*A.* **Federal Question Cases:**

- ☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts
- ☐ 2. FELA
- ☐ 3. Jones Act-Personal Injury
- ☐ 4. Antitrust
- ☐ 5. Patent
- ☐ 6. Labor-Management Relations
- ☐ 7. Civil Rights
- ☑ 8. Habeas Corpus    2254
- ☐ 9. Securities Act(s) Cases
- ☐ 10. Social Security Review Cases
- ☐ 11. All other Federal Question Cases
  *(Please specify):* _____

*B.* **Diversity Jurisdiction Cases:**

- ☐ 1. Insurance Contract and Other Contracts
- ☐ 2. Airplane Personal Injury
- ☐ 3. Assault, Defamation
- ☐ 4. Marine Personal Injury
- ☐ 5. Motor Vehicle Personal Injury
- ☐ 6. Other Personal Injury *(Please specify):* _____
- ☐ 7. Products Liability
- ☐ 8. Products Liability – Asbestos
- ☐ 9. All other Diversity Cases
  *(Please specify):* _____

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, _____, counsel of record *or pro se plaintiff*, do hereby certify:

- ☐ Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs:

- ☐ Relief other than monetary damages is sought.

DATE: _____      _____      _____
*Attorney-at-Law / Pro Se Plaintiff*          *Attorney I.D. # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

Civ. 609 (5/2018)



## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### CASE MANAGEMENT TRACK DESIGNATION FORM

Ramos                                  :          CIVIL ACTION
                                       :
                    v.                 :
                                       :          NO.  **18    4920**
Hainsworth, et. al.                    :

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

### SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.          **2254** (☒)

(b) Social Security – Cases requesting review of a decision of the Secretary of Health and Human
    Services denying plaintiff Social Security Benefits.                              (☐)

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.  (☐)

(d) Asbestos – Cases involving claims for personal injury or property damage from
    exposure to asbestos.                                                              (☐)

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
    commonly referred to as complex and that need special or intense management by
    the court. (See reverse side of this form for a detailed explanation of special
    management cases.                                                                  (☐)

(f) Standard Management – Cases that do not fall into any one of the other tracks.      (☐)


NOV 1 3 2018                    _David McCaul_          _____
**Date**                       **Deputy Clerk**        **Attorney for**


_____            _____     _____
**Telephone**                  **FAX Number**           **E-Mail Address**

(Civ. 660) 10/02

JLS

PAE AO 241
(Rev. 05/2018)

Page 4

# PETITION UNDER 28 U.S.C. § 2254 FOR WRIT OF HABEAS CORPUS
## BY A PERSON IN STATE CUSTODY

| United States District Court | District: Eastern District of Pennsylvania |
|---|---|
| Name (under which you were convicted): Jesus Ramos | Docket or Case No.: 18 4920 CP-51-CR-0000561-2008 |
| Place of Confinement: SCI Somerset P.A | Prisoner No.: JG-5518 |
| Petitioner: (Include the name under which you you were convicted): Jesus L Ramos | Respondent (Name of Warden, Superintendent, Jailor, or authorized person having custody of petitioner): Melissa Hainsworth |

v.

and

The District Attorney of the County of: Philadelphia

and

The Attorney General of the State of: P.A

## PETITION

1. (a) Name and location of court that entered the judgment of conviction you are challenging:

Criminal Justice Center 1301 filbert St Phila P.A 19107

(b) Criminal docket or case number (if you know): CP-51-CR-0000561-2008

2. (a) Date of judgment of conviction (if you know): August 6, 2009

(b) Date of sentencing: October 29, 2009

3. Length of sentence: seven and a half (7½) to fifteen (15) years for third degree murder and conspiracy to run concurrent.

4. In this case, were you convicted on more than one count or of more than one crime? ☒ Yes ☐ No

5. Identify all crimes of which you were convicted and sentenced in this case: Third degree murder, conspiracy, violation of the Uniform Firearms act.

PAE AO 241
(Rev. 05/2018)

6.    (a)  What was your plea?  (Check one)

☑ (1)   Not Guilty                   ☐ (3)   Nolo contendere (no contest)

☐ (2)   Guilty                        ☐ (4)   Insanity plea

    (b)  If you entered a guilty plea to one count or charge and a not guilty plea to another count or charge, what
did you plead guilty to and what did you plead not guilty to? _____

_____

_____

_____

_____

    (c)  If you went to trial, what kind of trial did you have? (Check one)

☐ Jury                    ☑ Judge only

7.    Did you testify at a pretrial hearing, trial, or a post-trial hearing?

☐ Yes                     ☑ No

8.    Did you appeal from the judgment of conviction?

☑ Yes                     ☐ No

9.    If you did appeal, answer the following:

    (a)  Name of court: _Superior Court of P.A_

    (b)  Docket or case number (if you know): _CP-51-CR-0000561-2008_

    (c)  Result: _Denied_

    (d)  Date of result (if you know): _2-15-12_

    (e)  Citation to the case (if you know): _____

    (f)  Grounds raised: _Uneffective assistance of trial counsel._
—The evidence is insufficient to sustain these convictions as the
commonwealth failed to prove the defendents guilt or the essential
elements of these crimes beyond a reasonable doubt. — Trial court pre-
trial ruling denying defendent his motion to suppress statement should
result in a new trial — defendent is entitled to a new trial as a
result of the trial courts ruling denying his (defendents) motion for a new
trial based upon the commonwealth failure to disclose the statement
of Alison Ramirez to the defense prior to the start of trial.

    (g)  Did you seek further review by a higher state court?

☑ Yes                     ☐ No

PAE AO 241
(Rev. 05/2018)

Page 6

If yes, answer the following:

(1) Name of court: State Supreme Court of P.A

(2) Docket or case number (if you know): CP-51-CR-0000561-2008

(3) Result: Denied

(4) Date of result (if you know): 7-16-12

(5) Citation to the case (if you know): _____

(6) Grounds raised: The same grounds were raised as they were raised for the Superior court of P.A. (see page 5 9 F)

_____

(h) Did you file a petition for certiorari in the United States Supreme Court?

☑ Yes          ☐ No

If yes, answer the following:

(1) Docket or case number (if you know): CP-51-CR-000056-2008

(2) Result: Denied

(3) Date of result (if you know): 7-16-12

(4) Citation to the case (if you know): _____

(i) Other than the direct appeals listed above, have you previously filed any other petitions, applications, or motions concerning this judgment of conviction in any state court?

☑ Yes          ☐ No

10.  If your answer to Question 10 was "Yes," give the following information:

(a) (1) Name of court: Pro SE PCRA Petition (Criminal Justice Center)

(2) Docket or case number (if you know): CP-51-CR-0000561-2008

(3) Date of filing (if you know): 7-30-13

(4) Nature of the proceeding: Pro SE PCRA

(5) Grounds raised: Counsel John P. Cotter Esq requested an evidentiary hearing under the PCRA alleging ineffective assistance of trial defense counsel at the motion to suppress statement hearing. Defendant informed tric defense counsel of what was done to him by police at the custodial interrogation by the police (Det Nordo) but based on advice of counsel the defendant did not testify. This advise was so unreasonable that it vitiated the defendant's knowing and intelligent decision not to testify in his own defense. what the defendant would have testifi to was that he was sequestered in a holding room without food or water for over 30 hours, that he was not permitted to go to the lavatory and urinated on himself. That his statement was coerced by the police changed the facts stated in the statement and there fore the statement was not true. "(There could be other grounds brought forth to the record but I do not have the records").

PAE AO 241
(Rev. 05/2018

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?

☐ Yes   ☑ No

(7) Result: _Denied    1-6-17_

(8) Date of result (if you know): _1-6-17_

(b) If you filed any second petition, application, or motion, give the same information:

(1) Name of court: _Superior Court_

(2) Docket or case number (if you know): _CP-51-CR-0000561-2008_

(3) Date of filing (if you know): _8-4-17_

(4) Nature of the proceeding: _Pro SE PCRA_

(5) Grounds raised: _The trial court erred in denying appellent an evidentiary hearing when the ⬛ appellant raised a material issue of fact that trial defense counsel was ineffective in advising appellant not to testify at the motion hearing to suppress appellant's alleged confession to police. "(There could be more grounds raised I'm not sure)"._

_____

_____

_____

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?

☐ Yes   ☑ No

(7) Result: _Denied_

(8) Date of result (if you know): _4-16-18_

(c) If you filed any third petition, application, or motion, give the same information:

(1) Name of court: _Supreme court_

(2) Docket or case number (if you know): _Allocatur Docket, 2018 CP-51-CR-0000 61-200_

(3) Date of filing (if you know): _April-23-2018_

(4) Nature of the proceeding: _Petition For allowance of appeal of Petition_

(5) Grounds raised: _Did the trial court err in denying petitioner an evidentiary hearing when petitioner raised a material issue of fact that trial defense counsel was ineffective in advisi the appellant not to testify at the motion to suppress appellant's alleged confession to police._

_"(There could be more grounds raised I'm not sure)"._

PAE AO 241
(Rev. 05/2018

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?

☐ Yes  ☑ No

(7) Result: _____ Denied _____

(8) Date of result (if you know): _ 8/29/18 _

(d) Did you appeal to the highest state court having jurisdiction over the action taken on your petition, application, or motion:

(1) First petition: ☑ Yes   ☐ No

(2) Second petition: ☑ Yes   ☐ No

(3) Third petition: ☑ Yes   ☐ No

(e) If you did not appeal to the highest state court having jurisdiction, explain why you did not:

_____

_____

11. For this petition, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the facts supporting each ground.

**CAUTION:** To proceed in the federal court, you must ordinarily first exhaust (use up) your available state-court remedies on each ground on which you request action by the federal court. Also, if you fail to set forth all the grounds in this petition, you may be barred from presenting additional grounds at a later date.

**GROUND ONE:** Newly Discovered Evidence

_____

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

(Please see Attached pg's For the entire supporting) Facts of Ground one

_____

_____

_____

_____

# Ground one: Newly Discovered Evidence
## (a) Supporting Facts

Detective Phil Nordo Badge #93b, who took the defendants alleged confession has been suspended with intent to dismiss for misconduct and is on the D.A's list of policemen not to call as witnesses. The petitioner believes therefore is that Det Nordo coerced the defendant's alleged confession and that the defendant is entitled to an evidentiary hearing in light of this newly discovered evidence. At the time of the trial courts decision in this case denying the defendant's P.C.R.A petition without an evidentiary hearing on 1-6-17 the information concerning Det Nordo was not known by the trial court nor the defense. Due to this new evidence it raises reasonable doubt to believe that the allegations made by the petitioner are true. The petitioner states that back in the year 2007 while in police custody for the suspected homicide, the defendant was brought to the 25th district and was being interogated by Det Nordo who took the defendant to a observation type holding cell and was placed at this location for many hours without a toilet, running water, food and was continuosl coerced with threats of violence, physically assaulted and was call names such as lowlife, crackhead because of a drug addiction with cocaine and other substance's that the defendant was taken at the time. Now with this newly discovered evidence wher Det Nordo has been suspended with intent to dismiss because of his misconduct abuse of his duty as a law abiding officer

all of the detectives actions can be held into question. There is no way the court's can be certain at one point in time did the detective start this illegal and unethical practise in his career. The statement from the defendant /petitioner taken by Det Nardo cannot be used against the petitioner in light of this new evidence that was obtained. In fact Amil Gonzalez who was a witness for th prosecution that was held at the 25th district at the same time, date as the defendant. (see trial notes Vol 2 pg 82 13-25). Amil testified that he was held in a holding cell very similar to the holding cell that the defendant describes he was beeing held, Amil describes the cell being without toilet and did not have a sink. "The was nothing in there only a little table, that was all" (see trial notes Vol 2 pg  ,90 at 18). Amil was asked by Defense attorny Diamondstein " How long was you held in that cell?" Amils answer was "Two days". (See trial notes Vol 2 pg 90 23-24). Amil also testifies that Det Nardo was one of the officers that came in the cell to interrogate him and was the officer to coerce him by calling him a Liar, hit him and pulled his hair (see trial Vol 2 pg 85, 22 to 23, pg 86, 2 to 21, pg 87, 6 to 14). Amil was also asked by Defense attorny Bruno if he was tired at the time of the interrogation? Amils answer was "I had been there for awhil

Amils testimony at trial sounds very identical to what defendant/petitioner Ramos says Det Nordo did to him. Amil also testified that at some point in time of his interrogation police took him to the holding cell right next door to his cell. At which point police opened the cell door and pointed to the one single man that was held in the room and asked Amil if he had seen this person before.(see trial notes pg 88,18-20 vol . Regardless who this inmate was police did not use proper police procedure and there was defenetly a violation done by them. Petitioner Ramos avers that the man that detectives wanted Amil to identify at the holding cell was in fact the defendant/petitioner himself. This was another violation done by lead det. Nordo and the rest of the officers conducting the interrogation. When counsel for defendant RAMOS, Mr Diamondstein got his turn to cross examine the witness Amil Gonzalez, Diamondstein asked him "When you wer in that cell, the holding cell, could you see the person they late asked you if you knew? Amils answer was "no because they too me out of the little room and they took me over there and they asked me do you know him, and I said no, and they took me back to the little room" (see trial notes vol 2 pg 91, 2-10 )Mr Diamondstein also asked Amil "When they took you out, the male that they showed you and asked you if you knew, is it this guy? (indicating Petitioner/defendant Ramos ) Amils answer was " when they showed him to me, he was completly shaved. He didn't have" okay, like " I then wasn't sur

They just told me, do you know him. — and I say no, and they took me back. (note: at trial the petitioner did not loo as he did at the time of the homicide, defendant Ramos grew his hair into a Afro style and was heavier set). So Mr Diamondstein brought to evidence what was marked as D-1 arres photo of defendant Ramos that was taken on 1-5-07, because this photo best described Ramos at the time of his arrest for the homicide. (see trial notes Vol 2 pg 92, 12-23) This arrest photo better described the man that witness Amil Gonzal states police showed him at the holding cell. Arrest photo D-1 described the petitioner totally shaved as Amil Gonzalez described the man in the holding cell. Although after questioning Amil about the photo he could not positively Identify defendant Ramos as the man that detectives asked if he knew in the holding cell. Amil states" Truly they pass me by really fast. But I know that the hair was like that in the picture. (see tria notes Vol 2 pg 93, 12-14). Mr Diamondstein asked Amil "So you are saying you can't be sure that is the person that you saw." Amil answer was " This happened a long time ago, and they showed it to me for a half a minute. (see trial notes vol 2 pg 93 15-20) Mr Diamondstein continued his cross examinatio and asked Amil about the person he saw being held. "Do you reca about the person you saw beeing held? Meaning was he in a comfortable chair, was he in a cell, was he in a room like the one you and been in? (trial notes pg 93, 21-24) Amils answer was " He was in a

same type of room were I was (see trial notes vol 2 pg 13 & 25, pg 94-

Mr Diamondstein ask Amil if there was any toilet in the room. "There
was no toilet. But I assume that since it was next to me, It is the
same Kind of room. He was sitting in a chair." Mr Diamondstein Finished
his cross examination by asking the witness. "And the entire time
that you were in custody, you were never fed?" Amil Gonzalez
answer was "NO. They did'nt give me anything." (see trial notes
vol 2 pg  94 7-9). After reviewing the Newly discovered evidence
about Det Phil Nordo's suspension, the very similar testimony
that the prosecutions only eye witness Amil Gonzalez Delgado
gives about the way Det Nordo and the rest of the lead
detectives treated him while being held for questioning, the way
he was housed at the time, the lack of food he was given, the
way he was physically assaulted by Det Nordo, his lavatory
arrangements or lack there of. Although witness Amil Gonzalez
could not positively identify the petitioner as the man who
Detectives took to see when they asked the witness while being
escorted to the holding cell right next door if he knew this guy
It is highly possible with how the witness Amil Gonzalez
described the mans hairstyle, the time and date, Location where
the witness was housed, his lavatory arrangments or Lack there of,
the way he was fed all that plus physicall abuse by Det
Nordo all match the way Defendant Jesus Ramos PP#100301
State # JG5518 states he was treated by detectives
mainly Det Phil Nordo. The witness Amil Gonzalez
and the defendant/petitioner Jesus Ramos do not

about each other's statements. They both made very similar allegations about Det Nordo if it were not true. Any and all of Detective Phil Nordo Badge # 936 actions and involvment in the handling of this case should be withdraw from the records. Detective Nordo was untruthful under oath when he was asked by D.A Mark Gilson if "At any time that you were speaking to Mr Ramos that night, did you threaten him to waive his miranda rights and answer any of your questions and ultimatley give this statement and sign it". Det Nordo answered "No". (See trial notes vol2 pg 157, 1-7). Det Nordo was untruthful when he was asked by D.A Gilson Amil Gonzalez testified that while he was in East Detectives, just prior to beeing interviewed by Detective Gonzalez at midnight on 1-5-07, you went into the room that he was in and hit him and pulled his hair. Detective Nordo, did you do that! did that ever happen? Nordos answer was "NO". (SEE trial note Vol2 pg 158 9 to 17). IF Det Nordo was with witness Amil Gonzalez at or around midnight on 1-5-07 as the witness states. (see trial notes Vol2 pg 158; 9-18) Then Det Nordo was untruthful once again when D.A Gilson asked Det Nordo "on the evening OF 1-4-07 between the hours of ten p.m and untill the date OF 1-5-07 at 1:25AM, who were you with and where were you?" Det Nordos answer was "I was talking to Jesus Ramos in EAst detectives". (trial notes pg 158, 18-22). clearly Det Nordo must have stoped the interview with defendant Ramos at some time around midnight of

1-5-07, because Detective Nordo & Aitken were in two places at the same time. But when asked by D.A Gilson "Between the hours of ten p.m when you started given the miranda warnings and up until the completion of Mr Ramos statement at 1:25 a.m, would you have been with him that entire time taking this interview Nordo answers" yes, absolutely." (see trial notes pg 157 20 to pg 158 1 to 2). Detective Nordo also testified under oath that Detective Ronald Aitken Badge # 955 was present as a witness during the entire interview conducted on the petitioner Mr Diamondstein asked Det Nordo "But very clearly from the beginning of the statement at ten o'clock untill the statement ended at 1:25 a.m you were there, yes? Nordo answers "yes" And Aiken was there? "I believe so, yes" (see trial notes vol 2 pg 162 23 to 25, pg 163 1 to 5). In Fact Det Nordo was asked multiple times by Mr Diamondstein and D.A Gilson iF Det Aitken was with him during the entire interview conducted on defendant Ramos and every _ time the detective says "yes" (see trial notes vol 2 pg 159, 12-24, pg 160, 0-25, pg 161, 21-23, pg 162, 23-25, pg 163, 1-5) pg 167, 13-17, pg 168 7-9, pg 169, 21-23, pg 179, 15-18, pg 186, 14-16). But it was clear from a police interview conducted on witness Amil Gonzalez on 1/5/0 at midnight by a Det Gonzalez badge # 930, Det Aitken was present at this interview as a police witness. (see statement taken from eye witness Amil Gonzalez)(see trial notes pg 186, 6 to 14). So Detective Nordo was caught once again being untruthful when he states that Det Aitken was present for the entire interview that was

vidence, U... ...ing ...ce he was conducting his interview on eye witness Amil Gonzalez

t the same exact time Nordo claims that Aitken was with him while he was conducting his interview with defendant Ramos. (Det Aitken was not present at trial becaus he was on vacation)(see trial notes) In Fact Det Gonzalez was called as a witness to testify by D.A Gilson and was asked by Gilson" How it came to be that you were nterviewing Amil Gonzalez inside of the East Detectives division on that date at that time? Det Gonzalez's answer was " Your Honor, on that date I was working S.I.U. We were doing our own investigations when I was pproached by Det Aitken, who asked me if I could onduct **or** do an Interview for him from a witness who poke spanish, and I said I would. (see trial notes pg 105 4 to 19). D.A Gilson also asked detective Gonzalez "Now, other hen you and Amil Gonzalez, was there any other person during re interview?" "Det Gonzalez answered " Det Aitken, myself and mil Gonzalez. (see trial notes pg 107, 2 to 7). So it is clear y the testimony from Detective Gonzalez, Det Aitken was onducting his own police interview on Amil Gonzalez at the ame time and date Det Nordo says that Det Aitken vas with him during the entire police interview being onducting on defendant Ramos. Det Nordo was obviously

not telling the \_\_\_\_\_ \_\_\_\_\_ \_\_\_\_\_ reasons plus the Newly Discovered Evidence about the misconduct and suspension of Detective Phil Nordo from the police force of Phila P.A, any and all evidence that Detective Nordo produced in this case should be withdrawn from the record and Defendant/petitioner Jesus Ramos should recieve a New Trial with the interest of Justice in mind.

PAE AO 241
(Rev. 05/2018)

Page 9

(b) If you did not exhaust your state remedies on Ground One, explain why: _Newly Discovered_ _evidence that was obtained sometime in_ _March 2018._

(c) **Direct Appeal of Ground One:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

☑ Yes      ☐ No

(2) If you did not raise this issue in your direct appeal, explain why? _____

_____

_____

(d) **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☑ Yes      ☐ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: _Superior Court_

Name and location of the court where the motion or petition was filed: _Superior Court_ _of P.A_

Docket or case number (if you know): _no 289 EDA 2017_

Date of the court's decision: _4-16-18_

Result (attach a copy of the court's opinion or order, if available): _Denied_

(3) Did you receive a hearing on your motion or petition?      ☐ Yes      ☑ No

(4) Did you appeal from the denial of your motion or petition?      ☑ Yes      ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?

☑ Yes      ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _Supreme Court_

Docket or case number (if you know): _CP-51-CR-0000561-2008_

Date of the court's decision: _8/29/18_

PAE AO 241
(Rev. 07/10)

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(7)   If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this

issue: _____

_____

_____

_____

_____

_____

(e)   **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies,
etc.) that you have used to exhaust your state remedies on Ground One: _____

_____

_____

**GROUND TWO:** Ineffective Assistance of Counsel

_____

(a)   Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

please see Attached pages for the complete
supporting facts of ground two

_____

_____

_____

_____

_____

_____

(b)   If you did not exhaust your state remedies on Ground Two, explain why: First opportunity
to raise this issue.

_____

_____

(c)   **Direct Appeal of Ground Two:**

(1)   If you appealed from the judgment of conviction, did you raise this issue?

☐ Yes        ☐ No

Ineffective Appellate Counsel
Ground two

(a) Supporting Facts

Court appointed counsel for the Appellant, John P Cotter was ineffective for failing to raise all of the appellants issues that pertained to the petition for Newly discovered evidence about the misconduct and suspension of Detective Phil Nordo Badge #936. Although Counsel Cotter did raise this issue in behalf of the appellant to the superior court, counsel failed to properly explain the reasons why this Newly discovered Petition entitles appellant to a evidentiary hearing and why it should be remanded back to the lower court for the lower court to decide whether or ___ not in light of the recently released information concerning the misconduct of Detective Nordo, Petitioner would be entitled to an evidentiary hearing in this matter. Counsel should have raised the statement of eye witness Amil Gonzalez who testified that Detectives Nordo assaulted him while he was being interrogated and placed in a holding cell without toilet, water or food. Amils testimony was significant to mention because it tells very similar action of events as the way petitioner states Detective Phil Nordo #936 conducted himself while interogating him. Counsel John P Cotter could had also raised the fact that Det. Aitken (a officer that Detective Nordo claims was present with him during the entire police interview conducted on the defendant/petitioner

That claimed that was in the Statement of Amil Gonzalez Delgado. Detective Aitken was mentioned by Detective Gonzalez Badge # 930 on the First page and First line F the statement of Amil Gonzalez Delgado. Were it says "I'm Detective Gonzalez and this is Detective Aitken. (See First page, first line of the statement of eye witness Amil Gonzalez Delgado.) Clearly there was many issues pertaining to the Newly Discovered Evidence that Appellants counsel could have easily raised o make it clearer to the Superior court that a evidentiary hearing was necessary. For these reasons petitioner prays that this ground for Ineffective assistance of counsel should be Granted.

PAE AO 241
(Rev. 07/10)

(2)  If you did not raise this issue in your direct appeal, explain why? _____

_____

_____

**(d)  Post-Conviction Proceedings:**

(1)  Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☐   Yes       ☐       No

(2)  If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

(3)  Did you receive a hearing on your motion or petition?          ☐   Yes       ☐   No

(4)  Did you appeal from the denial of your motion or petition?     ☐   Yes       ☐   No

(5)  If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?

☐ Yes      ☐ No

(6)  If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(7)  If your answer to Question (d)(4) or Question (d)(5) is  "No," explain why you did not raise this issue: _____

_____

_____

_____

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Two: _____

_____

_____

_____

**GROUND THREE:** Prosecutorial Misconduct

_____

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

Please see Attached pages for the complete supporting facts of Ground three

_____

_____

_____

_____

_____

(b) If you did not exhaust your state remedies on Ground Three, explain why: _____

_____

_____

_____

(c) **Direct Appeal of Ground Three:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

☑ Yes          ☐ No

(2) If you did not raise this issue in your direct appeal, explain why? _____

_____

_____

(d) **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☑ Yes          ☐ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: P.C.R.A and at Trial court.

Ground Three:

(a) Supporting Facts

        D.A Mark Gilson witheld evidence pertaining infor-mation that witness Alison Ramirez shared with him about alleged confessions made by the defendant/petitioner about beeing the actual shooter in the homicide and not the driver as the majority of the evidence suggest. Ms Ramirez states that the defendant while on a visit in the county Jail stated to her that he switched positions from driver to passenger of the toyota Camry before the two individuals arrived at the scene. Ms Ramirez then states that the petitioner confessed to being the shooter that led to the homicide death of victim Marco Martinez. (See trial notes pg 126, 5 to 19, pg 128, 20 to 25, pg 129, 1 to 19) All of these allegations were made to Mr Gilson prior to trial and was not disclosed to the Defense or the court until the actual day of Trial (8/5/A). Attorny for the petitioner Michael Diamondstein Esq raised a Motion for Mistrial due to not beeing notified in writing by the prosecution about the new evidence when the information was obtained. (see trial notes pg 130 at 25, pg 131, 1 to 25, pg 132, 1 to 24). Mr Diamondstein states "Those are statements that my client made whether Mr Gilson heard it Mon, Sat, Sun, Fri he's got to tell me as soon as he hears that. Mr Gilson has my cell number and has used it repeatedly, and as such Judge

een turned over to me, and therefore it is prosecutorial misconduct not to
urn it over to me. I would ask you for a mistrial. (see trial
otes pg 132, 1 to 24) Judge Shelley Robins New denied the motion
see trial notes pg 147 19 to 22). D.A Gilson testified that the reason
shy he did not advise the defense about the additional admissions
llegedly made by the defendant was because Ms Ramirez was being
rreatened, coerced, and confronted by the defendants family repeatedly
er the course of the last couple of years. That they had on several occasions
essence kidnapped her when she was supposed to have came to
ourt. (trial notes pg 133, 19 to 25, pg 134, 1 to 6). Mr Diamondstein responds to these
llegations with "This is 2009 there is 7,000 police officers. They got an
ntire staff of homicide detectives, and homicide prosecutors that are
itbulls, If they had any information that this girl had been threatened, cell
rone records, a 48, nothing. This homicide was two and a half years ago,
e threats we hear are the day in court, in my opinion to cover the com-
onwealth from turning over evidence that they should have turned
er. There is not one piece of document, not one documentary piece of
vidence, not one cell phone record, nobody to say that this girl has
otten threatened. That is with all due respect to the commonwealth,
nat is just garbage." (See trial notes pg 142, 1 to 19). For this reason the
osecution thought it was necessary to put Ms Ramirez up in a hotel,
nen relocate her to a undisclosed location. Mr Diamondstein then asks
Is Ramirez "Did you ever tell D.A Mark Gilson that you have

been kidnapped on this case. Ms Ramirez answered that (see trial notes pg 183, 1 to 4). Ms Ramirez totally denies that a kidnapping ever took place and further explains in her testimony that the only thing that happened was when I was supposed to come to court that time for ----- to testify against him. His mom went to his house and she took us all day, so I wouldn't come to court. That is --- now he's (Mr Gilson) saying that they kidnapped me." (See trial notes pg 183 22 to 25, pg 184, 1 to 3) Mr Diamondstein asked Ms Ramirez "She didn't threaten you?" She answered "No, but she took me out of the house"" (see trial notes pg 185, 10 to 11) Mr Diamondstein then

id she, while she was taking your family shopping at the Dollar store, did she threaten you and say you can't go to court? Ms Ramirez answered "No" (See trial notes pg 187, 8 to 11) In fact Ms Ramirez stated that she has not heard from any of the defendants family at all in over a year from the date of trial (8/5/09) (see trial notes pg 189 13 to 16). That means there could be no threats made to Ms Ramirez and there should not be any valid reason to withhold evidence from the defense. In addition Counsel Diamondstein asked the witness Ms Ramirez about the rented house that the prosecution obtained for her and made the deposit including the first couple months rent on her behalf. (See trial notes 197, 11 to 25, pg 198 1 to 5) "What kind of home do you think you are going to get?" (See trial notes

pg 193, 23 to 2 45. After being very reluctant and having the judge remind her that she is under oath and must testify as to the size of the house that she will be moving to. (See trial notes pg 192, 4 to 21) Mr. Diamondstein asks Ms. Ramirez "What do you think your getting?" Ms. Ramirez answers" Three bedroom house." Mr. Diamondstein then asks Ms. Ramirez "Your own three bedroom house?" "Her answer" Yes". (see trial notes pg 194, 2 to 15). Clearly witness Alison Ramirez was a opportunist and was more likely then not, persuaded by the generosity from the prosecution. She was moved along with her kids to a three bedroom house from a low class enviroment to a middle class upgrade. Clearly there was a insintive by both witness and prosecutors. At closing Argument 2. A Mark Gilson did not seem too convinced with Alison Ramirez's testimony at trial pertaining to the defendants confession to being the actual shooter of the homicide and not the driver because Mr Mark Gilson goes on to explain to the court as to his own personal theory as to why the defendant/petitiner allegedly confessed to his estranged girlfriend Alison Ramirez about him beeing the shooter. Mr Gilson states" So you have to ask yourself then what was the purpose of those admissions to Ms Ramirez" And I would submit to the court that there might be a couple reasons why he said that. (See trial notes pg 249, 1 to 3)" One of those reasons might be that he wanted to intimidate Ms Ramirez to believe that he was the killer or shooter, so that she would no longer co-operate with the police or testify against him. Perhaps also the opposite, not to put fear into her or to intimidate her, but in some warped way perhaps to impress her, that hes the real deal, hes

i mans man, that he would step up and offend - I don't know maybe he thinks that is something that she would find attractive bout him. (see trial notes pg 249, 6 to 18) Mr Gilson seems to believe hat the allege confessions made by the defendant to Ms Ramirez bout beeing the shooter of the homicide were not true because .A Mark Gilson goes out of his way at closing argument to xplain to the Judge reasons why the defendant were to tell ls Ramirez that he was the shooter and not the getaway driver ke the majority of the evidence suggest. Mr Gilson seems to ake more credibility the statement of eye witness Amil Gonzalez ho states the opposite story from what the defendants trange girlfriend states happen. It is clear to come to the onclusion that D.A Gilson does not hold the testimony of Alison lamirez as substantive evidence as he seems to favor the tatement of witness Amil Gonzalez as so. Mr Gilson seems to e using both eye witness Amil Gonzalez and Ms Ramirez's estimony as evidence in some ploy to cover both ends of us case. Basicly if defendant Ramos is not the shooter hen hes the driver, in both conclusions the defendant will he convicted. (see trial notes at closing Argument for D.A Mark Gilson g 250, 20 to 22). D.A Mark Gilson withheld evidence from he defense untill the day of trial. Mr Gilson's excuse for doing so was because witness Ms Ramirez allegedly tated to him that she was beeing threatened and at some oint even kidnapped by the defendants family. Ms Ramirez

estified on cross examination that she was never bribed or threatened by the family and in fact has'nt had any contact with any of the defendants family for over a year since the day of trial. The prosecution lead by D.A Mark Gilson had the defendants estrang girlfriend witness Alison Ramirez put up in a hotel then relocated to a new three bedroom house at a undisclosed location because of all the alleged threats made by the defendants family. At trial Ms Ramirez testified for the court stating these threats and kidnapping never happened. The violation not was done in many aspects by the prosecution especially he handling of witness Alison Ramirez. the petitioner prays that the ground for Prosecutorial Misconduct be Granted -

Also District Attorny Mark Gilson has been fired as assistant district attorny of Phila P.A for reasons unknown to the petitioner.

PAE AO 241
(Rev. 07/10)

Page 13

Name and location of the court where the motion or petition was filed: Criminal Justice Center 1301 Filbert St Phila P.A 19107

Docket or case number (if you know): CP-51-CR-0000561-2008

Date of the court's decision: 1-6-17

Result (attach a copy of the court's opinion or order, if available): Denied

(3) Did you receive a hearing on your motion or petition?  ☐ Yes  ☑ No

(4) Did you appeal from the denial of your motion or petition?  ☑ Yes  ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?
☑ Yes  ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: Superior Court of P.A

Docket or case number (if you know): CP-51-CR-0000561-2008

Date of the court's decision: 4-16-18

Result (attach a copy of the court's opinion or order, if available): Denied

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this
issue: _____

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies,
etc.) that you have used to exhaust your state remedies on Ground Three: Supreme Court
of P.A.
Denied 8/29/18

**GROUND FOUR:** _____

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

PAE AO 241
(Rev. 07/10)

_____

_____

_____

_____

(b)  If you did not exhaust your state remedies on Ground Four, explain why: _____

_____

_____

_____

_____

(c)  **Direct Appeal of Ground Four:**

    (1)  If you appealed from the judgment of conviction, did you raise this issue?

        ☐ Yes    ☐ No

    (2)  If you did not raise this issue in your direct appeal, explain why? _____

        _____

        _____

(d)  **Post-Conviction Proceedings:**

    (1)  Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

        ☐ Yes    ☐ No

    (2)  If your answer to Question (d)(1) is "Yes," state:

        Type of motion or petition: _____

        Name and location of the court where the motion or petition was filed: _____

        _____

        Docket or case number (if you know): _____

        Date of the court's decision: _____

        Result (attach a copy of the court's opinion or order, if available): _____

        _____

    (3)  Did you receive a hearing on your motion or petition?    ☐ Yes    ☐ No

    (4)  Did you appeal from the denial of your motion or petition?    ☐ Yes    ☐ No

PAE AO 241
(Rev. 07/10)

Page 15

    (5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?

          ☐ Yes     ☐ No

    (6) If your answer to Question (d)(4) is "Yes," state:

        Name and location of the court where the appeal was filed: _____

        _____

        Docket or case number (if you know): _____

        Date of the court's decision: _____

        Result (attach a copy of the court's opinion or order, if available): _____

        _____

        _____

    (7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue: _____

        _____

        _____

        _____

  (e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Four: _____

    _____

    _____

    _____

    _____

    _____

12.    Please answer these additional questions about the petition you are filing:

  (a) Have all grounds for relief that you have raised in this petition been presented to the highest state court having jurisdiction?

    ☑ Yes     ☐ No

    If your answer is "No," state which grounds have not been so presented and give your reason(s) for not presenting them: _____

    _____

    _____

    _____

PAE AO 241
(Rev. 07/10)

Page 16

(b) Is there any ground in this petition that has not been presented in some state or federal court? If so, which ground or grounds have not been presented, and state your reasons for not presenting them:

NO

13. Have you previously filed any type of petition, application, or motion in a federal court regarding the conviction that you challenge in this petition?

☐ Yes   ☑ No

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, the issues raised, the date of the court's decision, and the result for each petition, application, or motion filed. Attach a copy of any court opinion or order, if available. _____

14. Do you have any petition or appeal now pending (filed and not decided yet) in any court, either state or federal, for the judgment you are challenging?

☑ No

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the issues raised: Supreme Court of PA No. 289 EDA 2017

CP-51-CR-0000561-2008

15. Give the name and address, if you know, of each attorney who represented you in the following stages of the judgment you are challenging:

(a) At preliminary hearing: Michael J. Diamondstein P.C Suite 900 (ESq) two Penn Center Plaza J.F.K Blvd Phila P.A 19102

(b) At arraignment and plea: Michael J. Diamondstein (ESq)

PAE AO 241
(Rev. 07/10)

Page 17

(c) At trial: Michael J. Diamondstein Esq

(d) At sentencing: Michael J Diamondstein Esq

(e) On appeal: Mitchell scott Strutin Suite200 two penn Center 1500 JFK Blvd Phila PA 19102

(f) In any post-conviction proceeding: John P. cotter, Esq 2541 S. Broad St Phila, PA 19148

(g) On appeal from any ruling against you in a post-conviction proceeding: John P. Cotter, Esq 2541 S. Broad St. Phila PA 19148

16.    Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging?

☑ Yes          ☐ No

(a)   If so, give the name and location of the court that imposed the other sentence you will serve in the future: Criminal Justice Center 1301 Filbert St

(b)   Give the date the other sentence was imposed: 11/3/09

(c)   Give the length of the other sentence: 8½ to 17yrs

(d)   Have you filed, or do you plan to file, any petition that challenges the judgment or sentence to be served in the future?

☑ Yes          ☐ No

17.    **TIMELINESS OF PETITION:** If your judgment of conviction became final over one year ago, you must explain why the one-year statute of limitations as contained in 28 U.S.C. § 2244(d) does not bar your petition*

PAE AO 241
(Rev. 07/10)

Page 18

* The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2244(d) provides in part that:

(1)     A one-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State Court. The limitation period shall run from the latest of -

(A)  the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B)  the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such state action;

(C)  the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D)  the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2)     The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

Therefore, petitioner asks that the Court grant the following relief: A vacate of sentence, A new trial or any relief given by the Judge.

or any other relief to which petitioner may be entitled.

Jesus Ramos    Pro-se  Jesus Ramos
Signature of Attorney (if any)    JG-5518

PAE AO 241
(Rev. 07/10)

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Petition for Writ of Habeas Corpus was placed in the prison mailing system on _10/30/18_ .

*(month, date, year)*

Executed (signed) on _Jen Nann_ _10/30/18_ (date).

_____

*Signature of Petitioner*

If the person signing is not the petitioner, state the relationship to petitioner and explain why petitioner is not signing this petition. _____

_____

_____

_____

_____

# Table of contents
## (what is included in this petition)

First - A copy of the petition to remand to trial court or consideration of newly discovered evidence to the superior court. Filed by John P. Cotter Esq

Second - Statement of witness - Amil Gonzalez

Third - Phila Police Arrest report

Forth - Biographical information report

Fifth - Copy of signed document by petitioner refusing to comply to questioning

Sixth - Arrest Photo D-1

Seventh - statement of petitioner

Eigth - Statement of witness Alison Ramirez

Ninth - trial notes

Tenth - copy of (PCRA)

COTTER & MILLER
BY: JOHN P. COTTER                    ATTORNEY FOR APPELLANT
ID#20166
2541 S. BROAD St.
PHILA., PA 19148
(215)336-0343

---

COMMONWEALTH OF PENNSYLVANIA, : SUPERIOR COURT
            APPELLEE         OF PENNSYLVANIA

         VS            NO 289 EDA 2017
JESUS RAMOS,
        APPELLANT

---

**PETITION TO REMAND TO TRIAL COURT FOR CONSIDERATION OF NEWLY DISCOVERED EVIDENCE**

TO THE HONORABLE JUDGES OF SAID COURT:

Petitioner, John P. Cotter, Esq., Attorney for Appellant, respectfully represents:

1. He is court appointed attorney for the appellant.

2. This matter is now pending before Panel Number 05 of this Honorable Court

3. Counsel has recently learned that Detective Phil Nordo who took the appellant's alleged confession has been suspended with intent to Dismiss for misconduct and is on the DA's list of policemen not to call as witnesses. The Appellant believes therefore avers that this list of names was released by the DA's office sometime in March 2018.

4. The issue that is before this court is that Detective Nordo coerced the defendant's alleged confession and that the defendant is entitled to an evidentiary hearing on whether trial defense counsel was ineffective for not calling the defendant/appellant as a witness at the suppression hearing.

4. At the time of the trial court decision in this case denying the defendant's PCRA Petition without an evidentiary hearing on1-6-17 the information concerning Detective Nordo was not known by the trial court nor the defense.

4. The matter should be remanded to the trial court in the interests of justice, so that trial court can make a decision if the defendant is entitled to an evidentiary hearing in light of the information recently found out by the defendant concerning Detective Phil Nordo.

5. Appellant is presently serving his sentence. This petition is not made for the purpose of delay.

WHEREFORE, Petitioner prays that this Honorable Court remand the matter to lower court for the lower court to decide whether or not in light of the recently released information concerning the misconduct of Detective Phil Nordo, the defendant would be entitled to an evidentiary hearing in this matter.

                RESPECTFULLY SUBMITTED,

                JOHN P. COTTER, ESQ.
                ATTORNEY FOR APPELLANT



# Philadelphia Police Department

| | |
|---|---|
| **EVENT#:** | 181795088 |
| **PID#:** | 1025147 |
| **NAME:** | AMIL |
| | GONZALEZ |
| **ARREST DATE:** | Oct 26 2006 12:13AM |
| **AGE AT ARREST:** | 25 |
| **HEIGHT:** | 508 |
| **WEIGHT:** | 120 |
| **HAIR COLOR:** | BLACK |
| **EYE COLOR:** | BROWN |

**Phil**
**Arrestee DATABASE**



FOR INVESTIGATION ONLY
NOT FOR IDENTIFICATION
DESTROY AFTER 90 DAYS

Printed Philadelphia PD:  1/5/2007 6:12 P.M.

| CASE NO. 07-24-703 | | | | | | |
|---|---|---|---|---|---|---|
| INTERVIEWER: DET. GONZALEZ #930 | | | | | | |

| NAME: Amil Gonzalez Delgado | AGE: 26 | RACE: Hisp | SEX: Male | | DOB: 11-30-80 | |
|---|---|---|---|---|---|---|
| ADDRESS: 2837 Swanson St. | APT. NO. House | | | PHONE: ███████ | | |
| NAME OF EMPLOYMENT/SCHOOL: ██████████ | | | | SOC. SEC. NO.: | | |
| ADDRESS OF EMPLOYMENT/SCHOOL: | DEPARTMENT | | | PHONE NO. | | |
| DATES OF PLANNED VACATIONS. | | | | | | |
| DATES OF PLANNED BUSINESS TRIPS | | | | | | |
| NAME OF CLOSE RELATIVE. | | | | | | |
| ADDRESS: | | | | PHONE NO | | |
| PLACE OF INTERVIEW. EAST DETECTIVE DIVISION | | | DATE 01/05/07 | | TIME. 12:00AM | |
| BROUGHT IN BY: | | | DATE | | TIME: | |
| WE ARE QUESTIONING YOU CONCERNING | | | | | | |
| WARNINGS GIVEN BY. | | | DATE | | TIME: | |

| ANSWERS: (1) | (2) | (3) ---- | (4) () FORMTE XT () ---- | (5) () FORMTE XT () ---- | (6) () FORMTE XT () ---- | (7) () FORMTE XT () ---- |
|---|---|---|---|---|---|---|
| | | | | | | |

I'm Detective Gonzalez and this is Detective Aiken.

Q. Amil, can you tell me what you may know about the shooting that occurred today 1/3/07, inside your residence at 2837 Swanson St. some around 12:29PM?

A. I was walking home to my house at 2837 Swanson st coming from the store from Swanson & Somerset St. I saw Marco walking towards me from the other end of Swanson St.

Q. Where exactly did you see Marco at on Swanson when you seen Him?

A. He was almost at my house, maybe one or two house away.

Q. What happened next?

A. Then I saw a Burgundy car coming up Swanson from Somerset Street. It was traveling at a high rate of speed. Then the car stopped in front of my house and the front passenger got out of the car. As soon as the guy got out of the car Marco ran into my house and closed the front door. The guy with the gun stood by the Burgundy car and fired one time at the front door but, the gun mis fired and then he fired two more gun shots at the front door of my

house.  The guy then jumped back into the car and they took off up Swanson St then turned left a t the end of the block.

Q. How far away where you when you observed this male shooting at your house?

A. I was about four to five house away from my house.

Q. What happened next?

A. I ran to my house and tried to open the front door but, I couldn't because something was stopping the door from opening. I kept pushing the front door and when I finally open the door I saw Marco inside my house lying in front of the door.  He was facing up with a lot of blood around him.  I yelled out to my girlfriend (Aurelia Delgado) "they shot Marco, call the cop."  When the cops came I told them that Marco was inside my house, a few minutes later the ambulance came and took Marco to the Hospital.

Q. Was Marco Conscious when you saw him lying on the floor of your house?

A. No, his eyes and his mouth were open but, he was unconscious

Q. Amil, I've just shown you a photo array, did you recognize anyone in the photo array?

A. Yes, Photo number (6) six. (Indicating PPN# 1005215, name Carlos Ruiz)

Q. Can you tell what you saw this male do during the shooting?

A. He's the guy who got out of the Burgundy car and shot at my house.

Q. Are you certain the male you just identified was the person fired a gun at your residence?

A. Yes.

Q. Do you know this male?

A. I seen him driving around in the neighborhood a couple of times, I heard some people calling him by the name of "Dominicano"

Q. Can you describe the gun he used?

A. It was a big nickel plated gun.

Q. How long after Marco entered your house did this male fire into your house?

A. Real fast, about two seconds after Marco closed the door.

Q. Can you describe the burgundy car?

A. I was a Toyota Camry, the kind with the square trunk.

Q. Can you describe the driver of the vehicle?

A. He was dark skin H M about my age (26years) he pulled up real fast and I didn't get a good look at him, plus I was watching Dominicano shooting.

Q. Do you know why the male you knew as Dominicano was shooting at Marco?

A. I'm not sure but, about two months ago Marco, myself and two other guys got into a fight with Dominicano over some stupid thing then his wife came around Swanson St that same night and told us it was all right and that it was over

A. I'm not sure it was with one of the other guys.

Q. Is there anything thing else you may want to add to your statement at this time?

A. That's all.

Q. Amil, I'm going to read your statement to you and if it's correct, I want you to sign it.

Yes, its correct.

Amil Gonzalez



Printed Philadelphia PD:        1/3/2007  0:12 A.M.





Philadelphia Police Department

Q. Do you know what the fight was over?

A. I'm not sure it was with one of the other guys.

Q. Is there anything thing else you may want to add to your statement at this time?

A. That's all.

Q. Amil, I'm going to read your statement to you and if it's correct, I want you to sign it.

Yes, its correct.

Amil Gonzalez
1-5-07

# *Philadelphia Police Department Arrest Report*

| | | | | | | **Page 2 of 2** *PARS* |
|---|---|---|---|---|---|---|

Defendant: last name: **RAMOS**

first name: **JESUS**

middle initial:

Sex: Male    Race: White    SSN: · ·    DOB: 09/10/1982    Birth Place: Philadelphia

**ARREST REPORT BY:**
220858  GRAF FRANCIS IV

Badge  Description
9066  59 East Detective Division

Unit Id  Platoon  Squad  Group Id
0       7       0

**ARREST REPORT APPROVED BY:**

Supervisor- payroll no:  MILLER JAMES A JAMES       183063    Approval Code: Approved

**POLICE PERSONNEL:**

| Employee Name | Payroll Number | Badge | Dist/Unit | Platoon/Group | Vacation Dates | Vacation Description | Needed At Hearing Police/Sup | Arrest Ofc. |
|---|---|---|---|---|---|---|---|---|
| AITKEN RONALD | 202267 | 955 | 59/0 | 7 0 | | | N / N | Y |
| GRAF FRANCIS IV | 220858 | 9066 | | 0 | | | N / Y | N |
| LUCKE THORSTEN THORSTEN | 223875 | 880 | 60/3 | 3 A | | | Y / R | N |
| NORDO PHILIP | 228042 | 935 | 59/0 | 7 0 | | | N / N | N |

**ADDITIONAL INFORMATION:**

Hits: Y    Statement?: Y    Lab User Fees Requested?: N    ADA Concerns?:

**EMPLOYER INFORMATION:**

Occupation: UNEMPLOYED    Employer: N/A

0000 0 unknown 00 APT/Suite: 0000 Philadelphia PA  .    Phone: 215-000-0000

**DESCRIPTIVE DATA:**

| | | | | |
|---|---|---|---|---|
| Complexion | CLEAR | | Eye Characteristics | HAZ |
| Eye Color | NORMAL | | Facial Hair | GOATEE |
| Glasses (Y=Yes) | 0 | | Hair Color | BLK |
| Hair Length | ABOVE EARS | | Hair Style | STRAIGHT |
| Teeth | NORMAL | | | |

**Appended Text**

ON THURSDAY JANUARY 4TH, 2007, THE VICTIM WAS PRONOUNCED DEAD INSIDE TEMPLE
UNIVERSITY HOSPITAL AT 2:55 PM BY DR. RAY,
A POST MORTEM EXAM PERFORMED BY DR. MCDONALD DETERMINED THAT THE CAUSE
OF DEATH WAS A GUNSHOT WOUND TO THE HEAD AND THE MANNER OF DEATH WAS
HOMICIDE.
ON SATURDAY JANUARY 6TH, 2007, SGT. COONEY CONFERRED WITH ADA PONTERIO AS
TO ALL THE ASPECTS OF THE INVESTIGATION AND SHE APPROVED THE CHARGES OF
MURDER, PIC, VUFAS AND CRIMINAL CONSPIRACY FOR THIS DEFENDANT.

# BIOGRAPHICAL INFORMATION REPORT

☑ ARREST   ☐ INVESTIGATION   ☐ OTHER

*(CHECK BLOCKS WHERE DOCUMENTATION EXISTS)*

PHILADELPHIA POLICE DEPARTMENT

| DATE | TIME | LOCATION OF INITIAL CONTACT | DISTRICT | D.C. NO. |
|---|---|---|---|---|
| 7-4-07 | 12:00 AM | 3901 Whitall | 25 | 07-25-000698 |

| NAME | | | D.O.B. | SEX | RACE |
|---|---|---|---|---|---|
| *Last* Ramos | *First* Jesus | *Middle* | 7-10-82 | M | W |

| HEIGHT | WEIGHT | HAIR COLOR | EYE COLOR | COMPLEXION | BUILD | GLASSES (YES/NO) | FACIAL HAIR |
|---|---|---|---|---|---|---|---|
| 5'7" | 130 | Blo. | Blo. | Dark | Thin | N | |

| NICKNAME | ALIASES | MARITAL STATUS |
|---|---|---|
| Fresh | | |

| RESIDENCE: STREET NUMBER/NAME | CITY/STATE (OTHER THAN PHILA.) | DIST. |
|---|---|---|
| | | |

| TYPE OF RESIDENCE | RESIDES WITH | DRIVER NUMBER | STATE |
|---|---|---|---|
| | 2124 Waterloo St. | | |

| SOCIAL SECURITY NUMBER | OCCUPATION | EMPLOYER/ADDRESS |
|---|---|---|
| | | |

| PLACE OF BIRTH/CITY, STATE | GROUP AFFILIATION | ETHNIC BACKGROUND |
|---|---|---|
| | | |

| SCARS, TATTOOS, DEFORMITIES | CLOTHING DESCRIPTION | JEWELRY WORK |
|---|---|---|
| | White Shirt<br>Blue Joe Boxer Pants<br>Blue Socks | |

## VEHICLE INFORMATION

| | YEAR | MAKE | MODEL | COLOR | STATE | TAG | VIN |
|---|---|---|---|---|---|---|---|
| 1. | | | | | | | |
| 2. | | | | | | | |

| | OWNER—LAST NAME, FIRST | ADDRESS | CITY | STATE |
|---|---|---|---|---|
| 1. | | | | |
| 2. | | | | |

| MODUS OPERANDI *(METHODS, TRAITS, ETC.)* | AREAS FREQUENTED |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |

75-229 (Rev 3/92)

AREAS MARKED WITH ▶ MUST BE FILLED IN.
CHECK RELIABILITY BOXES WHEN APPROPRIATE

TO THE POLICE DEPARTMENT OF PHILADELPHIA
AND ALL OFFICIALS OF THE CITY OF PHILADELPHIA
AND ALL REPRESENTATIVES OF THE DEPARTMENT OF HUMAN
SERVICES (DHS)

I have been arrested and I am represented by an attorney

I have not had the opportunity to completely discuss the details of my case with my attorney, whether appointed or hired. I am exercising the following rights:

I do not consent to any questioning

I want my lawyer present for any questioning so that I may fully discuss all issues with my attorney.

I do not consent to a lie detector.

I do not consent to any searches of my personal property

I do not consent to a line-up (or any form of identification) without the presence of my attorney.

I will not give up any of my rights, orally or in writing, without the presence of my attorney.

| | |
|---|---|
| DATE    1-7-07 | Jesus Ramos 1028828 |
| 01/07/07 2:44 am | |
| DATE | Gerard Galloway, Esq. Defender Association |
| 01//07/07 2:44 am | |

Arrest Photo D-1

# Philadelphia Police Department





Phil Arrestee Database Printed Philadelphia PD:  1/4/2007  10:07 P.M.

*this is Fresh*
*Juana Serrano*

STATEMENT OF:

NAME: Jesus Ramos

ADD:  2924 Waterloo Street
DOB:  09/10/1982

DATE AND TIME:

01/04/07 10:00pm

PLACE:

3901 Whataker ave EDD

CONCERNING:

The shooting on the 2800 block of Swanson Street

IN PRESENCE OF:

Detective Ronald Aitken #955

INTERROGATED BY:

Detective Phil Nordo #936

RECORDED BY:

Detective Phil Nordo #936

I am

Detective Phil Nordo #936

We are questioning you concerning

Shooting on the 2800 block of Swanson Street

We have a duty to explain to you and to warn you that you have the following legal rights:

A.   You have a right to remain silent and do not have to say anything at all.

B.   Anything you say can and will be used against you in Court.

C.   You have a right to talk to a lawyer of your own choice before we ask you any questions, and also to have a lawyer here with you while we ask questions.

D.   If you cannot afford to hire a lawyer, and you want one, we will see that you have a lawyer provided at no cost or charge, before we ask you any questions.

E.   If you are willing to give us a statement, you have a right to stop any time you wish.

*Jesus Ram* 1-4-07   At 10:15 pm

*Det. Nordo* #936  1-4-07   10.15AM

Page 1

**INVESTIGATION INTERVIEW RECORD**

PHILADELPHIA
POLICE DEPARTMENT
EAST DETECTIVE DIVISION

CASE#

INTERVIEWER:
DETECTIVE NORDO #936

| | | |
|---|---|---|
| NAME<br>Jesus Ramos | AGE<br>24 | RACE/SEX<br>W/M |
| ADDRESS<br>2924 Waterloo Street | APT# | DOB<br>9/10/82 |
| NAME OF EMPLOYER / SCHOOL | | PHONE# |
| ADDRESS OF EMPLOYER / SCHOOL | | SS# |
| DATES OF PLANNED VACATION / BUSINESS TRIPS | | PHONE#<br>215-989-5737 |
| NAME OF CLOSE RELATIVE<br>Carmen Diaz-Rosario | | RELATIONSHIP |
| ADDRESS OF RELATIVE<br>651 E. Tioga Street | | PHONE# |

PLACE OF INTERVIEW
3901 WHITAKER AVENUE

| | DATE | TIME |
|---|---|---|
| | 1/4/07 | 10:30pm |
| BROUGHT IN BY<br>Police | DATE<br>1/3/07 | TIME<br>12:00am |

WE ARE QUESTIONING YOU CONCERNING:
The shooting that happened on the 2800 block of Swanson Street where you were with Jonathan AKA/Primo

WARNINGS GIVEN BY:
Detective Nordo #936 Pr#229042

| | DATE | TIME |
|---|---|---|
| | 1/4/07 | 10:00pm |

ANSWERS:

| (1) yes | (2) yes | (3) no | (4) yes | (5) yes | (6) no | (7) yes |
|---|---|---|---|---|---|---|

My name is Detective Nordo and you are at 3901 Whitaker Ave. and I'am going to ask you some questions regarding the day you were with your friend you call "Jonathan" AKA/Primo PPN#1005215 and shot at that dude that was shot through the door at 2837 Swanson Street while you were in the car with "Primo".

A: OK.

Q: Can you tell me are you incarcerated for a crime right now?
A: Yes, my girl put a PFA on me last night, Detective and I was told that my probation was violated.

Q: How far did you go in school?
A: Kensington High School in the 12th. Grade, I never graduated.

Q: Are you currently under a doctor's care?
A: No.

Q: Are you currently under any drugs (Illegal and/or Prescription) or any alcohol?
A: No.

Q: Do you have any physical and/or mental problems that I should be aware of or that would prohibit you from doing this interview with me?
A: Other than I was shot last year and you handled that Detective. There's nothin' wrong with me.

Q: Can you read and write the English language?
A: Yes

Q: Were you threatened by anyone including the Police to give this statement to me right now?
A: No, Detective

Q: Were you promised anything by anyone inside or outside the Police Department to give a statement to me and you'll be rewarded in some way?
A: No, Detective

RECORD  YES  NO     CHECKED BY:

REVIEWED BY: Jesu Ram 1-5-07 1:25Am

Det. Nordo #936 1-5-07 1:25

| INVESTIGATION INTERVIEW RECORD | | CITY OF PHILADELPHIA |
|---|---|---|
| CONTINUATION SHEET | | POLICE DEPARTMENT |
| NAME | PAGE: | CASE# |
| Jesus Ramos | 2 | |

Q: Do you want to talk to me about the man who was shot inside the house at 2837 Swanson Street on 01/03/07 at about 12:29pm ?
   A: Yes I will Detective Nordo

Q: Alright, tell me how this all happened and how this man was shot while you were outside the house at 2837 Swanson Street ?
   A: The boy Primo has beef with those boys on Swanson Street because he was trying to hustle around their block and they told him that he couldn't sell that shit over there. And that the shit that he was hustling wasn't their weed. They both were puttin' out weed but it wasn't their weed. You know what I mean? And they beat the shit out of him. So, he wanted to get back at them and he came over my house on Waterloo Street and was crying and shit and he was asking me for a gun and I was telling him I don't know mother fucker. That was about three weeks ago.

Q: Now, during the course of these three weeks what was happening that led to this shooting ?
   A: Not a day goes by where he wasn't saying that he wanted to fuck these guys up. And he wanted a gun. I don't know where he got a gun but I know about three days ago he said to me that he went over around there and he had a mask on and he was looking for these dudes to shoot them. He knows these dudes. I don't know these dudes. So now it's that day when the dude was shot. I was inside "Primo's" apartment on Hope Street and I was with a guy named green eyes and Primo. I was smokin' a blunt and we were chillin', we were watchin' T.V. Primo has his Old ladies car and this is when he says "Come on let's go for a ride". So I say O.K. but I ask him, "Can we stop because I want to see my old lady"? He says, "No problem". He was sayin' once we got in the car that, "We're gonna go get these motherfuckers". I say, "Get who"? Primo says, "The guys from Swanson". I told him not before I see my girl. He was kinda of nervous because he knows about this PFA order that Allison has against me. She was nervous when she was talkin' with me. I had to get out of the car and talk to her because Primo didn't want her to come over to the car. So when she walks away she was nervous because she sees Primo. And maybe she's sees Primo get out of the car with the gun in his hand. Primo was yellin' to me get back in the car because she's "Going back to the crib and she's callin' the COPS". And I was standin' there and I was lifting my shirt up and I was tellin' her I ain't got nothin'. I wanted to show her that I didn't have anything on me. Primo had the gun. So anyway she went back to her house and I didn't want to follow her because of the PFA order. So I got in Primo's car and I drove away because Primo was scared and he thought the COPS were coming. I got a license and he don't. He also told me that he's an immigrant. He told me, "You drive". So now when I pull off from the corner of "A" & Wishhart meetin' with Allison and I drive to where is Swanson Street. When I get in the car he's sittin there in the car and he's got that shit out and he's showing me that gun. All I do is grab the gun and I'm looking at it and then I hand the gun right back to him and I said, "Here man, take this thing. I don't want that thing". I told him, "Your gonna kill this motherfucker with that". I'm going real slowly. I wanted to make it look like a buy and shit. And I go passed the house where this boy that got shot is at and Primo sees him and he's standin' right outside. Meanwhile this mother fucker has the gun right in his lap. I just go by because I don't even know the house or the person. Primo tells me, "Yo man, that's that mother fucker right there, reverse the car slowly". I back up slowly and I stop and Primo gets out of the car and he points the gun at the guy and the gun goes "Click" and then he pulls the thing back and it looked like he didn't have enough strength and he looked weak and he was pulling that thing back on the top of the gun. (NOTE; (Motioning with his hand pulling the top of the gun back) Now the guy had enough time to run inside the house. And that's why the guy didn't get hit in front of his house. Now Primo puts the gun up again and fires (Bang,Bang) like two times right through the house door. He gets back in the car real fast and he says, "Get off the fuckin' block". I drive away real fast and the car was hard to steer because of the power steering. I go up Swanson and make a left on Cumbey Street and then I go to Waterloo Street and I park it on the corner of Waterloo and Cambria Street. I like three or four houses from the stop sign. I go in my house and he's arguing with his lady in front of my house. I began arguing in front of the house when I pulled up but I went inside the house and Primo was outside my house. It was like that because one of Primo's girl came around the block and she's was screamin' at him, "Who took my car"? "Who took my car and is going away with my car?" "People are sayin' you guys shot someone". I'm like you don't, this man is goin' away and he didn't do anything. And I went inside. And her and primo left. Then everyone on the block was comin' around and they saw the car in the back. And I'm tellin' these people, "It's not my car". They were saying that it's their car and it's my car. I told them it's not my car.

Q: Who is green eyes ?
   A: He's just some dude who comes around and gets high. I know he lives on "G" & Hope Street. He's always high.

| SIGNATURE OF INTERVIEWEE: | | DATE: |
|---|---|---|
| 1-5-07   1:25 AM | | |

| INVESTIGATION INTERVIEW RECORD | | CITY OF PHILADELPHIA |
|---|---|---|
| CONTINUATION SHEET | | POLICE DEPARTMENT |
| NAME | PAGE: | CASE# |
| Jesus Ramos | 3 | |

Q: What does he look like ?
A: He's tall , maybe like thirty-nine years old, maybe like 250-260 Lbs. He's got light skin and Green Eyes. I mean big green eyes. Big ass nose. Low cut hair.

Q: What did the gun look like ?
A: All black metal gun.

Q: What people ?
A: The neighbors on the block.

Q: O.K. continue, what else happened ?
A: I'm going crazy throughout the block looking for my cell phone. I know someone had my phone on the block and I'm yellin' at these motherfuckers someone has my phone and I want my phone. I couldn't find it so I said "Fuck it". And I bought another phone up at Front & Allegheny Ave.

Q: Did you call anyone and tell anyone that this shooting happened ?
A: I called Allison my girl from my house before I left the house and I told her that me and Primo went around to Swanson Street and we just shot somebody. And I wanted to meet her. And she said, "I'm not meeting you after you just shot somebody". And I tell her, "I didn't shoot nobody, he did". And she said, "O.K., I'll meet you at Front and Allegheny Ave." So I go meet her there. I figured she's still getting ready and this is when I go up to front & Allegheny Ave. to buy my new cell phone. Than later on I go and meet her and this is when the COPS wind up locking me up right at "A" & Wishart Street. And they tell me that I'm getting arrested for questioning. And that's when I come in here.

Q: So you haven't heard anything else about this shooting other than what we talked about ?
A: No, I don't know where Primo is at. I had one phone call and I called my mom and told her that I need two thousand and twenty dollars to get the bail and she said that she would work on it. And that's it.

Q: Is there anything you would say to the mother of the guy that got shot ?
A: I would say, Mom, I didn't know your son and I didn't shoot the guy and the other guy shot him through the door and I'm sorry for what happened even though I didn't do it. But I didn't do it. I know I can't say anything to make you feel better because you lost your seed. If I would have known we were going there to shoot him you know I wouldn't have anything to do with killing him.

Q: When you knew that Primo had a gun did you think he was going to kill him or just wound him ?
A: I didn't think he was gonna kill him and I thought he was gonna shoot him in the legs. I didn't know he was gonna kill him. He got beat up but I didn't know he was gonna kill him. I'll go to them and I'll tell them that I feel real sorry that the guy had to die.

Q: Is there anything else you want to add to this interview ?
A: No Detective that's it.

1-5-07
1:25 AM

Det. Nub #836
1-5-07  1:25 AM

| SIGNATURE OF INTERVIEWER: | DATE: |
|---|---|

 

INVESTIGATION INTERVIEW RECORD
PHILADELPHIA
POLICE DEPARTMENT
EAST DETECTIVE DIVISION

| | | | | | |
|---|---|---|---|---|---|
| | | | | **CASE NO.** 07-00097 | |
| | | | | **INTERVIEWER** Detective Graf #9066 | |
| **NAME:** Alison Ramirez | | **AGE:** 32 | **RACE.** White Latin | **SEX:** Female | **DOB:** 2/20/74 |
| **ADDRESS:** 207 East Wishart Street (19134) | | **APT. NO:** | | **PHONE:** ▮▮▮▮▮ | |
| **NAME OF EMPLOYMENT/SCHOOL:** | | | | **SOC. SEC. NO.:** ▮▮▮▮▮ | |
| **ADDRESS OF EMPLOYMENT/SCHOOL:** | | **DEPARTMENT:** | | **PHONE NO :** | |
| **DATES OF PLANNED VACATIONS:** | | | | | |
| **DATES OF PLANNED BUSINESS TRIPS:** | | | | | |
| **NAME OF CLOSE RELATIVE:** ▮▮▮▮▮ | | | | | |
| **ADDRESS:** ▮▮▮▮▮ | | | | **PHONE NO** | |
| **PLACE OF INTERVIEW:** 3901 Whitaker Avenue | | **DATE:** 1/3/07 | | **TIME** 4:45pm | |
| **BROUGHT IN BY:** Self | | **DATE:** 1/3/07 | | **TIME:** | |
| **WE ARE QUESTIONING YOU CONCERNING:** Shooting at 2837 Swanson st | | | | | |
| **WARNINGS GIVEN BY:** | | **DATE:** | | **TIME:** | |

| **ANSWERS:** | | | | | | |
|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) |

Q. Ms. Ramirez, I am Detective Graf and I am going to ask you some questions about incidents that occurred today involving your ex-boyfriend, Jesus Ramos.
A. Okay.

Q. Do you read, write and understand the English language?
A. Yes.

Q. How far did you go in school?
A. I graduated from Woodrow Wilson High School in Camden.

Q. At this time are you under the influence of drugs or alcohol?
A. No.

Q. Do you go by any other names?
A. Sometimes I go by Jaylee.

Q. I am showing you a photograph (PPN 1003014). Do you recognize the person in the photograph?
A. Yes that is my ex-boyfriend, Jesus Ramos.

Q. Does Jesus go by any other names?
A. They call him Fresh and Curro on the street.

Q. Did you have any contact with Jesus Ramos today?
A. Earlier in the morning he was calling my house but nobody was picking up because they know his number. At around 11:30am I was doing my hair and it was hot because of the hair dryer so I went outside to

*Alison Ramirez*                              11/3/07

 

INVESTIGATION INTERVIEW RECORD
PHILADELPHIA
POLICE DEPARTMENT
EAST DETECTIVE DIVISION
PAGE #2

smoke a cigarette. I was sitting on the steps smoking a cigarette when I looked up Jesus was walking towards me from A Street. I told him to stop because he isn't allowed around me because I have a protection order against him. I went in the house and called 911. I went back outside and Jesus was standing across A Street on the other block of Wishart Street. He started yelling to me that he loved me and he wanted to get back with me. I was talking back and forth with him because I wanted the police to come. I went back inside and he called me on the house phone. I told him that I was changing my clothes because I was in my pajamas. I was waiting for the police to come. I went back outside and he came up in a burgundy Toyota Camry with his friend Primo driving. He told me to get in the back seat of the car and I said No. He said that he wanted to talk to me and for me to go to the corner. I stood on the steps of my house and they drove around the corner. I called the cops again because I got even more scared becasue he had Primo in the car. They parked in the same spot where Jesus had been standing earlier on the other side of A Street. Jesus got out of the car and was waving his arm at me and yelling to me. Then he called the house phone and my sister told me to pick it up. I picked up the phone because I wanted to keep him there until the police came. The police started coming down from Front and Wishart and Primo honked the horn. Jesus walked slowly over to the car and got in the passenger side. The police drove past them and stopped in front of my house. Primo got out of the car and walked around to the passenger side of the Camry. Jesus moved over to the driver side and they drove off slow. The police officer was standing next to me and I told him that was him driving off. The cop wanted to find out what was going on and that's when I gave them the restraining order. While the cops were there Jesus kept calling the house phone from his cell phone. The police took a report and they left. Then like five minutes later the same two cops came back and asked me about the car. They asked me if Jesus knew anybody on Swanson Street. I told him that maybe he did, that I didn't know. I told the cops that the car was Primo's. It is really Primo's girlfriend's car. The cops left and then the same two cops came back again about 15 minutes later asking me if the other guy, Primo, was black. I told them that he is dark-skinned but he is Dominican. And they asked if they had a third person in the car. I said that I only saw the two of them. I showed the cops the two numbers that Jesus was calling from. They asked me if I had an answering machine and I said no. Then the cops left. Maybe about ten minutes after the cops left Jesus called me from his house number. My sister and I picked up the phone at the same time. I said Hello and Jesus said Hello. Then he told me that he wanted to see me and he sounded like he was crying. I asked him where he went at after he left my house when the cops came. He said that he went and shot this guy twice and he thought the guy was dead. He said that the guy he shot tried to kill his friend. He was talking in Spanish. He said that he shot the guy for his friend. I asked him what and he said the guy tried to kill his friend. I asked him what he did that for and he because he tried to kill his friend. I said, You shot him?, because I thought maybe Jesus was there and Primo shot him. And Jesus said, yeah I shot him. Then he was saying that he wanted to see me and he wanted me to meet him at Front and Allegheny. He said that he lost his cell phone when he shot the guy and was going to get a new one. He said that he would buy me one too. I told him that I had to pick up my daughter at school becasue she had an appointment. He said that he would meet me at Front Street. He asked me if my daughter still went to Sheppard School near his house and I said yeah. She doesn't go there anymore because I took her out because of Jesus. After I got off the phone with Jesus I called the cops. I called twice but the police didn't come. 911 told me that if Jesus around the best thing to do was to leave the area. So me and my sister came here to the police station.

Q. Did you sister Marangeli listen to your conversation on the telephone with Jesus?
A. She heard Jesus say that he shot the guy.

Q. Can you tell me why you wanted the police to come when Jesus was at your house?
A. I have a protection order against Jesus. On December 19, Jesus and a girl named Juanita beat me up and and took my boots. I was here yesterday to see Detective Winward. Everytime I see Jesus he tries to beat me up, I am afraid of him.

Q. Did you have Jesus arrested before for assaulting you?
. Yes. He is on probation for beating me with a hammer. We broke up after that but then he got shot last y. His family begged me to go back with him because he had changed. I did go back with him and things

 

INVESTIGATION INTERVIEW RECORD
PHILADELPHIA
POLICE DEPARTMENT
EAST DETECTIVE DIVISION
PAGE #3

were good until he got better. Then he started getting violent and using powder. He started selling drugs and he kept throwing me out of the house.

Q. Have you ever seen Jesus with a gun?
A. No but he told me before that he has one.

Q. When Jesus told you he shot the male twice for a friend. Did he mention which friend this male was supposed to have tried to kill?
A. No.

Q. What can you tell me about the male named Primo?
A. He is Dominican and he used to to stay two doors down from Jesus on Waterloo with his girlfriend. I don't know her name but she was working at the Bar BQ Hut on Allegheny about a month ago. About two months ago I heard that Primo beat his girlfriend up. Her Mom told me that and the girlfriend was supposed to have a protection order against Primo. Primo just recently came from New York.

Q. Do you know the name of Primo's girlfriend's mother?
A. No but she was living in the same house with them on Waterloo. She moved back to New York after Primo beat up her daughter, maybe about a month ago.

Q. Do you know where Primo and his girlfriend are living now?
A. No.

Q. Do you know the name of Primo's girlfriend?
A. No.

Q. Can you describe her?
A. She is about my age (32), Puerto Rican and she is heavyset, heavier than me. She has black hair and thick eyebrows. She just found out that she is pregnant.

Q. Can you desibe Primo?
A. He is dark-skinned but lighter than Jesus. He is about the same age as Jesus (24). He is taller than Jesus and Jesus is about 5'7". He is a regular size, not fat or thin.

Q. What is the cell phone number that Jesus was using to call your house today?
A. 267-262-9298.

Q. What is the phone number at Jesus's house?
A. 215-427-1435.

Q. Is there anything that you would like to add at this time?
A. No.

Ⓧ _Alba Ramij_                    1/3/07

Page 249

[1]  shooter?  And I would submit to the
[2]  Court that there might be a couple of
[3]  different reasons why he said that.
[4]  And obviously the reason he said that
[5]  is best known to him.
[6]          But one of those might be
[7]  that he wanted to intimidate Alison
[8]  Ramirez to believe that he was the
[9]  killer or shooter, so that she would
[10] no longer cooperate with the police or
[11] testify against him.
[12]         Perhaps also the opposite,
[13] not to put fear into her or to
[14] intimidate her, but in some warped way
[15] perhaps to impress her, that he's the
[16] real deal, he's a man, a man's man,
[17] that he would step up and shoot
[18] someone for a friend.  I don't know,
[19] maybe he thinks that is something that
[20] she would find attractive about him.
[21]         But I would submit to the
[22] Court that what is more important
[23] isn't necessarily the admission for
[24] Mr. Ramos that he's the shooter, but
[25] the effect of that evidence in this

Page 250

[1]  case under the law.
[2]          And I think what the
[3]  admissions do, Your Honor, is that
[4]  they tie Mr. Ramos even more into this
[5]  conspiracy to shoot Mr. Martinez.
[6]          Because what the admission
[7]  shows is that he's not backing off of
[8]  this incident and he's not backing
[9]  away from it.  He is fully embracing
[10] the crime that took place.  He is
[11] claiming ownership of that crime.  And
[12] is in fact bragging about it, and is
[13] proud of it, and maybe even gilding
[14] the lily a little by trying to claim
[15] that he's the one that actually did
[16] the shooting.
[17]         But I would submit to the
[18] Court as to that particular question
[19] if you will, I am asking the Court to
[20] credit the statement that Amil
[21] Gonzalez gave as substantive evidence
[22] for a number of reasons.
[23]         Number one, it is just
[24] simply too detailed to be something
[25] that was made up by the detective.

Page 251

[1]          And these are the types of details
[2]  that only Mr. Gonzalez would know as
[3]  an eyewitness.
[4]          First of all, the number of
[5]  shots that were fired.
[6]          Secondly, the problem with
[7]  the gun, the fact that the gun didn't
[8]  seem to appear to have shot the first
[9]  time that Mr. Ruiz tried to shoot it.
[10]         It is interesting, because
[11] that is exactly what Mr. Ramos said in
[12] his statement when he was describing
[13] the incident, that the shooter had a
[14] problem shooting the gun and had to
[15] rack it or do something to it, which
[16] --
[17]         MR. BRUNO:  I object to that.
[18] That is not relevant against my
[19] client.
[20]         THE COURT:  The objection is
[21] sustained.  You can't argue that
[22] against his client.
[23]         MR. GILSON:  No, I wasn't arguing
[24] that against his client.  I was
[25] arguing that as to the reasons why the

Page 252

[1]  Court should accept the statement of
[2]  Mr. Gonzalez as being credible.
[3]          THE COURT:  It still -- that is
[4]  not something the Court would consider
[5]  in regards to Mr. Gonzalez's statement
[6]  is against Mr. Ruiz, and the Court
[7]  will not consider a corroboration that
[8]  may or may not exist in a statement
[9]  given by his co-defendant.
[10]         MR. GILSON:  I understand that
[11] objection, Your Honor.  I'll move on.
[12]         The type of gun that was
[13] used, as Mr. Gonzalez described it,
[14] clearly describing what would be a
[15] semiautomatic and which we now know
[16] that the gun used was a
[17] semiautomatic.
[18]         The fact that Mr. Ruiz --
[19] I'm sorry -- that Mr. Gonzalez
[20] indicated that Mr. Ruiz was referred
[21] to on the streets as Dominicano, and
[22] which we now know several days later
[23] when Mr. Ruiz was arrested he
[24] indicated to Detective Lucke that he
[25] was in fact born in the Dominican

Page 245

[1]   Court to give whatever weight you want
[2]   to give to the evidence or the
[3]   testimony of the witnesses.
[4]        But I would submit to the
[5]   Court that if you are going to
[6]   consider the testimony against
[7]   Mr. Ramos, that he's the shooter, and
[8]   the testimony against Mr. Ruiz, that
[9]   he's the shooter, you have one person
[10]  who's an eyewitness to what would be a
[11]  broad daylight, high noon, middle of
[12]  the day shooting, namely Mr. Gonzalez,
[13]  who says it was Mr. Ruiz. And you
[14]  have Alison Ramirez, who wasn't
[15]  present, but who testified that on
[16]  several occasions that Ramos admitted
[17]  to her that he was in fact the
[18]  shooter.
[19]       And I would submit to the
[20]  Court that normally I think under
[21]  those circumstances most people would
[22]  give greater weight to the testimony
[23]  of an eyewitness, such as Amil
[24]  Gonzalez, as to which was the shooter
[25]  in this case and which therefore was

Page

[1]   the driver.
[2]        That is also I believe
[3]   something that the Court would give
[4]   greater weight to if you consider the
[5]   rest of the evidence in this case that
[6]   came from Mr. Gonzalez, Amil Gonzalez,
[7]   that even he admitted in this
[8]   courtroom that there was in fact a
[9]   prior altercation, a prior fight, a
[10]  prior problem between Carlos Ruiz and
[11]  Marcos Martinez.
[12]       So, clearly, Mr. Ruiz seems
[13]  to have more of the motive to do the
[14]  shooting of Mr. Martinez, based on the
[15]  prior problem that occurred between
[16]  them, and also the testimony of Miss
[17]  Ramirez, as it was corroborated to by
[18]  the police officer who was speaking to
[19]  her, Officer Boyle, at the time that
[20]  she was reporting the PFA violation,
[21]  that the person who was seen driving
[22]  the car almost minutes before the
[23]  shooting took place was in fact
[24]  Mr. Ramos.
[25]       So, we have Mr. Ramos last

Page 247

[1]   seen driving the car, just perhaps two
[2]   or three blocks away from the scene of
[3]   the shooting in the direction of where
[4]   the shooting took place. And then you
[5]   have Mr. Gonzalez, as an eyewitness,
[6]   saying that the shooter got out of the
[7]   passenger seat. It was clearly
[8]   identified that person as Mr. Ruiz.
[9]   And Mr. Ruiz, he further testified to
[10]  and also in his statement, admitted
[11]  was the one who had the motive to
[12]  shoot Mr. Martinez.
[13]       As to the admissions to Miss
[14]  Ramirez, Your Honor, by Mr. Ramos,
[15]  obviously there -- I would submit to
[16]  the Court that he said those things to
[17]  her. I would ask the Court to credit
[18]  her testimony, especially since this
[19]  is something that she said to the
[20]  detectives on the very day that it
[21]  happened.
[22]       What occurred up at the
[23]  prison is simply repeating the same
[24]  thing. He admitted to me additionally
[25]  again up at the prison that he was the

Page

[1]   shooter. But on the day that the
[2]   incident happened, she had no motive,
[3]   she had nothing to gain, she had no
[4]   interest in the outcome, she had no
[5]   particular bias against anybody here.
[6]   Perhaps maybe she felt some sort of
[7]   way about Mr. Ramos because of the PFA
[8]   order. But she went out of her way to
[9]   call the police and become involved
[10]  and to go down to the police station
[11]  and give the statement.
[12]       And obviously, based on the
[13]  evidence, we know here that Mr. Ramos
[14]  has a fatal attraction to this woman.
[15]  He simply couldn't leave her alone on
[16]  that particular day. He admitted that
[17]  in his statement. He was even
[18]  arrested across the street from her
[19]  house, when he returned to the house
[20]  to try to locate her.
[21]       So, you have to ask yourself
[22]  then what was the purpose of these
[23]  admissions to Miss Ramirez by
[24]  Mr. Ramos, if it wasn't to actually
[25]  admit to her that he was in fact the

51CR00005612008, 51CR00005612008X    Case 2:16-cv-04920-JLS   Document 1   Filed 11/13/18   Page 58 of 108 Trial (Waiver) Volume 1

Jesus Ramos                                                                  August 05, 2009

Page 193

[1] incident that happened at the preliminary
[2] hearing, did you tell that to Mr. Gilson?
[3]      A.   The what?
[4]      Q.   All right. The incident at the
[5] preliminary hearing where the defendant --
[6]        THE COURT: What he wants to know
[7]     is on the day that you were supposed
[8]     to go to Court for the preliminary
[9]     hearing --
[10]        THE WITNESS: Yes, I told him.
[11] BY MR. DIAMONDSTEIN:
[12]      Q.   You explained it to him the same way
[13] you explained it to us?
[14]      A.   Yes.
[15]      Q.   And you explained to him that you
[16] haven't had any contact with the defendant since,
[17] you know, May of 2007, correct?
[18]      A.   Yes, because I move away from him.
[19]      Q.   And you had also explained to him that
[20] you haven't had any contact with his mother since
[21] that time as well, right?
[22]      A.   Yes.
[23]      Q.   All right. What kind of home do you
[24] think you are going to get? You don't know?
[25]      A.   What are you trying to ask?

Page 194

[1]        THE COURT: He's asking do you
[2]     have any knowledge concerning when the
[3]     District Attorney's Office arranges to
[4]     move you to an undisclosed location,
[5]     do you at this time have any knowledge
[6]     about what the apartment or house may
[7]     look like?
[8]        THE WITNESS: Yes.
[9] BY MR. DIAMONDSTEIN:
[10]      Q.   Okay. What do you think you are
[11] getting?
[12]      A.   Three bedroom house.
[13]      Q.   Your own three bedroom house that your
[14] mom doesn't have to live in with you, right?
[15]      A.   Yes. I have only been living in my
[16] mom's house for two weeks.
[17]      Q.   And I'm not going to ask you -- again
[18] I don't want to know neighborhoods, but are they
[19] going to move you out of the city or do you stay
[20] in the city?
[21]        MR. GILSON: Objection.
[22]        THE COURT: That objection is
[23]     sustained.
[24]        MR. DIAMONDSTEIN: All right.
[25] BY MR. DIAMONDSTEIN:

Page 195

[1]      Q.   The information that you told the
[2] District Attorney about the changed seats, talked
[3] on the cell phone, called the guy, all that
[4] stuff, you told the DA that after you told him
[5] you were in fear for your safety and wanted to be
[6] moved, right?
[7]      A.   Yeah, that was the first time I did
[8] came to Court, because I was afraid of his family
[9] coming at me.
[10]      Q.   Right. But meaning that you told the
[11] DA that you wanted to be moved. And then you
[12] told him all the information about the switched
[13] positions, et cetera, et cetera?
[14]      A.   No.
[15]      Q.   You told him that first?
[16]      A.   Yes.
[17]      Q.   And then you told him you wanted to be
[18] moved?
[19]      A.   No. They told me that they would help
[20] me move for my safety.
[21]        MR. DIAMONDSTEIN: That is all I
[22] have. Thank you.
[23]        THE COURT: Redirect.
[24]        MR. DIAMONDSTEIN: One other
[25]     thing.

Page 196

[1] BY MR. DIAMONDSTEIN:
[2]      Q.   The caller ID that you described for
[3] us, did you ever show any of the police officers
[4] the caller ID?
[5]      A.   Yes. The cop that was there that day,
[6] he knew, and I showed him the phone.
[7]      Q.   Anyone take it from your home to the
[8] best of your recollection?
[9]      A.   What happened?
[10]      Q.   Did anyone take it from your home?
[11] Was it taken from your home --
[12]      A.   No.
[13]      Q.   -- the caller ID?
[14]      A.   No.
[15]      Q.   Anyone come take any pictures of it?
[16]      A.   No.
[17]      Q.   Do you recall the name of the police
[18] officer that looked at the caller ID?
[19]      A.   No, I don't remember.
[20]      Q.   Uniformed or detective?
[21]      A.   He -- he was a cop.
[22]      Q.   Meaning he was a uniform?
[23]      A.   Yes.
[24]        MR. DIAMONDSTEIN: That is it.
[25]     That is all I have. Thank you.

Page 197

[1]  THE COURT: Mr. Bruno, do you
[2]  have any questions?
[3]  MR. BRUNO: No, Your Honor.
[4]  THE COURT: Mr. Gilson, do you
[5]  have any redirect?
[6]  MR. GILSON: Yes, just a little.
[7]  - - -
[8]  REDIRECT EXAMINATION
[9]  - - -
[10] BY MR. GILSON:
[11]  Q. Miss Ramirez, this new place that you
[12] are being relocated to, is that a rental
[13] property?
[14]  A. Yes.
[15]  Q. Okay. So no one is buying you a
[16] house, are they?
[17]  A. No, I'm renting.
[18]  Q. You are going to be renting this
[19] house, right?
[20]  A. Yes.
[21]  Q. And you are going to have to pay the
[22] rent, aren't you?
[23]  A. Yes.
[24]  Q. Okay. You are getting some assistance
[25] in the deposit and maybe the first couple of

Page 198

[1] months rent, right?
[2]  A. Yes.
[3]  Q. But after that, you are on your own,
[4] right?
[5]  A. Yes, I am.
[6]  Q. All right.
[7]  A. It is not a free house.
[8]  Q. It is not a free house in return for
[9] your testimony, is it?
[10]  A. No.
[11]  Q. Okay. When Mr. Ramos's mother took
[12] you out to lunch that day, did you tell her that
[13] you had to go to Court?
[14]  A. She knew I had to go to Court.
[15]  MR. DIAMONDSTEIN: Objection,
[16]  non-responsive.
[17] BY MR. GILSON:
[18]  Q. How did she know?
[19]  A. Because a detective had gave me a
[20] subpoena.
[21]  Q. Did you tell her you had to go to
[22] Court when she came to get you?
[23]  A. Yes.
[24]  Q. All right. So, she knew because you
[25] told her?

Page 199

[1]  A. Yes.
[2]  Q. And when you told her, "I have to go
[3] to Court today," what did she say?
[4]  A. You are not going to Court.
[5]  MR. DIAMONDSTEIN: She said
[6]  what?
[7] BY MR. GILSON:
[8]  Q. She said what?
[9]  A. You are not going to Court.
[10]  Q. All right. When you spoke to Jesus's
[11] mother, did she talk about Jesus?
[12]  A. Yes.
[13]  Q. And tell the Judge why you are -- let
[14] me ask you this question: Were you afraid to
[15] come to Court today and testify?
[16]  A. Yes, I was.
[17]  Q. Why? If all she did was take you to
[18] lunch, what are you concerned about?
[19]  A. Because, one, I don't know his
[20] family. And one time she was talking like: If
[21] somebody mess with the family, everybody gets in
[22] it, and that is her only son. And I was afraid
[23] for me and my kids, because he got cousins,
[24] sisters from some -- and really I don't know his
[25] family.

Page 200

[1]  Q. So, Mrs. Ramos told you this is my
[2] only son?
[3]  A. Yes. And she will do anything for
[4] him.
[5]  Q. And she would do anything for him?
[6]  A. Yes.
[7]  Q. And if somebody messes with the family
[8] --
[9]  A. Everybody gets in it.
[10]  Q. -- everybody gets in it, right?
[11]  A. Yes.
[12]  Q. Okay. So she didn't come right out
[13] and threaten you, did she?
[14]  A. No. She just said that, so I took it
[15] as a threat towards me.
[16]  Q. When she said that, how did you take
[17] it?
[18]  A. As a threat.
[19]  MR. GILSON: All right, all
[20]  right. That is all I have.
[21]  THE COURT: Any recross?
[22]  MR. DIAMONDSTEIN: No, not based
[23]  on that.
[24]  THE COURT: Thank you.
[25]  Now, you are a sequestered

Page 189

[1] defendant in years?

[2]    A.    Yes, I haven't.

[3]          The last time he drove (sic) a

[4] letter to my sister house was in February of this

[5] year?

[6]    Q.    He wrote a letter to your sister?

[7]    A.    Yes, for me.

[8]    Q.    Do you have a copy of the letter?

[9]    A.    No.

[10]    Q.    So, you have had no contact with the

[11] mother in over a year?

[12]    A.    Yeah.

[13]    Q.    You have had no contact with the aunt

[14] or any family member of the defendant in over a

[15] year?

[16]    A.    No.

[17]    Q.    And the last time that you spoke to

[18] the defendant would be the last time that you

[19] visited him in prison, right?

[20]    A.    Yes.

[21]    Q.    So, if the prison log says that the

[22] last time that you visited him was --

[23]    A.    In May.

[24]    Q.    Begging the Court's pardon.

[25]          Would it be fair to say the last

Page 190

[1] time you visited him was ballpark May of 2007;

[2] would that sound about right?

[3]    A.    Yes.

[4]    Q.    So no one has even talked to you about

[5] this case in over two years, right?

[6]    A.    Exactly.

[7]    Q.    You just got a new house though out of

[8] this case, right?

[9]    A.    What?

[10]    Q.    You just got a new house out of this

[11] case, right?

[12]    A.    No.

[13]    Q.    What do you mean no?  You are living

[14] in a hotel right now, right?

[15]    A.    Yes.

[16]    Q.    Who's paying for the hotel?

[17]    A.    The district.

[18]    Q.    I'm not going to ask you what hotel it

[19] is, but it is a nice hotel, right?

[20]    A.    Yes.

[21]    Q.    And where were you living prior to

[22] living in a hotel?

[23]    A.    My mom's house.

[24]    Q.    Where is that at?

[25]    A.    Allegheny.

Page 191

[1]    Q.    All right.  The District Attorney's

[2] Office now has given you a new house, right?  I'm

[3] not going to ask you where it is.  I don't even

[4] want to know if you know.  But you are getting a

[5] new house out of it, right?

[6]    A.    I don't get a new house from that.

[7]    Q.    Well, they are moving you, right?

[8] They moved you out of your mom's house, right?

[9]    A.    No, not yet.

[10]    Q.    Well, soon.  You are living in a hotel

[11] right now, right?

[12]    A.    Yes.

[13]    Q.    You and your kids, right?

[14]    A.    Yes.

[15]    Q.    And the promises that you have been

[16] given are, because we are afraid for your safety,

[17] we are going to move you to a new home, right?

[18]    A.    Yes.

[19]    Q.    Because you told the District

[20] Attorney's Office that you were afraid about your

[21] safety, right?

[22]    A.    Yes.

[23]    Q.    What are you afraid of, you are going

[24] to get dinner instead of lunch?  What were you

[25] afraid of, dinner instead of lunch?

Page 192

[1]          THE COURT:  That question is not

[2]       appropriate, Mr. Diamondstein.  You

[3]       may ask --

[4] BY MR. DIAMONDSTEIN:

[5]    Q.    Well, you are getting a new house,

[6] right?  How many bedroom house are you getting,

[7] do you know?

[8]    A.    (No response.)

[9]    Q.    You can answer that.

[10]          THE COURT:  Do you have any

[11]       information about --

[12]          THE WITNESS:  I really don't want

[13]       to talk about it.

[14]          THE COURT:  Well, you are under

[15]       oath and you must testify.  You don't

[16]       have to tell me where, but have you

[17]       been given any information as to the

[18]       size of the house or apartment or

[19]       whatever it is that you may be moving

[20]       to?  Do you have any information at

[21]       this time as to its size?

[22]          THE WITNESS:  No.

[23] BY MR. DIAMONDSTEIN:

[24]    Q.    All right.  Now, everything that you

[25] told me today on cross-examination, meaning the

Page 185

[1] in a city job, right?
[2]    A.  Yes.
[3]    Q.  And what you are saying is his mom
[4] pulled up to the house in a regular car, right?
[5]    A.  Yes.
[6]    Q.  Took you out to lunch?
[7]    A.  Yes.
[8]    Q.  Went shopping?
[9]    A.  Yes.
[10]    Q.  She didn't threaten you?
[11]    A.  No, but she took me out of the house.
[12]    Q.  Well, she didn't drag you.  I mean,
[13] she didn't pick you up and drag you out of the
[14] house, right?
[15]    A.  Well, you don't know her.
[16]    Q.  I actually do know her.  So, that is
[17] why I'm asking you these questions.
[18]       THE COURT:  Let me -- you may
[19]    describe to Mr. Diamondstein your
[20]    knowledge of her and how you were
[21]    treated that day.
[22]       THE WITNESS:  Well, that day she
[23]    came, come on, hurry up, get dressed
[24]    --
[25]       THE COURT:  Slow down.  Say it

Page 186

[1]    again.
[2]       THE WITNESS:  She said:  Let's
[3]    go.  Got everybody dressed, like in
[4]    five minutes, and we went out the
[5]    door.
[6] BY MR. DIAMONDSTEIN:
[7]    Q.  Who else is everybody?
[8]    A.  My kids and myself.
[9]    Q.  How many kids have you got?
[10]    A.  Four.  At that time I had four.  Now I
[11] have five.
[12]    Q.  So you went out to lunch, right?
[13]    A.  Yes.
[14]    Q.  And then what, did you go to the mall?
[15]    A.  No.
[16]    Q.  Where?
[17]    A.  To eat.
[18]    Q.  Okay.  That took all day?
[19]    A.  Then she went to a dollar store, yeah.
[20]    Q.  Okay.  At any point while she was
[21] feeding you, did she produce a firearm and tell
[22] you not to go to Court?
[23]    A.  No.
[24]    Q.  At any point while she was feeding
[25] your children, did she produce a firearm and tell

Page 187

[1] you not to go to Court?
[2]    A.  No.  She didn't want me to come to
[3] Court.
[4]    Q.  I understand that.  What I'm asking
[5] you is did she produce a firearm and point it at
[6] your children?
[7]    A.  No.
[8]    Q.  Did she -- while she was taking your
[9] family shopping at the dollar store, did she
[10] threatened you and say you can't go to Court?
[11]    A.  No.
[12]    Q.  When she dropped you off back at the
[13] home that you were living in, did she cut the
[14] phone lines from the house?
[15]    A.  No.
[16]    Q.  The next day, did she come to the --
[17] to your house that you were living at again and
[18] take you out all day?
[19]    A.  No.
[20]    Q.  What about the day after that, did she
[21] take you out all day so that you couldn't get to
[22] a phone?
[23]    A.  No.
[24]    Q.  All right.  In fact, she never
[25] threatened you at all, did she?

Page 188

[1]    A.  No.  She just took me out.
[2]    Q.  She just took you out on the day of
[3] the preliminary hearing?
[4]    A.  Yes.
[5]    Q.  Do you recall what day that was, how
[6] many years ago that was?
[7]    A.  Really I don't know.
[8]    Q.  It was at least over a year ago?
[9]    A.  Yes.
[10]    Q.  And in that time period, from that day
[11] until today, did she ever take you and your kids
[12] out to lunch again?
[13]    A.  I left her house.
[14]    Q.  I understand that.  That wasn't my
[15] question.  My question to you was --
[16]    A.  I haven't spoke to her in years.
[17]    Q.  You haven't spoken to her in years?
[18]    A.  Yeah.
[19]    Q.  You haven't spoken to the aunt in
[20] years?
[21]    A.  Who?
[22]    Q.  Her sister I guess.  Is that the only
[23] other person you know?
[24]    A.  No.  I haven't seen them.
[25]    Q.  And you haven't spoken to the

Page 181

[1]   A.   Yeah.
[2]   Q.   And so that you called the police at
[3] that point in time and you told the police, I
[4] have more information for you?
[5]   A.   No.
[6]   Q.   Well, when was it that you told
[7] anybody about this?
[8]   A.   Like a couple of -- like a week ago.
[9]   Q.   Who was it that you told?
[10]   A.   Gilson.
[11]   Q.   Who?
[12]   A.   Mark Gilson.
[13]   Q.   And I would imagine that you told
[14] Marcos (sic) how badly the threats have been
[15] about you, right, how badly you have been
[16] threatened and kidnapped?  Did you tell him you
[17] had been threatened and kidnapped?
[18]   A.   When was this?
[19]   Q.   I'm asking you, did you tell the
[20] prosecutor that you were threatened and
[21] kidnapped?
[22]   A.   I don't understand.
[23]   Q.   Which word didn't you understand?
[24]   A.   Because kidnapped when, now or that
[25] time?

Page 182

[1]   Q.   Well, how many times have you --
[2]       THE COURT:  What he wants to know
[3]   is from the time that you gave your
[4]   statement to the police and you had
[5]   these conversations with the defendant
[6]   when the case has been listed for
[7]   trial in the past until today, were
[8]   there any -- did you tell the
[9]   prosecutor as to any threats or
[10]   problems of any kind that you may have
[11]   had in regards to coming to Court to
[12]   testify.
[13]       THE WITNESS:  Well, at the time I
[14]   was afraid, yes, because I don't know
[15]   his whole family, and I don't know
[16]   nobody of his family.  I don't even
[17]   know his mom and his aunt.
[18]       MR. DIAMONDSTEIN:  All right.
[19]   May I ask a question?
[20]       THE COURT:  Yes, go ahead.
[21] BY MR. DIAMONDSTEIN:
[22]   Q.   So, then you never told the District
[23] Attorney that you have been kidnapped on the
[24] case?
[25]       Don't look at him.  Look at me.

Page 183

[1]       Did you ever tell the District
[2] Attorney that you have been kidnapped on this
[3] case?
[4]   A.   No.
[5]   Q.   Because no one kidnapped you, right?
[6] No one threw you in a car at gunpoint, nothing,
[7] right?
[8]   A.   So, you are asking me about the day I
[9] was coming to Court?
[10]   Q.   I'm not asking you about anything.
[11] I'm asking you --
[12]       THE COURT:  Hold on just a
[13]   minute.
[14]       You may finish your answer.
[15]   So tell me about --
[16]       THE WITNESS:  Because he's asking
[17]   me a kidnapping.  He's not asking me
[18]   exactly what he wanted to know.
[19]       THE COURT:  All right.  Then you
[20]   tell us, what is it that he wanted to
[21]   know.
[22]       THE WITNESS:  When I was supposed
[23]   to come to Court that time for -- to
[24]   testify against him.  His mom went to
[25]   his house and she took us all day out,

Page 184

[1]   so I wouldn't come to Court.  That is
[2]   -- now he's saying that they kidnapped
[3]   me.
[4]       MR. DIAMONDSTEIN:  I'm not saying
[5]   that.
[6]       THE COURT:  Hold on a second.  So
[7]   just so I understand this, you relayed
[8]   to the prosecutor when you spoke to
[9]   him a week ago that on the days that
[10]   you were supposed to come to Court,
[11]   his mother came to your house, took
[12]   you out for the day, and kept you from
[13]   coming Court?
[14]       THE WITNESS:  Yes.
[15]       THE COURT:  Okay.  Go ahead,
[16]   Mr. Diamondstein.
[17] BY MR. DIAMONDSTEIN:
[18]   Q.   All right.  His mom is about what,
[19] fifty years old, give or take?
[20]   A.   Like forty something.  I don't know.
[21]   Q.   His mom is about your height, yeah?
[22]   A.   And I'm living in her house, yes.
[23]   Q.   At the time, right?
[24]   A.   Yes.
[25]   Q.   His mom actually works for the city,

Page 141

[1] so we don't have this problem.
[2]     What I told Mr. Gilson with
[3] respect to this witness was I thought
[4] she was out of the country, because I
[5] couldn't find her. I wasn't telling
[6] him that I threatened the witness,
[7] that my client threatened the witness,
[8] that we had any information that the
[9] witness has been threatened.
[10]     **What I said was:** I don't
[11] think you are going to find her. In
[12] fact, I even told him I think she's in
[13] the Dominican Republic. That is the
[14] information that I received. So the
[15] whole red -- what do they call it, red
[16] herring about, "oh, you're not going
[17] to get the witness," it wasn't like
[18] that. It was I was trying to find her
[19] and I didn't think she was around
[20] because I wanted to get a statement
[21] from her as well.
[22]     So, the first that I have
[23] heard about threats to the witness was
[24] today. And, again, that is another
[25] red herring.

Page 142

[1]     This is 2009. There are
[2] 7000 police officers. They got an
[3] entire staff of homicide detectives,
[4] and homicide prosecutors that are pit
[5] bulls. If they had any information
[6] that this girl had been threatened,
[7] cell phone records, a 48, nothing.
[8]     This homicide was two and a
[9] half years ago and the threats we hear
[10] are the day in Court, in my opinion,
[11] to cover the Commonwealth from not
[12] turning over evidence that they should
[13] have turned over. There is not one
[14] piece of document, not one documentary
[15] piece of evidence, not one cell phone
[16] record, nobody to say that this girl
[17] has gotten threatened, that is with
[18] all due respect to the Commonwealth.
[19] That is just garbage.
[20]     And you know what the
[21] Commonwealth could have also done?
[22] They could have come to me and said:
[23] Mike, we have to meet with the Judge.
[24] I have got something I don't
[25] necessarily want to tell you now. I'm

Page 143

[1] going to tell you in front of the
[2] Judge.
[3]     And Mr. Gilson could have
[4] come to you in Court on the record and
[5] **said:** Look, this is the information I
[6] got from the witness. I'm turning it
[7] over because I'm duty bound. Judge, I
[8] want you to craft a protection order
[9] because we are so worried about this
[10] witness being threatened, we are going
[11] to turn the information over to you.
[12] We don't want you to disclose it to
[13] your client until we have more
[14] information, and we can safely
[15] determine whether or not this woman is
[16] being threatened and we can move her.
[17]     Then what do you do? Then
[18] you move the waiver trial back until
[19] all of the parties, until this girl is
[20] safe, so that now after a couple days,
[21] I know why the trial is being moved
[22] back, maybe we advise Mr. Bruno who is
[23] an officer of the Court.
[24]     And with all due respect,
[25] I'm not jeopardizing my law license

Page 144

[1] for anybody. So, if you order me not
[2] to turn something over to my client
[3] and we have to move the trial back,
[4] then we move the trial back. And when
[5] the woman is safely protected at the
[6] Hilton or wherever she is, then we go
[7] forward with the trial.
[8]     But with all due respect, it
[9] is all garbage that I find out on
[10] direct-examination that my client
[11] allegedly changed positions because my
[12] defense in this case, not that it is a
[13] big secret, because I have been open
[14] and honest with Mr. Gilson, I have
[15] discussed with him this case, it won't
[16] happen any more, but I have let him
[17] know what my position was.
[18]     Hey, my guy wasn't the
[19] shooter. My guy cooperated with the
[20] police. The police sweated him for 32
[21] hours and got a statement from him.
[22] My defense is he had nothing do with
[23] this.
[24]     And now I find out on
[25] direct-examination of -- I guess the

Page 145

[1] only eyewitness, that my guy is the
[2] shooter. The statements that were
[3] given with respect to the prison are
[4] easy cross-examination for me. My
[5] client's crying on the phone. You
[6] know, she misunderstood what he said
[7] with respect to this case.
[8]      I respectfully suggest to
[9] you that nothing that Mr. Gilson said
[10] should hoodwink this Court into
[11] allowing him to call a witness who
[12] has, by my client's own words,
[13] admitting to doing a homicide. That
[14] was exculpatory, possibly inculpatory,
[15] information that should have been
[16] turned over.
[17]      I sent every discovery
[18] letter. There are multiple
[19] conversations with Mr. Gilson and Miss
[20] Selber before him, and I would ask you
[21] to grant my motion for mistrial.
[22]      MR. GILSON: Your Honor, there
[23] are two points I want to make.
[24]      Number one, I'm not
[25] suggesting that Mr. Diamondstein told

Page 146

[1] me I wasn't going to get her because
[2] she was being threatened or
[3] intimidated or approached or anything
[4] like that.
[5]      As I recall, what I do
[6] remember him telling me, I don't think
[7] you are going to get her, and I do
[8] believe he said something that she may
[9] be out of the country. He's right
[10] about that. But he wasn't sure about
[11] that, and what I heard was, I'm not
[12] going to get her.
[13]      The second thing is I did
[14] tell Mr. Diamondstein this morning
[15] when he showed up that there -- that
[16] her client -- that Miss Ramirez
[17] visited her (sic) client up at jail.
[18]      THE COURT: Visited his client.
[19]      MR. GILSON: Right, visited his
[20] client up at jail, and I did turn over
[21] the records to show the visitations.
[22]      And I specifically told him
[23] that up at the jail the defendant,
[24] Ramos, repeated to Miss Ramirez that
[25] he was in fact the shooter, that he

Page 147

[1] still insisted on what he had told her
[2] on the telephone, that he was the
[3] shooter, and we discussed that a
[4] little bit.
[5]      And I said, you know,
[6] obviously that is what he told her.
[7] You know what the evidence is going to
[8] show, and you also have your client's
[9] statement, which obviously you haven't
[10] heard it yet, but to the contrary in
[11] terms of his position in the car. So,
[12] Mr. Diamondstein knew about that this
[13] morning when he showed up.
[14]      I submit to the Court, I did
[15] tell him about it. And there were
[16] reasons why I didn't disclose it
[17] earlier, but I didn't spring it on him
[18] on the direct-examination.
[19]      THE COURT: Okay. The Defense
[20] motion for mistrial is denied. The
[21] Court finds that there was not
[22] prosecutorial misconduct. And in
[23] light of what counsel on both sides --
[24] because I have not read them, but from
[25] what both sides have told me, the

Page 148

[1] witness's original statement talks
[2] about information that is almost
[3] exactly the same, and she is
[4] indicating at this time that those
[5] kinds of things were repeated in a
[6] direct conversation.
[7]      Mr. Diamondstein has had an
[8] opportunity to speak to his client and
[9] gather whatever information his client
[10] may be able to give him concerning
[11] that.
[12]      And if you need,
[13] Mr. Diamondstein, additional time to
[14] discuss this with him before you begin
[15] your cross-examination, then the Court
[16] will give you as much time as you
[17] would like to be prepared for your
[18] cross-examination.
[19]      You may bring the witness
[20] back in.
[21]      And, Mr. Diamondstein, when
[22] he's finished direct, you will let me
[23] know whether you want to go right into
[24] cross-examination or whether you want
[25] a recess, whether it be this

Page 125

[1] from where you were, any kind of a gun inside of
[2] the car, on a seat or in the back seat or
[3] anything like that?
[4]    A.   No.
[5]    Q.   So, you didn't see either one of these
[6] men with a weapon that day?
[7]    A.   No.
[8]    Q.   Miss Ramirez, at some point did you
[9] become aware that the police had arrested Jesus
[10] Ramos and charged him with being involved in the
[11] shooting?
[12]    A.   Yes.
[13]    Q.   And after that happened, did you visit
[14] him while he was in jail?
[15]    A.   Yes, I did.
[16]    Q.   Are you still visiting him now?
[17]    A.   No.
[18]    Q.   Have you stopped visiting him?
[19]    A.   Yeah, a long time.
[20]    Q.   All right.  If you remember, how long
[21] for a period of time from January of '07 when he
[22] was arrested do you recall visiting him up at the
[23] jail?
[24]    A.   Until May.
[25]    Q.   May of '07?

Page 126

[1]    A.   Yes.
[2]    Q.   How many times would you go see him in
[3] a given week or month?
[4]    A.   Like three times a month.
[5]    Q.   All right.  During that period of
[6] time, about four or five months when you were
[7] visiting Mr. Ramos up at the jail, did you ever
[8] speak to him about the incident further?
[9]    A.   Yes.
[10]    Q.   And did he talk with you about it?
[11]    A.   Yes.
[12]    Q.   What did he tell you about it?
[13]    A.   Well, he said that -- in one
[14] particular time he told me that -- I was asking
[15] him if it was him, the shooter, and because he
[16] drove off on the car.  So then he told me that he
[17] changed position.  Like right down the street,
[18] they changed.  Primo was driving, and he was in
[19] the passenger side.
[20]    Q.   When you last saw Mr. Ramos in the
[21] car, he was where?
[22]    A.   Driving.
[23]    Q.   Okay.
[24]    A.   That is why I asked him in jail.
[25]    Q.   So, Mr. Ramos told you that after they

Page 127

[1] drove off, they switched positions again?
[2]    A.   Yes.
[3]    Q.   And at that point who did Mr. Ramos
[4] say was driving the car?
[5]    A.   Primo was.
[6]    Q.   And then where was Mr. Ramos -- did
[7] Mr. Ramos say he was?
[8]    A.   In the front seat.
[9]    Q.   All right.  So, he told you that?
[10]    A.   Yes.
[11]    Q.   And did he -- what did he tell you
[12] about who did the shooting?
[13]    A.   Well, actually he said that they
[14] called the guy on the phone --
[15]    Q.   Okay.
[16]    A.   -- for the guy to go outside.
[17]       MR. BRUNO:  I'm going to object
[18]    to this.
[19]       MR. GILSON:  I'll be more
[20]    specific.
[21]       THE COURT:  You may ask
[22]    concerning Mr. Ramos, but the Court
[23]    will not consider anything in regards
[24]    to Mr. Bruno's client.
[25]       MR. BRUNO:  Thank you, Your

Page 128

[1]       Honor.
[2] BY MR. GILSON:
[3]    Q.   Did Mr. Ramos say he called the guy on
[4] the phone or did Primo call --
[5]    A.   Yes, Jesus called.
[6]    Q.   He called, okay.  Mr. Ramos told you
[7] that he called this guy on the phone and what,
[8] told him what?
[9]    A.   And for him to go outside.
[10]    Q.   All right.
[11]    A.   And when the guy went outside, he
[12] pointed the gun at the guy.
[13]    Q.   So, Mr. Ramos --
[14]       MR. DIAMONDSTEIN:  I couldn't
[15]    hear that last part.
[16]       THE COURT:  That when he went
[17]    outside, Mr. Ramos pointed the gun at
[18]    the guy.
[19] BY MR. GILSON:
[20]    Q.   Is that right, Mr. Ramos told you that
[21] when the guy came outside Mr. Ramos pointed the
[22] gun at him?
[23]    A.   When he opened the door, he pointed
[24] the gun, but he couldn't -- he tried to shoot,
[25] but the gun was locked.

Page 129

[1]   Q.   Okay.

[2]   A.   So the guy slammed the door, and he
[3] shot the door twice.

[4]   Q.   All right.  Did he say what he did --
[5] do you recall Mr. Ramos said what he did or had
[6] to do to unlock the gun?

[7]   A.   (Indicating.)

[8]   Q.   Nothing?

[9]   A.   No, I don't know.

[10]   Q.   All right.  So he said -- if I
[11] understand you correctly, Mr. Ramos said that
[12] when he first tried to shoot at the guy --

[13]   A.   It was -- it was -- the gun was
[14] locked.

[15]   Q.   -- the gun was locked.  And then the
[16] guy shut the door --

[17]   A.   And he shot at the door.

[18]   Q.   -- and he shot at the door?

[19]   A.   Yes.

[20]   Q.   Okay.  All right.  Now, these
[21] conversations that you had with Mr. Ramos up at
[22] the jail, did you ever tell any of the police
[23] detectives or anyone in the DA's Office about
[24] those before you were subpoenaed to come to
[25] Court?

Page 130

[1]   A.   No.

[2]   Q.   When was the first time you told
[3] somebody about those things?

[4]   A.   The other day to yourself.

[5]   Q.   You told me?

[6]   A.   Yes.

[7]   Q.   Is that when you came down to the DA's
[8] Office?

[9]   A.   Yes.

[10]   Q.   All right.

[11]       MR. DIAMONDSTEIN:  Judge, based
[12] upon that, can we excuse the witness
[13] for a second?  I would like to make a
[14] motion to the Court.

[15]       THE COURT:  All right.  If you
[16] will step down to the -- take her to
[17] the anteroom.

[18]       Don't discuss your testimony
[19] with anyone.  You can leave that right
[20] there.  Okay.  Thank you.

[21]       - - -

[22]       MR. DIAMONDSTEIN:  If I may,
[23] Judge.

[24]       THE COURT:  Mr. Diamondstein.

[25]       MR. DIAMONDSTEIN:  I have a

Page 131

[1]   motion for a mistrial.  Everything
[2] that we are hearing today on the stand
[3] with reference to the statements that
[4] my client allegedly made, this is all
[5] news.  The only information that I had
[6] -- in fact, to be quite frank, I
[7] didn't know that Miss Ramirez was even
[8] going to testify until this morning.
[9] Certainly I had her name and I had her
[10] statement that has been marked as
[11] Commonwealth's Exhibit C-7.  That I
[12] was aware of.

[13]       This morning I received a
[14] lock and track printout from the
[15] Government, and also Mr. Gilson told
[16] me that she was going to testify and
[17] told me that the defendant admitted to
[18] her doing the crime allegedly in the
[19] prison.

[20]       But the statements with --
[21] that they changed positions, first
[22] time I heard it was on the stand.

[23]       That they called the guy on
[24] the phone, first time I heard it was
[25] on the stand.

Page 132

[1]       That the defendant admitted
[2] to her in prison that he pointed the
[3] gun, first time I heard that was on
[4] the stand.

[5]       That the gentlemen opened
[6] the door, that the gun was locked,
[7] that my client admitted all that, that
[8] my client admitting to shooting the
[9] door two times, I heard that all for
[10] the first time on the stand.

[11]       Those are statements that my
[12] client made.  Whether Mr. Gilson heard
[13] that yesterday at ten o'clock at
[14] night, whether he heard it Monday,
[15] Saturday, Sunday, Friday, Thursday,
[16] he's got to tell me that as soon as he
[17] hears that.  Mr. Gilson has my cell
[18] phone number, and has used it
[19] repeatedly, and as such, Judge, that
[20] is in my opinion discoverable evidence
[21] that should have been turned over to
[22] me, and therefore it is prosecutorial
[23] misconduct not to turn it over to me.
[24] I would ask you for a mistrial.

[25]       THE COURT:  Mr. Gilson, respond.

Page 117

[1] -- so we both.

[2]    Q.   All right.  So, you intentionally had
[3] your sister listening in?

[4]    A.   Yes.

[5]    Q.   Now, did she speak to Mr. Ramos when
[6] she was on that line?

[7]    A.   No, she didn't.

[8]    Q.   Was there anything that was said to
[9] Mr. Ramos that would have alerted him to the fact
[10] that your sister was listening in?

[11]    A.   No.

[12]    Q.   Okay.  Did you agree to meet with
[13] Ramos at that Front and Allegheny?

[14]    A.   Yes.

[15]    Q.   Were you actually going to go?

[16]    A.   No.

[17]    Q.   Did you go?

[18]    A.   No.

[19]    Q.   Was anything else said on the phone
[20] between you and Mr. Ramos that you can recall
[21] about this shooting at that time?

[22]    A.   That he was going to buy a new phone.
[23] He said he going to go buy a new phone.

[24]    MR. DIAMONDSTEIN:  He's going to

[25]    what?

Page 118

[1]    THE COURT:  He was going to go
[2]    buy a new phone.

[3]    MR. DIAMONDSTEIN:  Thank you.

[4] BY MR. GILSON:

[5]    Q.   Did he say why?

[6]    A.   Because he lost his.  That he lost
[7] his.

[8]    Q.   He said he lost his phone?

[9]    A.   Yeah.  But I asked him why, if he was
[10] talking to the house -- to the cell phone, if he
[11] lost it like minutes.

[12]    Q.   Okay.  Because when he called your
[13] house the first time, what phone was he calling
[14] from?

[15]    A.   From his cell phone.

[16]    Q.   And when he called you for this
[17] conversation he was calling from I think you said
[18] his house phone?

[19]    A.   His house phone.

[20]    Q.   All right.  So, he told you he lost
[21] his phone and he was going to get a new one?

[22]    A.   Yes.

[23]    Q.   Anything else that you can remember
[24] about that conversation?

[25]    A.   Not at that time.

Page 119

[1]    Q.   All right.  When that conversation
[2] ended then, Miss Ramirez, what did you do?

[3]    A.   I went to the district.

[4]    Q.   Did you call the police first or did
[5] you just go?

[6]    A.   Yeah, I called them like two times or
[7] three.  And they said to best off go to the
[8] district.

[9]    Q.   All right.  And did you call the
[10] police station or just 911 again?

[11]    A.   911.

[12]    Q.   And when you called 911, do you
[13] remember what you told the operator?

[14]    A.   Yeah.  He's still around.  And they
[15] say for me to go to the district.

[16]    Q.   All right.  So the operator told you
[17] to go to the police station, the district?

[18]    A.   Yes.

[19]    Q.   Did you go?

[20]    A.   Yes.

[21]    Q.   That day?

[22]    A.   Yes.

[23]    Q.   Did anybody go with you?

[24]    A.   Yes, my sister.

[25]    Q.   Marangeli?

Page 120

[1]    A.   Yes.

[2]    Q.   Where did you go?  Which police
[3] station or precinct was it?

[4]    A.   I think the 25th District.

[5]    Q.   All right.  Is that the one on
[6] Whitaker Avenue?

[7]    A.   Yes.

[8]    Q.   And your sister went with you?

[9]    A.   Yes.

[10]    Q.   Now, when you went to the district,
[11] did you meet with a detective?

[12]    A.   Yes, I did.

[13]    Q.   And did you tell him everything that
[14] you have just told us?

[15]    A.   Yes, I did.

[16]    Q.   Did he take a statement from you?

[17]    A.   Yes.

[18]    Q.   And before you came here today, did
[19] you have a chance to read your statement?

[20]    A.   Yes.

[21]    MR. GILSON:  Your Honor, at this
[22]    time may I have Miss Ramirez'
[23]    statement dated January 3rd, 2007
[24]    marked as the next exhibit please.

[25]    A COURT OFFICER:  C-7.

Page 133

[1]     MR. GILSON: Yes, Your Honor.
[2]     Counsel was well aware of the sum and
[3]     substance of Miss Ramirez's
[4]     testimony. That is namely that she's
[5]     not an eyewitness to this crime, that
[6]     his client made certain admissions to
[7]     her. Specifically that he admitted to
[8]     her that he was the one that actually
[9]     shot Mr. Martinez.
[10]          These conversations up at
[11]    the prison in essence are exactly
[12]    those same things. There might be
[13]    some difference in the details, but it
[14]    is exactly the same things, that is
[15]    number one. So counsel was well aware
[16]    that Miss Ramirez was going to testify
[17]    about admissions that Mr. Ramos made
[18]    to her.
[19]          Number two, Your Honor, and
[20]    the reason why I did not advise
[21]    counsel of this in a written letter or
[22]    in a statement is because Miss
[23]    Ramirez, when she came to my office,
[24]    advised me that she had been
[25]    threatened, coerced, and confronted by

Page 134

[1]     the defendant's family repeatedly over
[2]     the course of the last couple of
[3]     years. That they had on several
[4]     occasions in essence kidnapped her
[5]     when she was supposed to have come to
[6]     Court for the listings of the
[7]     preliminary hearing for which she had
[8]     been subpoenaed.
[9]           She agreed to cooperate and
[10]    testify, but she wanted to be
[11]    protected, because she was still
[12]    living in the neighborhood where she
[13]    had been living, and her sister is
[14]    still living at the house on Wishart
[15]    Street, which is where we found her.
[16]    She wanted to be moved.
[17]           We at that point immediately
[18]    made arrangements to relocate Miss
[19]    Ramirez to another undisclosed
[20]    location. And in fact she has been
[21]    put up in a hotel to protect her and
[22]    her family from any future attempts by
[23]    anyone to influence her or intimidate
[24]    her or threaten her.
[25]           In light of the situation,

Page 135

[1]     Your Honor, in terms of Miss Ramirez
[2]     and the fact that the trial was so
[3]     close in time and we were actually
[4]     having some difficulty unfortunately
[5]     making the arrangements to move her,
[6]     because as the Court is well aware, we
[7]     don't have a budget for the State, and
[8]     the funding for the DA's Office's
[9]     Witness Relocation Program is funded
[10]    through the Attorney General's Office
[11]    or the State.
[12]          So, while Miss Ramirez had
[13]    gone out and found another place to
[14]    stay and had made the proper
[15]    arrangements to stay, fortunately she
[16]    couldn't be moved, because no one was
[17]    willing to write a check. We didn't
[18]    have the money to pay for it, and
[19]    there was a question of where it was
[20]    going to come from.
[21]          Those arrangements to move
[22]    her were not made until yesterday. At
[23]    that point she was staying right where
[24]    everybody knew that she was. And last
[25]    night she was put up in a hotel, and

Page 136

[1]     she's now going to be moved once she
[2]     leaves here to an undisclosed
[3]     location.
[4]           So, I would submit to the
[5]     Court that in light of this situation
[6]     and what was going on with Miss
[7]     Ramirez, the attempts to contact her,
[8]     influence her, threaten her,
[9]     everything that I was told by Miss
[10]    Ramirez, I was not in a position to
[11]    disclose the fact that she was in fact
[12]    cooperating.
[13]          If I told Mr. Diamondstein
[14]    that she had given me additional
[15]    information, it would automatically
[16]    let him know that she was cooperating
[17]    and was going to come to Court.
[18]          When Mr. Diamondstein, based
[19]    on a conversation we had several weeks
[20]    ago at the pretrial conference, told
[21]    me she's not coming, and you are not
[22]    going to get her, which factored in
[23]    also to my decision-making process.
[24]          Because at this point I'm
[25]    thinking that we have never gotten her

FILED

JUL 30 2013

Post Trial Unit

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
TRIAL DIVISION - CRIMINAL SECTION

COMMONWEALTH OF PENNSYLVANIA : CRIMINAL ACTION-LAW
:
        v. : CASE NO. CP-51-CR-0000561-2008
:
JESUS RAMOS, :
        Defendant. :
:
: SENTENCING JUDGE: HONORABLE
: SHELLEY ROBINS NEW
:
:
:
:
: TYPE OF PLEADING: PETITION FOR
: POST-CONVICTION RELIEF (PCRA)
:
:
:
:
: FILED ON BEHALF OF:
: JESUS RAMOS
: DEFENDANT
:
:
:
: COUNSEL OF RECORD FOR THIS
: PARTY:
:     PRO SE
:
:
:
:
:
:
: FILED BY: JESUS RAMOS (PP#1003014)
:           PRO SE PETITIONER
:           INMATE NO. JG-5518
:           S.C.I. FOREST
:           P.O. BOX 945
:           MARIENVILLE, PA 16239
:           (814) 621-2110
:
:
:
:
:
:
:

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
TRIAL DIVISION - CRIMINAL SECTION

COMMONWEALTH OF PENNSYLVANIA      : CRIMINAL ACTION-LAW
                                  :
                   v.             : CASE NO. CP-51-CR-0000561-2008
                                  :
JESUS RAMOS,                      : PCRA
                   Defendant.     :
_____:

## PETITION FOR POST-CONVICTION RELIEF

TO THE HONORABLE, SHELLEY ROBINS NEW, JUDGE OF THE SAID COURT:

**NOW COMES**, Petitioner, Jesus Ramos (PP#1003014), pro se, and
files the instant petition for post-conviction collateral relief
pursuant to the Post-Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§
9541-9546, and moves this Honorable Court for a dismissal of all
charges, a new trial or other appropriate relief based upon the
following:

## FACTS AND PROCEDURAL HISTORY

1. On the morning of January 3, 2007, while suffering from a
   cocaine addiction and the continuing effects of a combination
   of other drugs (Xanax, cocaine, alcohol) consumed the night
   before, and after having smoked marijuanna earlier that morn-
   ing, an emotionally distraught, love-sick Defendant walked to
   an area near the home of his former girlfriend's (Allison
   Ramirez) sister's (Marangeli Rivera) home at 207 East Wishart
   seeking to amend their estranged relationship and attempted
   to speak to her from across the street in violation of an
   active PFA Order she had placed against him due to past events.

(1)

2.  As the Defendant neared the corner of A and Wishart he
    received a cellphone call from the co-defendant in this case,
    Carlos Ruiz (aka "Primo"/"Jonathon"), who asked the Defendant
    where he was, what he was doing, and indicated that he wanted
    Mr. Ramos to go for a drive with him without further expla-
    nation.

3.  The Defendant agreed, but told Mr. Ruiz that he had to talk
    with his girlfriend, Miss Allison Ramirez first and then told
    him where he was so he could pick him up at that location.

4.  When Mr. Ruiz arrived at A and Wishart Miss Ramirez became
    nervous and refused to cross the street to talk with the
    Defendant, then went back inside her sister's house and
    called 911.

5.  Assuming that Miss Ramirez was calling the police, Mr. Ruiz
    told the Defendant to "get in the car, she's calling the
    cops" and instructed him to drive.  The Defendant then drove
    off and the pair returned directly to the Defendant's home on
    Waterloo in contradiction to the statement allegedly made to
    the police while the Defendant was in custody and subjected
    to a custodial interrogation.

6.  After leaving the Defendant's home on Waterloo, Mr. Ruiz
    directed the Defendant to drive to an area near North Swanson
    Street where the shooting incident occurred. As the Defendant
    drove down the street, Mr. Ruiz suddenly recognized an indi-
    vidual and instructed the Defendant to stop and back up
    slowly as he produced a handgun.

7.  Fearful of the circumstances he suddenly found himself in
    and acting under duress at the sight of the handgun, Mr.
    Ramos, a former shooting victim himself and fearing for his
    own life if he failed to comply with Mr. Ruiz's instructions,

                        ·        (2)

reversed the vehicle's direction and backed up slowly as he
was instructed to do.

8.    Mr. Ruiz exited the vehicle, shots rang out, and upon re-
      entering the vehicle with handgun in tow, Mr. Ruiz ordered
      the Defendant to drive off and the Defendant complied, all
      the while wondering if he too would be shot if he failed to
      comply with Mr. Ruiz's instructions.

9.    Defendant Ramos asserts that he did not know the decedent,
      Mr. Martinez, what he looked like, or what Mr. Ruiz's true
      intentions were that fateful day. The only information known
      to Mr. Ramos prior to the shooting was that Mr. Ruiz had
      complained of being previously assaulted by some boys on
      Swanson Street and had talked about payback. The fact that
      Mr. Ruiz had been previously assaulted was common knowledge
      in the neighborhood and among people he associated with
      because he was very vocal about it, but he never identified
      any specific person either by appearance or name. Thus the
      identity  of his attackers was known only to him.

10.   After the shooting incident Mr. Ramos and Mr. Ruiz drove to
      the Defendant's home. Soon after, Mr. Ramos called Miss
      Ramirez on his cellphone because he was upset and hurt by her
      calling the police when he just wanted to talk with her and
      tell her that he was still in love with her. During this
      conversation, Defendant Ramos made arrangements to meet with
      her at the corner of A and Wishart where he had attempted to
      speak with her previously prior to the shooting earlier that
      morning.

11.   During this conversation, Defendant Ramos told Miss Ramirez
      about the shooting and that he was involved as he was still
      shaken from the incident, but at no time during that or any
      subsequent conversations with her did the Defendant ever say

(3)

that he was the shooter, only that he was there and had witnessed it.

12. Unknown to the Defendant, Miss Ramirez's sister again called for police and informed them that the Defendant was returning to talk with Miss Ramirez at the same location he had been earlier at the corner of A and Wishart. The Defendant then walked to that location and Mr. Ruiz returned to his girl-friend's house.

## ARREST

13. Defendant Ramos was later arrested and taken into custody at A and Wishart by Officers Michael Walsh (Badge #2334) and William Schlosser (Badge #2040), who he asserts were in plain-clothes and an unmarked vehicle in contradiction of Officer Schlosser's testimony at trial. The officers searched Mr. Ramos's person which yielded money and a cellphone, then cuffed his hands behind his back and placed him in the back of an unmarked police vehicle. The Defendant was not read his rights or "Mirandized" in any manner and the officers failed to answer any questions posed to them as to why he was being arrested. At this point, Mr. Ramos was plainly in custody and deserving of all constitutional protections afforded under the law.

## CUSTODIAL DETENTION/INTERROGATION

14. Defendant Ramos was transported to the 25th District and placed in a cellroom. A few hours later, Detective Phillip Nordo (Badge #936) and Detective Ronald Aitken (Badge #955) retrieved Mr. Ramos from the holding area downstairs and escorted him to a private observation-type room upstairs which lacked a toilet or sink.

(4)

15.  A few hours later, Detectives Nordo and Aitken returned to the isolation room. Detective Nordo became very confrontational with Mr. Ramos, getting up in his face, calling him a "piece of shit" and a "druggy" while Detective Aitken, in a typical "good cop-bad cop" routine remained quiet and calm saying nothing.

16.  Detective Nordo became accusatory, saying that he knew that Mr. Ramos "had shot someone on Swanson Street." Despite the accusation and verbal abuse, Defendant Ramos repeatedly insisted that he wasn't there, had nothing to do with it, and wanted to speak to his lawyer. In fact, Defendant Ramos, throughout this confrontational encounter with Detective Nordo, repeatedly asked to talk with his lawyer in the presence of Detective Aitken who for some unknown reason, has yet to be heard from and was not called as a witness for any proceeding held in this case which is highly suspect.

17.  In response to Mr. Ramos's repeated requests to speak with his attorney, Detective Nordo rather boldly said: " I don't give a fuck motherfucker about what you want!" Detective Nordo then went on to say: "What, you're getting mad?" And then told Mr. Ramos to "Take your best shot!" Detective Nordo was literally face-to-face, nose-to-nose with Mr. Ramos when he told him to take his best shot, all of which was witnessed firsthand by Officer Aitken, who interestingly enough, was never called as a witness in this case for any purpose as stated previously. A witness the Defendant now seeks to have called to verify his account of what occurred during the course of his custodial detention and involuntary statement.

18.  After a while, Detectives Nordo and Aitken returned to the isolation room and during this encounter, seized Mr. Ramos's clothing because there was blood on his shirt.  Mr. Ramos

had a cocaine addiction at the time and suffered from frequent nosebleeds due to his cocaine use. Defendant Ramos informed the detectives of this fact and that the blood was his own because he had to use his shirt to stop the bleeding. Ignoring his explanation, the detectives seized articles of his clothing for testing and it is not known to the Defendant whether or not DNA tests were conducted, whether his clothing was tested for the presence of primer-lead-residue (PLR) or gun-shot-residue (GSR), or even if his clothing was seized with a proper warrant.

19.   After several long hours of isolation in this observation room lacking toilet facilities, Defendant Ramos was eventually forced to urinate on the floor to relieve himself. When Detective Nordo again returned hours later, he again became verbally abusive and hurled insults at Mr. Ramos upon discovering that Ramos had urinated on the floor.  Detective Nordo began yelling and screaming at the Defendant and called him a "dirty motherfucker" for urinating on the floor.

20.   Detectives Nordo and Aitken later returned to the isolation room where Defendant Ramos was being held accompanied by a Hispanic male unknown to the Defendant at the time for a highly-suggestive, one-on-one identification. The unknown male, later identified as Amil Gonzalez, was asked by Detective Nordo if Mr. Ramos was the shooter, the man he saw shoot the decedent, Mr. Martinez, but Mr. Gonzalez said no. Mr. Ramos was not the shooter, nor did Mr. Gonzalez identify him as the driver.

21.   After hours and hours of detention without food or anything to drink, and feeling physically and emotionally fatigued, Detectives Nordo and Aitken again returned to the isolation room and told the Defendant that his co-defendant, Mr. Ruiz, had named him (Defendant) as the shooter.

(6)

22. At this point in the custodial detention, Detective Nordo softened his tone and warned Mr. Ramos that he better say something because they didn't think he had killed anyone. Mr. Ramos was also told that he needed to make a statement and that upon giving a statement, would be given food, a soda, whatever he needed.

23. It is important to stress that, despite his repeated requests to speak with his lawyer prior to the giving of any statement, Mr. Ramos's requests were not scrupulously honored nor was he permitted the opportunity to contact an attorney, which constitutes a blatant, **Miranda** and **Edwards** violation.   See **Miranda v. Arizona**, 384 U.S. 436, 496, 86 S.Ct. 1602, 1639 16 L.Ed.2d 694(1966)("There can be no questioning if defendant indicates in any manner and at any stage of interrogation process that he wishes to consult with an attorney before speaking). See also **Edwards v. Arizona**, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981)(holding that once a defendant requests counsel, "the interrogation must cease until an attorney is present[,]" citing **Miranda**, **supra**., 384 U.S. at 474, 86 S.Ct. 1602).

24. After thirty plus hours of detention and isolation since first being taken into custody, having asked to speak with a lawyer several times, and being deprived of food, water and restroom privileges, a physically exhausted, emotionally fatigued and drug-dependent Defendant still suffering from the effects of a combination of drugs finally agreed to give a statement hoping to end the conditions of his confinement and be treated more favorably.  Defendant Ramos was quickly moved to a more open, office-like setting, provided with a chicken pot pie, some juice, and eventually given a cigarette during the taking of his statement.

25. As Detectives Nordo and Aitken took turns asking questions

(7)

and typing the Defendant's alleged responses, both stopped
several times when they didn't like the answers being pro-
vided by Mr. Ramos prompting several discussions, presumably
because his answers did not match up with their theory of the
case or the facts as they perceived them to be, and directed
Mr. Ramos to change his answers to fit their theory of the
case and sequence of events which is highly unethical and
improper.

26.   For example, when Mr. Ramos informed the detectives that he
drove directly back to his home on Waterloo after leaving A
and Wishart, Detective Nordo got upset, stopped typing, and
told the Defendant that his answer "didn't make sense," that
"he had to say he drove straight to Swanson from Wishart" so
Mr. Ramos agreed to it just to appease Detective Nordo.

27.   After giving a statement and altering his answers to please
Detective Nordo, Mr. Ramos was taken by Detectives Nordo and
Aitken back downstairs to the round house part of the build-
ing where other prisoners were being detained and into the
the booking area where they told a woman working there that
Mr. Ramos was being charged with Murder, Conspiracy to
Murder and VUFA.

28.   Mr. Ramos was then transported to 8th and Race where they
took the following items from him: a gold key chain; a ring;
his welfare card; his ID;his keys; and a cellphone.  After a
period of roughly sixteen hours, Mr. Ramos was removed from
a holding cell and taken into another room with public
defender representatives to sign papers indicating that he
did not wish to make any statements without a lawyer present
and other things he doesn't recall.

29.   Defendant Ramos was then transferred to CFCF where blood and
urine samples were collected from him during his in-process-

(8)

ing. Results which he has independently attempted to obtain under the Right-To-Know-Law without success. Defendant Ramos is in pursuit of this evidence to establish his level of intoxication at the time of his statement and to further establish what drugs and other intoxicants remained in his system forty plus hours after the custodial detention and interrogation. Accordingly, Mr. Ramos seeks the issuance of subpoenas to compel the production of all blood and urinal-ysis test results for use in an evidentiary hearing if granted.

30. While incarcerated at CFCF, Mr. Ramos and his co-defendant, Mr. Ruiz, were unwittingly housed on the same cell block where Mr. Ramos was repeatedly approached, pressured and threatened by Mr. Ruiz to change his statement, necessita-ting the Defendant's transfer to another facility, PICC Prison for his own safety.

31. After his transfer from CFCF to PICC, Defendant Ramos was transported by police back to 8th and Race to speak with a Detective Lucke about information he possessed concerning an unrelated homicide in the Devine case. Mr. Ramos was initi-ally cooperative and gave a statement concerning what he had personally heard from the defendant in that case, but later became uncooperative in that investigation and prosecution after learning that a "hit" had been placed on him. Fearing for his own life and possible retaliation against his family, Mr. Ramos refused to cooperate further or testify favorably as a witness for the prosecution.

## PRELIMINARY HEARING

32. On January 15, 2008, a preliminary hearing was held before the Honorable David C. Shuter in room #306 of the Criminal Justice Center at Case No. MC-51-CR-0000966-2007. This pro-ceeding has been transcribed and reduced to a transcript as

(9)

reported by Meg Clark, RMR, CRR. (215) 683-8009.

33. During the preliminary hearing the only witness to testify was Detective Nordo, whose testimony centered upon Mr. Ramos's unlawfully obtained statement. No other witnesses were present or called. Mr. Ramos was represented at this proceeding by Mr. Michael J. Diamondstein, Esquire. His address is:

> Michael J. Diamondstein, Esquire
> Two Penn Center; Suite 900
> 15th Floor
> JFK Blvd.
> Philadelphia, PA 19102
> (215) 940-2700

34. At the conclusion of the hearing, Defendant Ramos was held over for court on four charges: Conspiracy to Murder of the Third Degree (18 Pa.C.S. § 903 §§C); Firearms Not To Be Carried W/O License (18 Pa.C.S. § 6106 §§A1); Carrying Firearms In Public In Philadelphia (18 Pa.C.S. § 6108); and Possession Of Instruments Of Crime W/Intent (18 Pa.C.S. § 907 §§A). Arraignment was scheduled for February 5, 2008 in Room 505 of the Criminal Justice Center at 10:30 AM.

## COURT CASE CREATED-COURT OF COMMON PLEAS

35. On January 16, 2008, a court docket was opened at CP-51-CR-0000561-2008 charging Defendant Ramos with the aforementioned crimes listed above at paragraph 34 and adding a fifth charge of Murder of the Third Degree (18 Pa.C.S. § 2502 §§C) by Information.

## SUPPRESSION PROCEEDINGS

36. On July 20, 2009 and July 30, 2009, separate hearings were conducted on Defendant Ramos's motion to suppress the statement taken by Detective Nordo before the Honorable Jeffrey P. Minehart. These proceedings have both been transcribed and

(10)

reduced to a transcript as reported by Tracy Allen, OCR. Mr.
Ramos was represented at these proceedings by Attorney Michael
Diamondstein.

37. During the course of these proceedings, Attorney Diamondstein
focused on police procedures and the length of time Mr. Ramos
was subject to detention prior to the giving of a statement
and his initial arraignment. Although Attorney Diamondstein
hinted at the Defendant's physical and emotional condition,
the lack of food and drink, and lack of a restroom or restroom
privileges for thirty plus hours, Attorney Diamondstein failed
to call the Defendant as a witness to establish the conditions
of his detention, his repeated requests to speak to an attor-
ney, and failed to advise Mr. Ramos of his absolute right to
testify at these proceedings to establish facts relevant to
the question before the Court.

38. At the conclusion of these proceedings on July 30, 2009, Judge
Minehart credited the detectives testimony and ultimately
determined that the challenged statement was voluntarily
obtained without ever hearing from the Defendant and absent
Attorney Diamondstein putting on any evidence capable of
fairly establishing what drugs and other intoxicants were pre-
sent in the Defendant's system at the time of the taking of
the challenged statement, and still present in his system
when processed into CFCF by failing to obtain the results of
his blood and urinalysis testing.

39. Given the "totality of the circumstances" standard and test
to be applied to challenges to the voluntariness of statements
obtained during a custodial detention and interrogation,
Attorney Diamondstein's failure to call Defendant Ramos as a
witness at these proceedings was objectively unreasonable and
prejudicial because it prevented the Defendant from estab-
lishing critical facts  relevant to the question of voluntari-

(11)

ness and capable of discrediting the Commonwealth's police
witnesses.

## WAIVER TRIAL

40. Mr. Ramos and his co-defendant, Carlos Ruiz, proceeded to a
joint, non-capital waiver trial before the Honorable Shelley
Robins New in Courtroom 607 of the Criminal Justice Center.
Trial began on August 05, 2009 and concluded on August 06,
2009. Mr. Ramos was represented at trial by Attorney Michael
J. Diamondstein. These proceedings have been transcribed and
reduced to a transcript as reported by Diane S. Raquet, RPR.

41. The most incriminating evidence adduced at trial stemmed
from Mr. Ramos's own challenged statement which he maintains
should not have been used against him directly or indirectly
through Detective Nordo's testimony, and the testimony of
Miss Allison Ramirez. Arguably, Miss Ramirez had a colorable
bias against Defendant Ramos given their prior history as a
couple, but Attorney Diamondstein failed to use the troubled
relationship as a means of impeaching her and establishing a
motive for her to lie.  Moreover, Attorney Diamondstein
failed to investigate Miss Ramirez's background and uncover
her criminal history which included crimes of crimen falsi
stemming from welfare fraud.  Such information was easily
uncovered simply by initiating a search on the ujs website
and obtaining certified copies of her convictions from the
Clerk of Courts office.

42. Arguably, the evidence adduced at trial was conflicting and
supported  two opposing inferences proving neither.  It is
apparent on the face of the record that the Commonwealth put
on not one, but two theories of the case with witnesses
pointing to Mr. Ramos as the shooter if we are to believe
Miss Ramirez and her testimony that he confessed the same to

(12)

her, versus Detective Nordo's testimony that Mr. Ramos had given a voluntary statement identifying Mr. Ruiz as the shooter.  The evidence put on was not overwhelming and the evidence adduced failed to establish that Mr. Ramos had engaged in a conspiracy much less shot the decedent.  Quite simply, Mr. Ramos's presence at the scene and having operated the vehicle did not establish complicity in the crime or that he had in any manner participated in any planning of the crime, but rather, was lured into the situation and acted under duress, a defense that Attorney Diamondstein failed to pursue or introduce as a partial defense.  One must ask oneself what they would have done had they unwittingly found themselves in the Defendant's position and looking down the barrel of a gun. Would you have complied with an armed gunman's directives and did as you were told, or risked a bullet to the head?  The only thing Defendant Ramos is guilty of in this case is poor choices and the Commonwealth failed to prove otherwise regardless of the verdicts entered.

43. During trial, Defendant Ramos, on the advice of his attorney, did not testify in his own defense and at the conclusion of trial, was found guilty by Judge New of Murder in the Third Degree, Conspiracy to Third Degree Murder and VUFA.

## SENTENCING

44. On October 29, 2009, Defendant Ramos appeared before Judge New for sentencing and was sentenced as follows: On Count Five, Murder of the Third Degree, $7\frac{1}{2}$ to 15 years with credit for all time served; On Count Two, the VUFA charge, no further penalty (NFP); On Count One, Conspiracy to Murder of the Third Degree, $7\frac{1}{2}$ to 15 years concurrent to Count Five and Counts three and Four were nolle prossed. The Court further ordered Defendant Ramos to pay all fines and court costs, to receive drug treatment while incarcerated, and as a condition of his sentence, that he obtain a GED Diploma. This proceeding

(13)

has been transcribed and reduced to a transcript, as reported by Diane Raquet, OCR.

## POST-SENTENCE MOTIONS

45. On November 02, 2009, Attorney Diamondstein filed a post-sentence motion on Defendant Ramos's behalf. Defendant is unclear of the issues raised in that motion as he has not been provided with a copy of it prior to the instant filing. The Court denied the motion on November 3, 2009, and counsel failed to file a notice of appeal on Mr. Ramos's behalf, causing his direct appeal rights to lapse.

## POST-CONVICTION PETITIONS

46. On December 09, 2009, court-appointed counsel, Mr. Mitchell S. Strutin, Esquire, entered an appearance on behalf of Mr. Ramos. His address is as follows:

> Mr. Michael S. Strutin, Esquire
> Two Penn Center; Suite 200
> JFK Blvd.
> Philadelphia, PA 19102
> (215) 854-6406

47. On February 01, 2010, Attorney Strutin filed a Post-Conviction Relief Act (PCRA) Petition seeking reinstatement of Ramos's direct appeal rights. Defendant Ramos does not have a copy of that petition and is currently unaware whether other issues were also presented in that initial petition.

48. On January 10, 2011, nearly a year later, Judge Shelley Robins New entered an Order reinstating Mr. Ramos's right to file a notice of appeal nunc pro tunc from the judgment entered on October 29, 2009. Because his first petition served only to reinstate his appellate rights, the first petition is not to be counted against him and does not qualify as a first peti-tion under the law.

(14)

## DIRECT APPEAL

49. On January 14, 2011, Attorney Strutin filed a timely notice of appeal to the Superior Court of Pennsylvania on Mr. Ramos's behalf, as well as, a motion for transcripts.

50. After preliminary matters and the filing of a Rule 1925(b) Statement and Opinion by the Court, Defendant Ramos's judgment of sentence was later affirmed by the Superior Court on appeal on February 15, 2012.

## PETITION FOR ALLOWANCE OF APPEAL

51. On February 28, 2012, Defendant Ramos, through counsel, filed a timely petition for allowance of appeal to the Supreme Court of Pennsylvania at 93 EAL 2012.

52. On July 16, 2012, the Supreme Court denied the Defendant's petition for allowance of appeal triggering his 90-day dead-line to petition for certiorari in the United States Supreme Court by operation of U.S. Supreme Court Rule 13 before the one-year statute of limitations would commence on both his right to petition for post-conviction relief in the trial court under the PCRA subject to the timing provisions of 42 Pa.C.S. § 9545(b), and in the federal court under § 2254 subject to the provisions of 28 U.S.C. § 2244(d).

53. Defendant Ramos did not seek certiorari and the one-year statute of limitations period began to run on both his state and federal avenues of relief on October 14, 2012, giving Mr. Ramos 365-days or until October 13, 2013 to file a timely PCRA petition to be counted as his first and toll the statute of limitations on his federal habeas corpus rights once filed.

## TIMELINESS OF THE INSTANT PETITION

54. Pursuant to the requirements of 42 Pa.C.S. § 9545(b)(1), the instant petition is timely filed.

## STATUS OF THE DEFENDANT

55. Defendant, Jesus Ramos, is currently incarcerated in the custody of the Department of Corrections at Inmate Number JG-5518 and presently serving the 7½ to 15 year sentence imposed by this Honorable Court at the State Correctional Institution at Forest (S.C.I. Forest), 286 Woodland Drive, P.O. Box 307, Marienville, PA 16239, (814) 621-2110. S.C.I. Forest is geographically located one mile North of Marienville, Pennsylvania on State Route 66 North in Forest County, Pennsylvania, where he is unlawfully being detained and constrained of his liberty in violation of the Constitution and laws of Pennsylvania, and the Constitution and laws of the United States as set forth within the instant petition.

## JURISDICTION

56. This Honorable Court would have general jurisdiction in this matter in that Defendant Ramos is currently serving a sentence of incarceration imposed by this Court on October 29, 2009, by the Honorable Shelley Robins New following his conviction after a waiver trial before the same judicial officer. 42 Pa. C.S. § 9545(a).

## WAIVER AND PREVIOUS LITIGATION

57. In order to succeed in post-conviction relief under the Act, a defendant must plead and prove that the claim or claims raised have not been previously litigated or waived. 42 Pa.C. S. § 9543(a)(3).

58. Defendant Ramos avers that the instant claims have not been previously litigated or waived. 42 Pa.C.S. § 9544.

(16)

59.   Defendant Ramos further avers that the claims raised herein
      are not waived under the general rule announced in **Commonwealth
      v. Grant**, 572 Pa. 48, 813 A.2d 726 (Pa. 2002). Pursuant to
      **Grant**, **supra.**, a defendant must wait to raise claims of ineff-
      ective assistance of counsel until collateral review and those
      claims will not be deemed waived, as clarified by the Supreme
      Court of Pennsylvania in **Commonwealth v. Grant**, 573 Pa. 141,
      821 A.2d 1246 (Pa. 2003)(Per Curiam).

## BURDEN OF PROOF

60.   Under Pennsylvania law, "counsel is presumed effective, and
      to rebut that presumption, the PCRA petitioner must demonstrate
      that counsel's performance was deficient and that such defic-
      iency prejudiced him." **Commonwealth v. Colavita**, 993 A.2d 874,
      886-887 (Pa. 2010)(citing to **Strickland v. Washington**, 466 U.S.
      668, 687-691, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)).

61.   In order "to prevail on an ineffective assistance of counsel
      claim, the defendant bears the burden of establishing: (1)
      an underlying claim of arguable merit; (2) no reasonable basis
      for counsel's act or omission; and (3) prejudice as a result,
      that is, a reasonable probability that but for counsel's act
      or omission, the outcome of the proceeding would have been
      different." **Commonwealth v. Cooper**, 596 Pa. 119, 941 A.2d 655,
      664 (Pa. 2007). See also **Commonwealth v. Pierce**, 515 Pa. 153,
      527 A.2d 973, 975 (Pa. 1987)(adopting the federal **Strickland
      Standard**).

## CLAIMS OF ERROR AND/OR OMISSION

62.   Defendant Ramos's conviction and/or sentence resulted from one
      or more of the following:

      A)   A violation of the Constitution of this Commonwealt

                              (17)

the Constitution or laws of the United States, which, in the circumstances of this particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place. 42 Pa.C.S. § 9543(a)(2)(i).

**Involuntary Statement**

1. Defendant Ramos's due process right to remain silent, right to consult with an attorney prior to questioning and to have counsel present during questioning under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution, and Article 1, § 9 of the Pennsylvania Constitution were blatantly violated in this case resulting in an involuntary statement when Detectives Nordo and Aitken ignored Mr. Ramos's repeated requests to speak with an attorney and deprived him of the opportunity to do so for more than 30 hours after his initial requests.

   Because Mr. Ramos's requests to speak with an attorney were not "scrupulously honored" and he did not attempt to initiate any further communication with police of his own volition while still subject to their custody, A **Miranda** and **Edwards** violation is present and should have resulted in the suppression of the statement illegally obtained by detectives in this case after Mr. Ramos had invoked and attempted to assert his right to counsel. See **Miranda v. Arizona**, 384 U.S. 436, 473-474, 86 S.Ct. 1602, 1627-1628, 16 L.Ed.2d 694 (1966); **Edwards v. Arizona**, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981); **McNeil v. Wisconsin**, 501 U.S. 171, 177, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991); **Koras v. Robinson**, 257 F.Supp.2d 941 (E.D.Mich. 2003). See also **Commonwealth v. Edwards**, 588 Pa. 151, 903 A.2d 1139 (Pa. 2006); **Commonwealth v. Gaul**, 867 A.2d 557 (Pa. Super. 2005).

2. Apart from the detectives failure to honor Mr. Ramos's requests to speak with an attorney, his statement should also have been ruled involuntary and banned from use against him at trial as substantive evidence either directly or indirectly through Detective Nordo's testimony given his physical and emotional condition after more than 30-hours of detention in isolation without food, water and toilet facilities, as well as, due to the level of intoxicants in his system at the time the statement was obtained and their effects on his decision-making capacity.  These facts, though relevant, were never introduced or considered by the suppression court under the "totality of the circumstances" standard applicable to a proper determination of the voluntariness of the challenged statement due to trial counsel's failure to call Mr. Ramos as a witness at suppression, and counsel's failure to obtain and introduce results of blood and urinalysis testing conducted on the Defendant when processed into CFCF.

### Confrontation Violation

3. Defendant Ramos was denied due process of law and his right to a fair trial as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article 1, § 9 of the Pennsylvania Constitution when "hearsay" evidence was admitted against him without objection and Mr. Ramos denied an opportunity to confront and cross-examine the Medical Examiner who actually performed the autopsy and post-mortem examination of the decedent (Mr. Martinez) in violation of his rights afforded by the Confrontation Clause of the Sixth Amendment, and Article 1, § 9 of the Pennsylvania Constitution.

   The statements, conclusions and findings listed in the report conducted and prepared by Dr. Gregory McDonald, the Medical Examiner who actually performed the post-mortem

(19)

constitute "testimonial hearsay" requiring the presence
at trial of the person who actually performed the autopsy
unless the Defendant had a prior opportunity to confront
and cross-examine the author of the report previously.
Mr. Ramos did not, hence, his Sixth Amendment and Article
1, § 9 rights were violated when the Commonwealth used
Dr. Sam Gulino, the Chief Medical Examiner, to establish
the cause and nature of the decedent's death and injuries
instead of Dr. McDonald.  Moreover, no evidence was addu-
ced by the Commonwealth at trial to establish that Dr.
McDonald was unavailable as a witness or the reasons for
his unavailability. The fact that Dr. McDonald no longer
worked in the Philadelphia Medical Examiner's Office did
not automatically render him unavailable as a witness and
the Defendant had a qualified right to question him per-
sonally.  See **Melendez-Diaz v. Massachusetts**, 557 U.S. ___,
129 S.Ct. 2527, 174 L.Ed.2d 314 (2009)(decided June 25,
2009 and available at the time of commencement of the trial
in this case, 08/05/2009, as controlling precedent).

## Failure To Make A Determination Of Defendant's Ability To Pay The Fines And Costs (Penal Sanctions) Imposed

4.    Defendant Ramos was denied due process of law and the
rights afforded by the First, Fifth, Sixth, Eighth and
Fourteenth Amendments to the United States Constitution
when the sentencing court automatically imposed fines and
costs (penal sanctions) without first making a determina-
tion of Mr. Ramos's ability to pay the costs and fines
imposed.  Because a hearing was not conducted and a proper
determination made, Mr. Ramos was denied due process of
law and his sentence to fines and costs imposed unlawful,
resulting in an illegal sentence. See **Turner v. Rogers**,
564 U.S. ___, 131 S.Ct. 2507 (2011)(due process requires
that a court make a determination of a defendant's
ability to pay before imposing restitution, fines, and
court costs);

(20)

**Matthews v. Eldridge**, 424 U.S. 319, 334-335 (1976)("[t]he fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner'"); **Shelley v. Kraemer**, 334 U.S. 1, 23 (1948) ("[t]he action of a state court in imposing penalties or depriving parties of their substantive rights without providing adequate notice and opportunity to defend, has, of course, long been regarded as a denial of the due process of law guaranteed by the Fourteenth Amendment"). See also **Commonwealth v. Gaddis**, 432 Pa.Super. 523, 543, 639 A.2d 462, 473 (1994); **Commonwealth v. Larsen**, 452 Pa. Super. 508, 530, 682 A.2d 783, 794 (1996); **Commonwealth v. Allshouse**, 924 A.2d 1215, 1227-1228 (Pa. Super. 2007).

B)    Ineffective assistance of counsel which, in the circumstances of this particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place. 42 Pa.C.S. § 9543(a)(2)(ii).

1.    Defendant Ramos was denied the effective assistance of counsel as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Article 1, § 9 of the Pennsylvania Constitution in each of the following respects:

**Pre-Trial Preparation/Investigation**

(a)   Attorney Diamondstein acted ineffectively by failing to subpoena and obtain the test results of blood and urinalysis testing conducted on Mr. Ramos when first processed into CFCF for use at suppression to establish the presence and level of cocaine and other intoxicants in his system at the time of the custodial detention, interrogation and taking of the challenged statement. Proof of drug usage and level of intoxication at the time of the challenged

(21)

statement was clearly relevant to the question of volun-
tariness and a proper factor to be considered under the
"totality of the circumstances" standard applicable to
challenges to the voluntariness of a statement and pur-
ported **Miranda** waivers. See **Commonwealth v. Perez**, 577 Pa.
360, 845 A.2d 779 (Pa. 2004); **Commonwealth v. Templin**,
568 Pa. 306, 795 A.2d 959 (Pa. 2002); **Commonwealth v.
Walker**, 470 Pa. 534, 368 A.2d 1284 (Pa. 1977). See also
**Commonwealth v. McGeachy**, 487 Pa. 25, 407 A.2d 1300 (Pa.
1979); **Commonwealth v. O'Bryant**, 479 Pa. 534, 388 A.2d
1059 (Pa. 1978); **Commonwealth v. Holton**, 432 Pa. 11, 17,
247 A.2d 228, 231 (Pa. 1968).

(b) Attorney Diamondstein acted ineffectively by failing to
interview and call Detective Aitken as a defense witness
during suppression and trial to substantiate Defendant
Ramos's claims of having invoked his right to counsel and
to speak with a lawyer prior to further police-initiated
interrogation and the giving of his challenged statement.

Detective Aitken should also have been called to
separately establish the conditions attendant to Mr.
Ramos's detention, Ramos's physical and emotional state
from his his own independent perspective at the time, and
to substantiate Ramos's claims to counsel and the detect-
ives of his having used cocaine to account for the blood
on his clothing, as well as, the seizure of his clothing
for testing while detained.  Even though the prosecution
inexplicably failed to call Detective Aitken separately
as a witness in this case at suppression or trial, Attorney
Diamondstein was certainly entitled to call him as a wit-
ness for the defense of his own volition to not only
challenge Detective Nordo's account and recollection of
events, but also to establish the extent of Aitken's involv-
ement in Ramos's interrogation and what he had actually
personally witnessed.  Mr. Ramos asserts that Detective
Aitken was unwilling to perjure himself and testify falsely

(22)

to further the prosecution's case and salvage what he knew to be an unlawfully obtained statement. Thus, because the prosecution knew that Detective Aitken's truthful testimony would have been adverse to their position on the taking of the statement and the Defendant's condition at the time, Detective Aitken simply was not called. See **Commonwealth v. Mejia-Arias**, 734 A.2d 870 (Pa. Super. 1999) (acknowledging a defense attorney's right to separately call police witnesses).

(c) Attorney Diamondstein acted ineffectively by failing to investigate Miss Ramirez's criminal background in this case for evidence of crimen falsi convictions capable of undermining her credibility as a witness for use at trial. Miss Ramirez, at a minimum, was convicted of welfare fraud in the Court of Common Pleas of Philadelphia County in or about 2007, and such criminal history information was readily discoverable simply by running her name on the Unified Justice System's (UJS) public criminal docket sheets website (http://ujsportal.pacourts.us/default.aspx), and then obtaining certified copies of her crimen falsi convictions from the Clerk of Courts Office or other authorized court official.  Given that Miss Ramirez was a critical witness against Mr. Ramos at trial, evidence reflective of her dishonesty and deceitful nature was a relevant consideration for the Court in assessing her credibility, an error of cross-examination that went unexplored.

**Suppression**

(d) Attorney Diamondstein acted ineffectively by failing to advise Mr. Ramos of his right to testify as a witness in his own defense during suppression, and by failing to call him as a witness to establish the facts and circumstances attendant to his custodial detention and interrogation,

(23)

his physical and emotional state, his repeated requests to speak with an attorney prior to giving the challenged statement that were ignored, and the drugs that were in his system at the time.  Counsel's failure to call Mr. Ramos as a witness during suppression deprived him of due process, **Commonwealth v. McLaurin**, 437 A.2d 440 (Pa. Super. 1981), and deprived the suppression court (Judge Minehart) of critical evidence necessary to a proper determination of the voluntariness of the statement obtained and validity of the alleged **Miranda** waiver.

Moreover, because such factors were never introduced or even considered by Judge Minehart, the suppression ruling entered is unreliable, factually incomplete, and should be ruled invalid and improvidently granted in the interests of justice.  Here, Attorney Diamondstein's failure to establish and develop equally relevant facts directly through Mr. Ramos's testimony is inexcusable given that, pursuant to Pennsylvania Rules of Criminal Procedure ("Pa.R.Crim.P."), Rule 581(H), Mr. Ramos had a clear right to testify at suppression without waiving or otherwise forfeiting his Fifth Amendment right to remain silent at a subsequent trial.  Considering the protections afforded by Pa.R.Crim.P. 581(H), and the absolute necessity of Mr. Ramos's testimony to refute the false testimony and misleading statement of facts given by Detective Nordo in this case, counsel's failure to call him as a witness in his own defense during suppression was objectively unreasonable and prevented him from establishing "true" facts attendant to his custodial detention and interrogation.

(e) Attorney Diamondstein acted ineffectively by failing to subpoena and call Detective Aitken as an independent witness for the defense during suppression in an attempt to impeach Detective Nordo and establish that Detective Nordo was less than candid concerning the true circumstances of Mr. Ramos's detention and how the statement was obtained.

(24)

### Trial Issues

(f) Attorney Diamondstein performed ineffectively at trial by failing to file a motion in limine seeking to re-visit and exclude Mr. Ramos's unlawfully obtained statement or otherwise attempt to relitigate suppression anew before the judicial officer (Judge New) who would actually be trying the case based upon the alternative grounds for suppression set forth within the instant petition that had not been previously addressed or even considered by Judge Minehart in his earlier suppression ruling. Arguably, the grounds for relief put forth herein by Defendant Ramos offered a greater potential for success than the limited grounds put forth by counsel during the initial suppression proceedings of July 20, 2009, and July 30, 2009.

Relitigation of suppression is permitted, and a court of common pleas is not bound by its initial suppression ruling. Especially when brought before a different judicial officer. See **Commonwealth v. Rodriguez,** 679 A.2d 1320 (Pa. Super. 1996)(recognizing that a court of common pleas is not bound by its initial suppression ruling).

(g) Attorney Diamondstein performed ineffectively at trial when he was unprepared to confront and impeach Miss Ramirez's surprise testimony concerning statements that were allegedly made to her by Defendant Ramos over the telephone while he was incarcerated in prison awaiting trial. All calls made from state and county prisons and jails are digitally recorded and stored, and are retrievable and discoverable by subpoena or other court order. Attorney Diamondstein could have requested a continuance and sought an appropriate order or subpoenas from the Court to obtain these recordings and use them to impeach Miss Ramirez's testimony. Such would have been an appropriate remedy to cure any prejudice from the "surprise"

(25)

disclosures, and more than likely, would have been granted by Judge New being that it was a waiver trial rather than a jury trial, and because such evidence bore directly on Miss Ramirez's credibility as a witness.

Moreover, given the constant references to cell and land-line phone calls, Attorney Diamondstein can also be faulted for failing to obtain all relevant cell and land-line telephone calls to Miss Rivera's residence on the date of the shooting, 01/03/2007, and those from the Defendant's cellular and home phone on the date of the incident by subpoenaing the records from all telephone service providers.

(h) Attorney Diamondstein performed ineffectively at trial when he failed to object to Miss Rivera's testimony and move to have it struck from the record on the grounds that the substance of her testimony was unlawfully obtained by her illegally listening in on Defendant Ramos's and Miss Ramirez's private phone conversation by eavesdropping on the conversation without his knowledge. Clearly an expectation of privacy was present and the aural interception qualifies as a violation of the Wiretap Act under federal law. Moreover, the prosecution neglected to lay a proper foundation for the introduction of Miss Rivera's testimony by failing to separately establish whether or not Miss Ramirez had knowingly consented to her sister's listening in on the call, or whether Miss Ramirez had informed Mr. Ramos that the phone conversation was being monitored by her sister Marangeli on a second handset. Had the conversation also have been illegally recorded, any such recording would not have been admissable under Pennsylvania law. Likewise then, Miss Rivera should not have been permitted to playback what she allegedly overheard through her own verbal testimony from memory given the manner in which it was obtained.

(26)

Accordingly, grounds existed to have Miss Rivera's testimony purporting to overhear Mr. Ramos tell Miss Ramirez that "they went and shot a guy," that "he shot" a guy excluded. Given the familial connection between Miss Ramirez and Miss Rivera as sisters, the prosecution's attempt to bolster Miss Ramirez's testimony through that of her sister should be considered highly suspect and inadmissable considering the questionable nature and lawfulness of how Miss Rivera , by her own admission of eavesdropping, overheard the alleged statements.

(i) Attorney Diamondstein performed ineffectively at trial by failing to present the partial defense of "duress." At trial, when arguing for a mistrial occassioned by Miss Ramirez's "surprise" testimony concerning admissions not previously disclosed, Attorney Diamondstein indicated that his defense was that Mr. Ramos "wasn't the shooter," that "he had nothing to do with this." See **N.T., 08/05/09, p. 144.** Mr. Ramos maintains that he had no foreknowledge of what was to happen that fateful day, and that he was not part of any conspiracy or had in any way participated in planning to carry out the shooting of the decedent, Mr. Martinez, or any other individuals involved in the attack on Mr. Ruiz, Ramos's co-defendant.

Arguably, given that the prosecution had witnesses willing to come in and testify that Mr. Ramos was involved in some capacity, a defense that he had nothing to do with it, when coupled with his statement made such a defense likely to fail. When faced with these circumstances, to establish that Mr. Ramos acted under duress out of fear for his own life at the sight of the gun would have made much more sense to the average citizen, as well as, an experienced trial judge who confronts the realities of guns and the fear they invoke on a regular basis. Considering that Mr. Ramos himself was a shooting victim, his fears

(27)

when confronted with a handgun and the sound of gunfire are not only understandable, but could cause a reasonable person to fairly conclude that Mr. Ramos acted solely out of fear under duress, had not engaged in a conspiracy, and unwittingly served as a getaway driver in a homicide. There just simply is not enough reliable evidence to conclusively show that Mr. Ramos had any foreknowledge of Mr. Ruiz's intentions or that Ramos had participated in the planning of the shooting in any manner. Mr. Ramos's mere presence at the scene as the driver of the vehicle at the time of shooting and fact that he drove the vehicle to and from that location does not automatically equate to complicity much less establish the existence of a conspiracy. See **Commonwealth v. Finley**, 477 Pa. 382, 383 A.2d 1259 (Pa. 1978)(no evidence that defendant knew of the planned crime, only that he served as the getaway driver). See also **Commonwealth v. Leach**, 455 Pa. 448, 317 A.2d 213 (Pa. 1974)(presence alone, without more, is insufficient to allow a conviction to stand).

(j) Attorney Diamondstein performed ineffectively at trial when he failed to make an objection to Dr. Sam Guliano testifying and expressing an opinion based upon the post-mortem examination and autopsy findings listed in Dr. Gregory McDonald's report. Dr. Guliano was not the Medical Examiner who actually conducted the examination or had authored the report, resulting in a Sixth Amendment, Confrontation Clause violation.

## Post-Trial/Post-Sentence Motions

(k) Attorney Diamondstein performed ineffectively by failing to file a post-verdict/post-sentence motion challenging the weight and/or the sufficiency of the evidence and seek a new trial where the Commonwealth introduced conflicting evidence capable of supporting two opposing

(28)

inferences as to the identity of the shooter, a failure
of proof proving nothing. Absent some objectively reliable
form of proof to support the verdicts, a fact finder, in
this case a judge, is not permitted to simply guess which
inference he or she will adopt in reaching a verdict. See
**Commonwealth v. Borrin**, 12 A.3d 466 (Pa. Super. 2011)
("Where the evidence of record equally supports two incon-
sistent inferences, it proves neither"); **Commonwealth v.
Crompton**, 545 Pa. 586, 682 A.2d 286 (Pa. 1996)("When a
party on whom burden of proof rests, in either a civil or
criminal case, offers evidence consistent with two opposing
propositions, he proves neither"); **Commonwealth v. Donald**,
192 Pa.Super. 276, 161 A.2d 915 (Pa. Super. 1960)("When two
equally reasonable and mutually inconsistent inferences
can be drawn from same set of circumstances, jury must not
be permitted to guess which inference to adopt, especially
when one of the two guesses may result in depriving [a]
defendant of his life or liberty")("When party on whom
rests burden of proof in either criminal or civil case
offers evidence consistent with each of two opposing prop-
ositions, he proves neither; and this rule is equally
applicable to trial without jury"). **Commonwealth v. Woong
Knee New**, 354 Pa. 188, 47 A.2d 450, 468 (Pa. 1946)(same).

   The evidence adduced by the Commonwealth in this case
was conflicting and hopelessly contradictory given that
the prosecutor, Mr. Gilson, introduced statements and
testimony that separately pointed to both Mr. Ramos and
Mr. Ruiz as the shooter.  Defendant Ramos posits that the
Commonwealth failed to meet its burden in this case because
only one of the defendants could have been the actual
shooter and the other the driver, making him less culpable
given the lack of clear evidence pointing to an actual
conspiracy, pre-planning, or an agreement to commit a
crime. For lack of a better characterization describing
Mr. Ramos's limited role in the shooting, Mr. Ramos was

(29)

simply out for a drive at the request of an acquaintance because he was a licensed driver and the acquaintance ended up shooting someone when he encountered him by chance on the street in an area near where he had been previously assaulted.

No disrespect to the Court, but the verdicts in this case rest on nothing more than surmise and conjecture. Here, the prosecutor presents the testimony of Miss Ramirez and her sister, Miss Rivera, who separately identify Mr. Ramos as the shooter purportedly based upon his own admissions. Mr. Gilson then introduces the substance of the statements of Mr. Ramos and an alleged eyewitness, Mr. Amil Gonzalez-Degaldo, as substantive evidence through the testimony of Detective Nordo and Detective Gonzalez (Badge #930).  In Ramos's statement Mr. Ruiz is identified as the shooter. In Mr. Degaldo's statement Mr. Ruiz is also identified as the shooter, but on the stand, Mr. Degaldo disavows statements attributed to him and asserts that he did not see who fired the fatal shots or say those things. Thus, at the conclusion of the Commonwealth's case we have evidence pointing to both defendants as the shooter, but little if any real evidence pointing to an actual conspiracy, pre-planning or an agreement to shoot the decedent, Mr. Martinez.

During closing, Mr. Gilson creatively tried to convince the Court that despite the conflicting evidence (and faliure of proof), Mr. Ruiz was the shooter and Mr. Ramos the driver based upon his theory of the case, a theory he failed to prove beyond a reasonable doubt.  Mr. Gilson then goes on to suggest that Defendant Ramos named himself as the shooter in a desperate attempt to either try to impress or somehow intimidate Miss Ramirez into getting back together with him, or to not cooperate with the police. Such an incredulous argument was not supported by the record, assumed facts not in evidence, and was

(30)

highly speculative at best. Assuming that Her Honor was not duped by Mr. Gilson's talismanic musings or had gazed into his crystal ball, the verdicts entered against Mr. Ramos in this case are simply not supported by the evidence adduced and should have been challenged post-verdict on both sufficiency and weight grounds given the mixed evidence presented and the opposing inferences that could be drawn from the same set of facts.

(1) Attorney Diamondstein performed ineffectively by failing to file a post-verdict/post-sentence motion seeking to re-litigate the Court's earlier suppression ruling based upon the alternative grounds for relief discussed above that he failed to present during the initial suppression proceedings held in this case which is permissible.    See **Commonwealth v. Monarch**, 510 Pa. 138, 507 A.2d 74 (Pa. 1986)(permitting relitigation of suppression issues in a post-sentence motion); **Commonwealth v. Rodriguez**, 679 A.2d 1320 (Pa. Super. 1996)(recognizing that a court of common pleas is not bound by its initial suppression ruling).


**Direct Appeal Counsel's Ineffectiveness**

(m) Attorney Strutin performed ineffectively on appeal by failing to specifically challenge the sufficiency of the evidence on appeal given the opposing inferences to be drawn from the mixed evidence presented naming both Mr. Ramos and his co-defendant, Mr. Ruiz, as the shooter. Such a significant and obvious faliure of proof on the prosecutor's part provided independent grounds to present just such a sufficiency challenge on appeal. Even though Attorney Diamondstein failed to raise this specific challenge in the post-sentence motion filed, the claim was still viable and available for the first time on appeal pursuant to Pa.R.Crim.P. 606(A)(7).

(31)

C) The imposition of a sentence greater than the lawful maximum (illegal sentence). 42 Pa.C.S. § 9543(a)(2)(vii).

**Automatic Assessment Of Fines And Costs**

1. The Court's automatic assessment of fees and costs (penal sanctions) without the benefit of a hearing and the absence of an express determination into Mr. Ramos's ability to pay violated the Defendant's rights under the First, Fifth, Sixth, Eighth and Fourteenth Amendments, and the imposition of fines and costs absent these procedural safeguards resulted in an illegal sentence and violated Sections 9726, 9728 and 9781 of the Sentencing Code. See 42 Pa.C.S. § 9726(c), § 9726(c)(1), and § 9781.  See also **Commonwealth v. Allshouse**, 924 A.2d 1215, 1227 (Pa. Super. 2007); **Commonwealth v. Gaddis**, 432 Pa.Super. 523, 541, 639 A.2d 462, 472 (1994); **Commonwealth v. Thomas**, 879 A.2d 246, 264 (Pa. Super. 2005); **George v. Beard**, 824 A.2d 393, 395 (Pa. Cmwlth. 2003).

63. Each of the above ineffective assistance of counsel claims individually and collectively could not have been the result of any rational, strategic or tactical decision by counsel. 42 Pa.C.S. § 9543(a)(4).

64. The failure to raise and/or litigate each of the claims set forth above prior to trial, during trial or on direct appeal was the direct result of each counsel's ineffectiveness.

65. Defendant Ramos avers that when reviewing claims of ineffectiveness, a reviewing court must assess the cumulative effect of error on prejudice stemming from each of the individual claims raised and not in isolation. **Commonwealth v. Johnson**, 600 Pa. 329, 966 A.2d 523, 532 (Pa. 2009)("[i]f multiple instances of deficient performance are found, the assessment of prejudice may be premised upon cumulation"). See also

(32)

<u>Wiggins v. Smith</u>, 539 U.S. 520, 534-536 (2003)(totality of errors must be considered to properly determine prejudice); <u>Williams v. Taylor</u>, 529 U.S. 362, 396-398 (2003)(acts or omissions must be considered aggregate).

## <u>STRICKLAND/PIERCE ANALYSIS</u>

66. Each of the above claims of error, omission and ineffective assistance of counsel has arguable merit.

67. The acts and omissions set forth above were without a reasonable basis.

68. Defendant Ramos was prejudiced by the acts and omissions identified above both individually and collectively as set forth within each claim.

69. Any of the facts supporting the claims of error that appear in the existing record are set forth within the instant petition.

70. Any of the facts supporting each claim that does not appear of record, including testimonial evidence, relies upon the testimony of witnesses the Defendant seeks to call if an evidentiary hearing is granted on the instant petition. The Defendant reserves the right to call additional witnesses up to and including the time of any hearing granted in this matter necessary to establish the merits of the instant claims raised within, or any future counseled petition.

## <u>INTENDED WITNESSES</u>

71. Defendant Ramos seeks to call the witnesses identified below:

A) Jesus Ramos (Defendant) (DOB-09/10/1982)
   Inmate No. JG-5518
   S.C.I. Forest, P.O. Box 945, Marienville, PA 16239

(33)

B.) Detective Ronald Aitken (Badge #955) (DOB-UNKNOWN)
Philadelphia Police Department
East Detective Division
#3901 Whitaker Avenue
Philadelphia, PA 19124

Detective Aitken will be called to verify Defendant Ramos's version of events and the circumstances surrounding the giving of a statement in this case. Detective Aitken is expected to testify in agreement with Defendant Ramos's averments contained within the instant petition, and to verify that Defendant Ramos did indeed ask to speak with an attorney several times which was not honored prior to the giving of any statement. Detective Aitken will also be called upon to testify to statements made by Defendant Ramos concerning his drug addiction, presence of blood on his clothing, and that clothing had indeed been confiscated from him.

## REQUEST FOR SUBPOENAS

72. Defendant Ramos seeks the issuance of subpoenas to compel the production of all taped phone conversations with Miss Ramirez while he was incarcerated on the instant offense and awaiting trial, so that they may be transcribed.

73. Defendant Ramos seeks the issuance of a subpoena to compel Detective Aitken's presence in court if an evidentiary hearing is granted, and production of his blood and urinalysis test results when processed into CFCF.

74. Defendant Ramos seeks a subpoena to compel the production of all criminal records and record of convictions for Miss Allison Ramirez from the Clerk of Quarter Sessions, Clerk of Courts, and/or the Prothonotary's Office of Philadelphia County, dualy certified and authenticated for admission as substantive evidence in any evidentiary hearing held in this matter.

## REQUEST FOR APPOINTMENT OF COMPETENT COUNSEL

75. Defendant Ramos is indigent, unable to pay the costs of litigation and is without the financial resources to privately

(34)

retain or otherwise obtain counsel. Defendant Ramos requests this Honorable Court to grant him leave to proceed in forma pauperis and appoint counsel to assist him in advancing and furthering the claims set forth above pursuant to Pa.R.Crim. P. 904(A),(C), and (E).

## REQUEST FOR AN EVIDENTIARY HEARING

76.  An evidentiary hearing is requested on this petition to allow the Court to receive testimony and to make the necessary cred- ibility determinations, to fairly assess the prejudice to the Defendant stemming from each of the claims raised within, and to develop a factual record to aid this Court in the proper disposition of the instant claims and/or to aid appellate review in the event the relief requested in this Court is denied. Pa.R.Crim.P. 902(A)(15).

## RIGHT TO BE PHYSICALLY PRESENT AT EVIDENTIARY HEARING

77.  Pursuant to Pa.R.Crim.P. 119(A)(6) governing the Use of Two- Way Audio-Visual Communication in Criminal Proceedings, Defendant Ramos does not consent to and will not waive his constitutional and statutory right to be physically present "in person" at any evidentiary hearing held under Pa.R.Crim. P. 908(C) and the Post Conviction Relief Act, 42 Pa.C.S. §§ 9541-9546.  The Comment to Pa.R.Crim.P. 119 makes clear "... and hearings held pursuant to Rule 908(C) and the Post Conviction Relief Act, 42 Pa.C.S.A. §§ 9541 et seq., are examples of hearings in which the defendant's consent to proceed using two-way simultaneous audio-visual communication would be required." Id.

    Rule 908(C) is clear and unambiguous--"The Judge shall [MANDATORY] permit the defendant to appear in person at the hearing..." A post conviction hearing is an adversarial and critical stage of the criminal process and has many similar- ities to a bench trial, preliminary hearing or suppression

(35)

hearing, all of which guarantee the defendant's right to be physically present in the court room to confront the witnesses face-to-face.  Any use of two-way, audio-visual technology will violate the Defendant's confrontation rights as guaranteed by the Confrontation Clause of the Sixth Amendment to the United States Constution, which affords greater protection of the right to face-to-face confrontation which was removed from the Pennsylvania Constitution by amendment of Article 1, § 9.

78.   The instant petition fully complies with all the necessary pleading requirements of the Post Conviction Relief Act (PCRA), 42 Pa.C.S. §§ 9541 et seq., 42 Pa.C.S. § 9543 and Pa.R.Crim.P. 902.  There is no requirement that a petitioner use the standard PCRA petition form produced by the Department of Corrections and clerk of courts are not permitted to refuse to file petitions merely because that form is not utilized given the limited space available. See **Commonwealth v. Jerman**, 762 A.2d 366, 368 (Pa. Super. 2000);**Commonwealth v. Kutnyak**, 781 A.2d 1259, 1261 (Pa. Super. 2001).

79.   Defendant Ramos reserves the right to further amend and/or supplement the instant petition and/or raise additional claims, including orally at any evidentiary hearing pursuant to Pa. R.Crim.P. 905(A). See generally **Commonwealth v. McGill**, 574 Pa. 574, 832 A.2d 1014 (Pa. 2003); **Commonwealth v. Rush**, 576 Pa. 3, 838 A.2d 651 (Pa. 2003); **Commonwealth v. Padden**, 783 A.2d 299 (Pa. Super. 2001).

80.   Any counseled amendment filed to this petition should be treated as an extension of the pro se claims raised by the Defendant and not a new, separate or replacement petition in order to preserve all claims raised pro se for the record, preferably by counsel incorporating the instant pro se petition by reference in any subsequent counseled petition(s) filed to fairly preserve all claims raised with the understanding that the PCRA court will independently review the

(36)

"entire" record, as will any reviewing court in the event the relief requested in the lower court is denied. See generally **Commonwealth v. Walls**, 993 A.2d 289 (Pa. Super. 2010); **Commonwealth v. DuPont**, 860 A.2d 525 (Pa. Super. 2004); and **Commonwealth v. Jordan**, 772 A.2d 1011 (Pa. Super. 2001).

81. Defendant Ramos avers that he is innocent of the crimes for which he was convicted and that he did not at any time knowingly participate in a conspiracy or planning of the shooting of the decedent in this case, Mr. Martinez.

## CONCLUSION

82. In conclusion, the individual and collective errors complained of and omissions have resulted in the conviction of an innocent person in violation of the Constitution and laws of the United States, and the Constitution and laws of Pennsylvania as set forth within.

## REQUEST FOR RELIEF

83. After due consideration of the substance and merit of each of the foregoing claims of error and omission, Defendant Ramos moves this Honorable Court to:

A) Appoint competent counsel;
B) Order an evidentiary hearing to receive testimony and develop a factual record on each of the above claims;
C) Compel the attendance of the witnesses named above;
D) Issue subpoenas to compel the production of the evidence requested necessary for the Defendant to prove his claims seeing how the burden is now on him;
E) Prepare a Transport Order compelling Defendant Ramos's physical presence in-person before the Court;
F) Find trial and direct appeal counsel ineffective;
G) Find the Defendant's challenged statement unlawfully

(37)

obtained in violation of **Miranda** and **Edwards**, declare a mistrial, and vacate the judgment of conviction and sentence and grant any such other relief the Court deems necessary, just and appropriate.

**WHEREFORE,** the Defendant, Jesus Ramos, respectfully requests this Honorable Court grant the relief requested herein and give right a second opportunity to prevail in the interests of justice.

Respectfully submitted,

DATE: _07/23/20 3_

_Jesus Ramos_

Jesus Ramos (PP#1003014)
Inmate No. JG-5518
S.C.I. Forest
P.O. Box 945
Marienville, PA 16239
(814) 621-2110

(38)

## VERIFICATION

I, Jesus Ramos, hereby verify that the foregoing is true and correct to the best of my own knowledge, information and belief. I understand that any false statements herein are made subject to the penalties of 18 Pa.C.S. § 4904, relating to unsworn falsification to authorities.

Respectfully submitted,

DATE: _07 /23 /2018_

_Jesus Ramos_

Jesus Ramos (PP#1003014)
Inmate No. JG-5518
S.C.I. Forest
P.O. Box 945
Marienville, PA 16239
(814) 621-2110

(39)