**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| Jesus Ramos | : | |
| | : | Civil Action |
| v. | : | No. 18-4920 |
| | : | |
| Melissa Hainsworth, et al. | : | |

**PETITIONER JESUS RAMOS'S AMENDED 28 U.S.C. § 2254 PETITION**

Petitioner Jesus Ramos respectfully requests that this Court order the Commonwealth of Pennsylvania to grant a retrial or to release him from confinement. Mr. Ramos contends that the now-infamous Detective Philip Nordo coerced his alleged confession, including but not limited to through the use of physical violence and sexual abuse. Despite the coercion, his trial counsel advised him not to testify at a pre-trial suppression hearing. At the hearing, the trial court declined to suppress his alleged confession. Mr. Ramos was then convicted based in large part on his confession. In state-court collateral proceedings, Mr. Ramos challenged his trial counsel's performance as ineffective.

Pennsylvania's courts rejected Mr. Ramos's ineffectiveness claim on the ground that it was irrelevant whether Detective Nordo coerced Mr. Ramos's confession. Instead, it found that testimony of Mr. Ramos's then-girlfriend was sufficient to support his conviction regardless of the coercion of a confession. Mr. Ramos now asserts that Pennsylvania is detaining him in violation of the federal constitution and requests relief under § 2254.

**PROCEDURAL HISTORY**

1. On August 6, 2009, Mr. Ramos was convicted of third-degree murder, conspiracy to commit third-degree murder, and carrying a gun without a license in the Court of Common Pleas of Philadelphia County at Docket No. CP-51-CR-0000561-2006.

2. On October 29, 2007, Mr. Ramos was sentenced to 7.5-to-15 years' confinement.

3. Mr. Ramos took a direct appeal to the Superior Court of Pennsylvania at Docket No. 1156 E.D.A. 2008. On February 15, 2012, the Superior Court affirmed his judgment of sentence. The decision is unreported.

4. Mr. Ramos sought discretionary review of the Superior Court's decision in the Pennsylvania Supreme Court at Docket No. 93 E.A.L. 2012. The Pennsylvania Supreme Court denied allocatur on July 16, 2012.

5. On July 30, 2013, Mr. Ramos filed a petition under Pennsylvania's Post Conviction Relief Act.

6. Relevant here, he challenged trial counsel as ineffective for advising him not to testify at a pre-trial suppression hearing. Mr. Ramos contended that Detective Nordo coerced his confession, yet trial counsel advised him not to testify to that effect.

7. The PCRA court denied the petition without a hearing on January 6, 2017.

8. On January 17, 2017, Mr. Ramos appealed the denial of his PCRA petition to the Superior Court of Pennsylvania at Docket No. 289 E.D.A. 2017.

9. On April 16, 2018, the Superior Court affirmed the trial court's dismissal of Mr. Ramos's PCRA petition.

10. On April 23, 2018, Mr. Ramos sought discretionary review of the Superior Court's decision at Docket No. 177 E.A.L. 2018.

11. On August 29, 2018, the Pennsylvania Supreme Court denied allocatur.

12. Mr. Ramos filed a *pro se* petition for a writ of habeas corpus. This Court docketed it on November 13, 2018.

13. The *pro se* petition challenged trial counsel's ineffectiveness as to advising Mr. Ramos not to testify at the pre-trial suppression hearing.

14. Mr. Ramos now seeks to amend his petition to raise the same claim through counsel.

## TRIAL EVIDENCE

15. The Commonwealth of Pennsylvania charged Mr. Ramos with murder, conspiracy to commit murder, and weapons charges.

16. The Commonwealth claimed that he conspired with his co-defendant, Carlos "Primo" Ruiz.

17. Mr. Ramos and Ruiz had a two-day bench trial in August of 2009.

18. The primary evidence at trial consisted of a purported confession that Mr. Ramos gave to Detective Nordo; a confession that Mr. Ramos allegedly gave to his then-girlfriend Allison Ramirez; a statement from someone who may or may not have seen the shooting; and testimony about the movements of a car that Mr. Ramos and Co-Defendant Ruiz were allegedly seen in around the time of the shooting.

19. This section discusses the shooting and then these pieces of evidence in turn.

**A.    The shooting.**

20. Officer Mark Bates testified that, around noon on January 3, 2007, he responded to the scene of a shooting at 2837 North Swanson Street (the "home"). He saw a man laying on the steps in front of a home unconscious with an apparent gunshot wound. (Aug 5, 2009 N.T. at 21–25).

21. Officer Bates saw two spent cartridges, one on the sidewalk and one on the street near the home. There were two bullet holes in the door of the home. Officer Bates went into the home and saw blood. (*Id.* at 25–26).

22. Officer Bates believed that the victim was shot inside the home and then was moved out to the steps. (*Id.* at 30).

23. The victim would be identified as Marcos Martinez. (*Id.* at 24).

**B.     Amil Gonzalez's statement.**

24. Amil Gonzalez testified that he was living at the home on the day in question. He was friends with the victim. (Aug. 6, 2009 N.T. at 6).

25. He testified that the victim ran into the home. Shortly after that, Gonzalez heard two gun shots and then the victim fell to the floor inside of the home. (*Id.* at 41–42).

26. Gonzalez testified that he did not see the shooter.

27. Police officers would later take Gonzalez to the police station for an interview. There, he gave a statement that was different than his trial testimony.

28. In his statement, Gonzalez explained that he saw a burgundy-colored Toyota Camry pull up outside the home. The passenger got out and then the victim ran into the home. The passenger then fired two shots into the door, hitting the victim. Gonzalez identified Co-Defendant Ruiz as the shooter. (*Id.* at 56–65).

29. At trial, Gonzalez asserted that this statement was inaccurate. He does not speak English. He asserted that his Spanish-language statement was not accurately translated into English. (*Id.* at 56–69, 87–89).

30. Gonzalez also explained the coercive conditions of his police interview. Officers held him for a very long time, he was tired and hungry, he was denied food and water, and he did not have ready access to a bathroom. (*Id.* at 84–85).

31. In addition, Gonzalez testified that Detective Nordo hit him, pulled his hair, and said that he was lying to coerce his statement. (*Id.* at 85–87).

### C. The burgundy-colored Camry.

32. Various witnesses testified about the burgundy-colored Camry. The Commonwealth argued that Mr. Ramos drove the Camry to the home to help Co-Defendant Ruiz shoot the victim, the basis for the conspiracy and homicide charges against Mr. Ramos.

33. Allison Ramirez testified that, on the morning of the shooting, she was at her sister's house at 207 East Wishart Street. (Aug 5, 2009 N.T. at 93).

34. At that point, Ramirez had a restraining order against Mr. Ramos. (*Id.* at 97–98).

35. Ramirez testified that Mr. Ramos tried to call Ramirez's sister's house but that Ramirez ignored his calls. She went outside to smoke a cigarette and saw Mr. Ramos. (Aug 5, 2009 N.T. at 94–98).

36. Ramirez called the police and tried to keep him on scene until they could arrive. (*Id.* at 100–02).

37. At some point, Ramirez went inside to change her clothes. When she came back out, Mr. Ramos was in a burgundy-colored Camry outside the house with Co-Defendant Ruiz. She testified that Co-Defendant Ruiz was driving and Mr. Ramos was in the passenger seat. (Aug 5, 2009 N.T. at 99–103).

38. Ramirez went back inside to call the police again. She testified that, when she got back outside, Mr. Ramos and Co-Defendant Ruiz had moved the car but were still in the area. Police arrived and Mr. Ramos and Co-Defendant Ruiz left in the car. Ramirez testified that, before they left, Mr. Ramos switched over into the driver's seat and Co-Defendant Ruiz into the passenger's seat. From there, she spoke to police officers (*Id.* at 104–08).

39. Officer John Boyle was one of the police officers who spoke to Ramirez. He testified that, while speaking to Ramirez, he got a report of a shooting at the home. He went to the scene of the shooting. (Aug. 5, 2009 N.T. at 250–53).

40. Later, Officer Boyle returned to speak to Ramirez again. She told him that Mr. Ramos lived on the 2900 block of Waterloo Street. Officer Boyle drove there and found an unoccupied red Toyota Camry. (*Id.* at 252–53).

**D.   Mr. Ramos's purported confession to his ex-girlfriend.**

41. Moving back in time a bit, Ramirez testified that she received a cell phone call from Mr. Ramos sometime after he left Ramirez's sister's house. Ramirez testified that Mr. Ramos confessed to shooting someone:

> A: . . . [H]e said he went to a block and he shot a guy twice, and he didn't know if he's dead.
> Q: All right. Now, are you clear that is what he said?
> A: Yes.
> Q: When he said that to you, did you question him about that?
> A: Yes.
> Q: Tell us what you said.
> A: I said: why you did that? And he said: Because of Primo, he try to hurt Primo.
> Q: All right. Now did you – did you – when he said he shot the guy, did you question him about whether it was he shot him or if the other guy shot him?
> A: Yes.
> Q: All right. What did you say to him?
> A: I said it was you or Primo? And he said it was him?

(Aug 5, 2009 N.T. at 114–15).

42. Ramirez testified that, after Mr. Ramos's arrest, she visited him in jail and that he again confessed to her. (*Id.* at 125–129).

43. Ramirez did not offer any clear motive for these unprompted confessions.

44. Ramirez admitted on cross examination that the Commonwealth had found housing for her and had paid several months of rent in connection with her testimony. (*Id.* at

190–98).

45. Ramirez's sister also testified. She explained that she was listening to Mr. Ramos's phone call with her sister. She also testified that Mr. Ramos confessed to shooting someone. (Aug 5, 2009 N.T. at 215–216).

### E.  Mr. Ramos's purported confession to Detective Nordo.

46. On the day of the shooting, police arrested Mr. Ramos. Detective Philip Nordo testified that Mr. Ramos was taken to East Detectives on January 3, 2007 at about 10 p.m. (Aug. 6, 2009 N.T. at 134).

47. Detective Nordo testified that he took a statement from Mr. Ramos.

48. Supposedly, almost immediately after Detective Nordo mirandized Mr. Ramos, Mr. Ramos confessed to driving Co-Defendant Ruiz to the scene of the shooting. The supposed motive was that Co-Defendant Ruiz had a dispute about drugs with the victim and that he got beaten up as a result. The shooting was supposedly revenge. (*Id.* at 141–50).

49. Mr. Ramos supposedly signed his confession at 1:25 a.m. on January 5, 2007, substantially more than a day after he was taken into custody. (*Id.* at 155).

### F.  The trial court convicts Mr. Ramos.

50. Based on this evidence, the trial court convicted Mr. Ramos of conspiracy to commit third-degree murder, third-degree murder, and carrying a gun without a license.

51. The trial court sentenced him to 7.5-to-15 years total confinement.

## FACTS SUPPORTING THIS PETITION

52. Before trial, Mr. Ramos moved to suppress his alleged confession to Detective

Nordo.

53. He based this motion on the coercive conditions of his interrogation, including the length of the interrogation, the lack of access to food or water, and the denial of access to a bathroom.

54. Critical here, Mr. Ramos did not testify at the suppression hearing.

55. Trial counsel specifically advised Mr. Ramos not to testify at the suppression hearing.

56. Trial counsel did so even though Mr. Ramos told him that Detective Nordo physically abused him to obtain the purported confession.

57. As Mr. Ramos alleges in his *pro se* petition (grammar, abbreviations, and pronouns modified without notation):

> I was being interrogated by Detective Nordo, who took me to an observation-type holding cell. I was placed at this location for many hours without a toilet, running water, or food. I was continuously coerced with threats of violence, physically assaulted, and was called names such as lowlife and crackhead.

58. Mr. Ramos specifically noted in his *pro se* petition that these allegations were similar to those of the purported eyewitness Amil Gonzalez, who also testified to abuse at the hands of Detective Nordo.

59. Worse than that, however, Detective Nordo sexually abused Mr. Ramos. At one point, when Mr. Ramos was forced to urinate on the floor, Detective Nordo threatened Mr. Ramos with forcing him to lick his own urine off the floor. Later, Detective Nordo forced Mr. Ramos to take his clothes off. He told Mr. Ramos to masturbate in front of him and that, if he complied, he would give Mr. Ramos food, water, and access to the bathroom. Mr. Ramos felt that he had no choice but to comply and so he did. Detective Nordo also touched Mr. Ramos's genitals.

60. After abusing Mr. Ramos, Detective Nordo demanded that Mr. Ramos agree to a false confession. Mr. Ramos agreed so that his ordeal would be over.

61. Because trial counsel advised Mr. Ramos not to testify at the suppression hearing, none of the evidence concerning the actions of Detective Nordo are of record.

62. Subsequently, Detective Nordo has been indicted for sexually abusing male suspects and informants. His case is being heard at Docket No. CP-51-CR-0001856-2019 in the Court of Common Pleas of Philadelphia County. The conduct underlying the charges are consistent with Mr. Ramos' allegations.

## STATE-COURT POST-CONVICTION PROCEEDINGS

63. Mr. Ramos took a direct appeal. Under Pennsylvania law, he was not able to challenge trial counsel's ineffectiveness.

64. Instead, among other things, he challenged the sufficiency of the evidence to support his conviction. The Superior Court of Pennsylvania affirmed the conviction, relying **entirely** on Mr. Ramos's confession.

65. Mr. Ramos's petition under Pennsylvania's Post Conviction Relief Act challenged as ineffective trial counsel's advice that he not testify at the suppression hearing. It did so under both the federal and state constitutions, preserving the issue for this Petition.

66. No evidentiary record was built on Mr. Ramos's claim, as the trial court dismissed his PCRA petition without a hearing. The trial court found that Mr. Ramos's purported confession to Ramirez was sufficient to uphold his conviction regardless of whether Detective Nordo coerced his confession. It therefore ruled that Mr. Ramos did not established the prejudice necessary to prevail on an ineffective-assistance claim.

67. The Superior Court affirmed on the same ground.

## GROUND ONE: INEFFECTIVE ASSISTANCE OF COUNSEL

68. Trial counsel was constitutionally ineffective, violating Mr. Ramos's rights under the Sixth Amendment of the Constitution of the United States.

69. The Commonwealth of Pennsylvania's failure to release Mr. Ramos is "contrary to clearly established Federal law, as determined by the Supreme Court of the United States," entitling him to relief under 28 U.S.C. § 2254(d)(1).

70. Under *Strickland v. Washington*, 466 U.S. 668 (1984), criminal defendants are entitled to effective assistance of counsel.

71. "To prevail on a claim of ineffective assistance, a defendant must show (1) deficient performance and (2) prejudice. The first prong requires a showing that 'counsel's performance . . . fell below an objective standard of reasonableness;' the second requires demonstrating 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Romansky v. Superintendent Greene SCI*, 933 F. 3d 293, 301 (3d Cir. 2019) (quoting *Strickland*, 466 U.S. at 688).

72. Mr. Ramos prevails under both prongs.

73. *First*, Supreme Court precedent clearly establishes that effective representation requires attorneys to litigate suppression claims "competently." *Kimmelman v. Morrison,* 477 US 365, 375 (1986). Here, trial counsel's decision to advise Mr. Ramos not to testify at the suppression hearing was objectively unreasonable.

74. His confession was devastating evidence against him. It had to be suppressed for Mr. Ramos to prevail. The only compelling argument to suppress the confession was that Detective Nordo used physical violence, sexual abuse, and coercion to obtain the purported confession. The only way that evidence could come in was through Mr. Ramos's testimony. Yet

trial counsel advised Mr. Ramos not to testify despite compelling evidence of coercion.

75.     *Second*, the admission of the coerced confession prejudiced Mr. Ramos. As the Supreme Court has noted, confessions are "probably the most probative and damaging evidence that can be admitted against [a defendant]." "The admissions of a defendant come from the actor himself, the most knowledgeable and unimpeachable source of information about his past conduct. Certainly, confessions have profound impact on the jury, so much so that we may justifiably doubt its ability to put them out of mind even if told to do so." *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991).

76.     In *Fulminante*, the Supreme Court explained that this reasoning can still remain true even if there is an additional confession at issue. A confession corroborated by a second confession is far stronger evidence than a single purported confession alone.

77.     Without Mr. Ramos's purported confession, there is a "reasonable probability" that he would have been acquitted. The remaining evidence against him was inherently inconsistent. Mr. Ramos's purported confession to his girlfriend was that he was supposedly the shooter despite the contrary statement of Amil Gonzalez. Moreover, Ramirez had strong motives to lie about Mr. Ramos, including that she had taken out a restraining order against him and that the Commonwealth was paying for her rent to support her testimony at trial.

78.     In addition, Gonzalez's statement to police identifying Co-Defendant Ruiz as the shooter did not in any way implicate Mr. Ramos. Gonzalez never said, much less testified, that he saw Mr. Ramos at the scene of the crime.

79.     The courts of the Commonwealth of Pennsylvania largely relied on the fact that Mr. Ramos's confession to Ramirez was sufficient to sustain his conviction. However, the Supreme Court counseled against this reasoning in *Fulminante*, ruling that the admission of a confession could prejudice a defendant despite another confession.

80. While that question was on direct appeal, rather than on a claim of ineffectiveness, it is still relevant here. Supreme Court precedent recognizes that the effect of a second confession can be prejudicial.

81. The Supreme Court's subsequent decision in *Premo v. Moore*, 562 U.S. 115 (2011) does not alter that conclusion. There, the Supreme Court faulted the Ninth Circuit for relying on *Fulminante* to find that there was prejudice to the defendant within the meaning of *Strickland* from his trial counsel's failure to challenge an allegedly coerced confession. The Supreme Court explained that *Fulminante* did not consider prejudice within the meaning of the *Strickland* test.

82. However, the Supreme Court rejected the application of *Fulminante* for reasons irrelevant here. In *Premo*, trial counsel believed it best to advise pleading guilty without challenging the allegedly coerced confession to hopefully secure a better plea bargain. The Supreme Court found that counsel's decision was a reasonable strategic decision. In addition, given that the defendant pled guilty, the Supreme Court also found that the defendant had to prove that he would not have pled guilty but for his counsel's alleged ineffectiveness. It found no evidence that was the case.

83. Here, in contrast, Mr. Ramos went to trial. There are no collateral issues to complicate the question of whether admitting his coerced confession prejudiced him. Instead, the Supreme Court's reasoning in *Fulminante* shows the critical importance of the admission of the coerced confession despite the supposed additional confession to Ramirez.

84. As a result, Supreme Court precedent—including *Strickland*, *Kimmelman*, and *Fulminante*—clearly establishes that Mr. Ramos is being held in violation of federal law.

WHEREFORE, Petitioner, Jesus Ramos, respectfully requests that this Court order the Commonwealth of Pennsylvania to retry him within 30 days or to release him.

Respectfully submitted,

*/s/ Robert M. Gamburg*
Robert M. Gamburg, Esq.
Daniel J. Auerbach, Esq.
Gamburg & Benedetto, LLC
1500 John F. Kennedy Blvd., Suite 1203
Philadelphia, PA 19102
(215) 567-1486

*Counsel for Petitioner*

Dated: January 29, 2020