# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JESUS RAMOS,** | : | |
| **Petitioner,** | : | **Civil Action** |
| | : | |
| **v.** | : | **No. 18-4920** |
| | : | |
| **MELISSA HAINSWORTH, *et al.*,** | : | |
| **Respondents.** | : | |

## RESPONSE TO AMENDED PETITION
## FOR WRIT OF HABEAS CORPUS

Michael Scalera
Assistant District Attorney
PHILADELPHIA DISTRICT ATTORNEY'S
OFFICE
Three South Penn Square
Philadelphia, PA 19107
michael.scalera@phila.gov
(215) 686-5774
*Attorney for Respondents*

Date:  October 9, 2020

After a non-jury trial, petitioner Jesus Ramos was found guilty of third-degree murder, conspiracy, and carrying a firearm without a license by the Honorable Shelley Robins New of the Philadelphia Country Court of Common Pleas.  Judge New sentenced Ramos to an aggregate term of seven-and-one-half to fifteen years in prison.  The Pennsylvania Superior Court affirmed his judgment of sentence, and Ramos filed a petition under Pennsylvania's Post Conviction Relief Act ("PCRA"), 45 Pa. C.S. § 9541 *et seq.*, alleging that trial counsel was ineffective for advising him not to testify at a hearing on his motion to suppress his statement to police.  Judge New denied his PCRA petition.  The Superior Court affirmed, and the Pennsylvania Supreme Court denied allowance of appeal.

Acting *pro se*, Ramos filed a petition for a writ of habeas corpus in federal court. (*See generally* Habeas Pet., ECF No. 1.)  That petition presented a claim of "newly-discovered evidence" that Detective Philip Nordo had subjected Ramos to unduly coercive interrogation techniques to extract a confession.  (*Id.* at 7-16 (ECF Numbering).)  Detective Nordo had been suspended by the Philadelphia Police Department ("PPD") with intent to dismiss for various improprieties.  Subsequently, in February 2019, Detective Nordo was arrested amid allegations that he had sexually assaulted criminal suspects.

Consistent with its disclosure polices for cases in which Nordo was involved, the Philadelphia District Attorney's Office ("DAO") forwarded a disclosure packet to Ramos that provided detailed information about the allegations against Nordo.  The

DAO also submitted Ramos's case to its Conviction Integrity Unit ("CIU") to determine if Nordo's involvement required that Ramos's conviction be vacated.  Soon after, Ramos submitted letters to the Court alleging for the first time in any forum that he, too, had been sexually assaulted by Nordo during his interrogation.  (*See* ECF Nos. 11, 14, 15.)  After a thorough review, the CIU determined that it had confidence in the integrity of Ramos's conviction and declined to pursue the matter further.

When the DAO informed Ramos of the CIU's decision, he retained private counsel, who filed an amended petition for a writ of habeas corpus.  (*See* Am. Habeas Pet., ECF No. 24.)  The amended petition maintains that trial counsel was ineffective for advising Ramos not to testify in support of his motion to suppress his confession and incorporates Ramos's new allegations of sexual misconduct by Nordo.  (*Id.* at 10-12.)

That claim is untimely, but in any event, the state courts correctly (and certainly not unreasonably) rejected Ramos's ineffectiveness claim.  As explained below, Nordo's involvement in Ramos's case was limited to his confession.  Typically, when a defendant's confession is taken by Nordo, the DAO views the case with extra caution.  Here, however, substantial additional evidence corroborates what Ramos said in his police statement, and the state courts reasonably concluded that Ramos would have been convicted even without his confession to police.  The petition for a writ of habeas corpus should therefore be denied without a hearing, and no certificate of appealability should issue.

## BACKGROUND

The Superior Court summarized the facts underlying Ramos's convictions as

follows:

> Carlos Ruiz ("Ruiz"), a drug dealer, had been fighting over drug-dealing "turf" with Marcos Martinez ("the victim"). Ruiz was badly beaten by the victim and vowed to take revenge. On January 3, 2007, [petitioner Jesus Ramos] drove Ruiz in a burgundy Toyota Camry to the 2800 block of North Swanson Street where the victim lived. Ruiz spotted the victim and directed [Ramos] to slow the car down so the victim would think it was someone coming to purchase drugs and draw him to the car. [Ramos] complied and when the vehicle stopped, Ruiz exited the vehicle and attempted to shoot the victim. However, no bullets discharged from the gun as it was locked. The victim fled inside a neighbor's house, and Ruiz shot two bullets through the door. One of these bullets fatally injured the victim. Ruiz ran back to the Camry, and [Ramos] drove him away from the scene. Neighbors called 911 and reported the shooting, describing the getaway car.

> [Ramos]'s ex-girlfriend, Alison Ramirez ("Ramirez"), testified to events that occurred shortly before the shooting. Ramirez explained that on the day in question, [Ramos] arrived at her sister's home located just three blocks from North Swanson Street. Ramirez had previously obtained a protection from abuse ("PFA") order, so she telephoned 911 upon seeing [Ramos]. Ruiz, whom Ramirez recognized, then arrived in a burgundy Camry, and [Ramos] got in the passenger seat. The vehicle left but returned shortly thereafter, and [Ramos] got out of the car. Police Officers John Boyle and Jason Forsythe responded to the 911 call. Upon arrival, Ramirez pointed to the burgundy Camry at the corner and identified [Ramos] as the subject of the PFA order. [Ramos] observed the police and went back to the Camry; however, Ruiz moved to the passenger seat, and [Ramos] got in the driver's seat and drove off.

> While the police were interviewing Ramirez, they received a flash report that a shooting had occurred a few blocks away in the 2800 block of Swanson Street. Upon arrival, the victim was lying outside the front door of his neighbor's home with a bullet through his brain. Investigators found two fired cartridge casings and two fired bullets nearby. Officers Boyle and Forsythe heard over the police radio that the perpetrators had

fled in a burgundy Toyota Camry—the same car that they had just seen [Ramos] and Ruiz in minutes earlier a few blocks away.  The officers returned to Ramirez'[s] home and learned that [Ramos] lived in the 2900 block of Waterloo Street; upon arrival, the officers saw a burgundy Camry parked across from [Ramos]'s home.  A computer check showed that the vehicle was registered to a woman who lived on Horrocks Street.

In the meantime, [Ramos] telephoned Ramirez and told her that he had just shot someone.  [Ramos] explained that the gun locked as he was trying to shoot, but he managed to get off two shots through the door of a house. Unbeknownst to [Ramos], Ramirez'[s] sister, Marangeli Rivera ("Rivera"), was listening on the other end of the phone.  [Ramos] pleaded with Ramirez to meet with him; she agreed but then hung up the telephone and called 911 to report what she had just heard.

The police instructed Ramirez to go to the police station.  Ramirez complied, with her sister accompanying her.  While Ramirez was giving a statement to the detectives, Rivera had to leave to pick up her children at school.  When she and the children arrived home, she saw [Ramos] standing on the corner.  Rivera called 911 and the police arrived to arrest [Ramos] for the assault/robbery he had committed on Ramirez the day before and for his continuing violation of the PFA order.

Detective Phillip Nardo testified that he took a statement from [Ramos] upon his arrest after [Ramos] waived his *Miranda* rights.  [Ramos] detailed the nature and extent of his involvement in the shooting.  [Ramos] explained that Ruiz had a previous altercation with the "boys on Swanson Street" over drug dealing and knew that Ruiz wanted to "get back at them."  For weeks after the fight, Ruiz asked [Ramos] to give him a gun so he could "fuck these guys up."  Three days before the shooting, Ruiz told [Ramos] that he had secured a gun and had gone over to Swanson Street "to shoot" the victim but did not do so.

On the day of the murder, [Ramos] agreed to go with Ruiz to Swanson Street to "get these mother fuckers."  While in the car, Ruiz showed [Ramos] the gun that he was carrying and [Ramos] stated, "you are going to kill this mother fucker with that."  [Ramos] then admitted that he drove Ruiz to Swanson Street and explained that he "drove real slowly.  I wanted to make it look like a buy."  [Ramos] stated that Ruiz had the gun right in his lap.  When Ruiz spotted the victim, [Ramos] followed his instruction to reverse the car slowly and stop.  Ruiz then got out of the car and

4

attempted to shoot the victim, but the gun did not fire.  Ruiz then fired two bullets through the front door, jumped back into the Camry, and yelled to [Ramos], "get off the fucking block." [Ramos] obeyed and drove off "real fast."

The police also obtained a statement from Amil Gonzalez, the victim's neighbor who lived at 2837 North Swanson Street.  In his January 5, 2008 statement to the police, Gonzalez averred that he was outside of his home when he saw the victim walking towards him from the other end of the street.  Gonzalez saw a burgundy car coming up the street at a high rate of speed.  The car stopped in front of his house and the passenger got out.  The victim then ran into Gonzalez'[s] house and closed the door. The passenger stood by the car and attempted to fire, but the gun misfired. The man then fired two shots at the door, returned to the car, and left the scene.  Gonzalez found the victim lying behind the door of his home.
The police subsequently showed Gonzalez a photo array; he identified Ruiz as the person who got out of the burgundy car and shot at his house. When asked if he was certain of his identification, Gonzalez answered affirmatively.  Gonzalez also recounted that Ruiz had sustained an earlier beating at the hands of the victim.

The medical examiner testified that the victim died of a gunshot wound to the brain.   Police Officer Ernest Bottomer of the Firearms Identification Unit testified that the cartridges and bullets came from the same gun.  He also stated that the cartridges found on the scene were consistent with accounts of the shooting.  Counsel stipulated that [Ramos] did not have a license to carry concealed weapons.

Prior to trial, [Ramos] moved to suppress the statement he gave to the police.  A hearing was held and the motion was denied.  Following a joint bench trial with co-defendant Ruiz, both men were convicted of third degree murder, conspiracy, and [carrying a firearm without a license].  On October 29, 2009, [Ramos] was sentenced to concurrent terms of 7½ to 15 years' imprisonment for third[-]degree murder and conspiracy; no further penalty was imposed for [carrying a firearm without a license]. . . . [The Superior] Court affirmed his judgment of sentence [on direct appeal, and the Pennsylvania] Supreme Court denied [Ramos]'s subsequent petition for allowance of appeal on July 16, 2012.

[Ramos] filed a timely PCRA petition on July 30, 2012.  Counsel was appointed, and filed an amended petition on [Ramos]'s behalf alleging that

> [Ramos]'s trial counsel was ineffective for not calling [Ramos] as a witness
> at the pretrial suppression hearing.  On September 23, 2016, the PCRA
> court issued a Pa. R. Crim. P. 907 notice of its intent to dismiss [Ramos]'s
> petition.  After receiving no response from [Ramos], the court issued an
> order dismissing his petition on January 6, 2017.

*Commonwealth v. Ramos*, No. 289 EDA 2017, 2018 WL 1790395, at *1-3 (Pa. Super.

Apr. 16, 2018) (quoting *Commonwealth v. Ramos*, No. 155 EDA 2011, slip op. at 1-6 (Pa.

Super. Feb. 15, 2012)) (footnotes and citations omitted; most alterations in original).

Ramos appealed the dismissal of his PCRA petition.  The Superior Court

affirmed, *id.* at *5-6, and the Pennsylvania Supreme Court denied Ramos's petition for

allowance of appeal.  CP Docket 14.  He then filed a petition for a writ of habeas

corpus in federal court, and the DAO made the appropriate disclosures regarding

Nordo and forwarded Ramos's case to the CIU, as detailed *supra*.  Following the CIU's

rejection of his case, Ramos retained private counsel, who filed the amended petition

for a writ of habeas corpus that is at issue here.

As demonstrated below, the amended petition's claim of ineffective assistance

of counsel is untimely.  But even if it were not, this claim was reasonably rejected by

the Superior Court in a decision that is entitled to deference here.  Accordingly, the

amended petition for a writ of habeas corpus should be denied with prejudice and

without a hearing, and no certificate of appealability should issue.

## APPLICABLE LEGAL STANDARDS

### I.   DEFERENTIAL REVIEW UNDER 28 U.S.C. § 2254(d).

When a federal claim has been adjudicated on the merits in the state-court

proceedings, the "restrictive" and "deferential" standard of review set forth in 28

U.S.C. § 2254(d) applies to the claim on habeas review.  *Johnson v. Williams*, 568 U.S.

289, 293, 297 (2013).  Section 2254(d) provides:

> An application for a writ of habeas corpus on behalf of a person in custody
> pursuant to the judgment of a State court shall not be granted with respect
> to any claim that was adjudicated on the merits in State court proceedings
> unless the adjudication of the claim—
>
> > (1) resulted in a decision that was contrary to, or involved an
> > unreasonable application of, clearly established Federal law, as
> > determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable
> > determination of the facts in light of the evidence presented in the State
> > court proceeding.

28 U.S.C.A. § 2254(d).  "[T]he requirements of § 2254(d) are difficult to meet."

*Williams*, 568 U.S. at 292.  This section "sharply limits the circumstances in which a

federal court may issue a writ of habeas corpus to a state prisoner."  *Id.* at 298.

"Section 2254(d)(1)'s 'clearly established' phrase refers to the holdings, as

opposed to the dicta, of [the United States Supreme Court's] decisions as of the time

of the relevant state-court decision."  *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003)

(quotation marks and citation omitted).  "In other words, 'clearly established Federal

law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Id.* at 71-72.

"A federal habeas court may issue the writ under the 'contrary to' clause if the state court applies a rule different from the governing law set forth in [the United States Supreme Court's] cases, or if it decides a case differently than [the Court] ha[s] done on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002). "[A] run-of-the-mill state-court decision applying the correct legal rule . . . to the facts of a prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

"The court may grant relief under the 'unreasonable application' clause if the state court correctly identifies the governing legal principle from [the United States Supreme Court's] decisions but unreasonably applies it to the facts of the particular case." *Bell*, 535 U.S. at 694. "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous. . . . The state court's application of clearly established law must be objectively unreasonable." *Lockyer*, 538 U.S. at 75. There must be "no possibility fairminded jurists could disagree that the state court's decision conflicts with th[e] [Supreme] Court's precedents." *Nevada v. Jackson*, 569 U.S. 505, 509 (2013) (per curiam). "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

## II.   *STRICKLAND* AND 28 U.S.C. § 2254(d).

The United States Supreme Court's decision in *Strickland v. Washington*, 466 U.S. 668 (1984), provides the "clearly established federal law" governing ineffectiveness claims.  To establish that his counsel was constitutionally ineffective, *Stickland* requires Ramos to demonstrate that: (1) counsel's representation fell below an objective standard of reasonableness; and (2) the deficient performance prejudiced the defense. *Id.* at 687.  Unless Ramos satisfies both prongs of the *Strickland* standard, "it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." *Id.*

The reasonableness of counsel's representation turns on "whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Richter*, 562 U.S. at 105 (quoting *Strickland*, 466 U.S. at 690).  Such incompetence requires that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687.  Thus, in assessing the reasonableness of counsel's actions, the relevant inquiry is "not what is prudent or appropriate, but only what is constitutionally compelled." *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n. 38 (1984)).

The Supreme Court has emphasized that "[j]udicial scrutiny of counsel's performance must be highly deferential," *Strickland*, 466 U.S. at 689, and counsel is

entitled to "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* Courts must avoid hindsight in evaluating counsel's actions, as "it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Id.*; *see also Bell v. Cone*, 535 U.S. 685, 702 (2002); *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993) ("[F]rom the perspective of hindsight there is a natural tendency to speculate as to whether a different trial strategy might have been more successful."). Where, as here, the record does not explicitly disclose trial counsel's actual strategy or lack thereof, the presumption of competence "may only be rebutted through a showing that no sound strategy . . . could have supported the conduct." *Thomas v. Varner*, 428 F.3d 491, 500 (3d Cir. 2005).

With respect to prejudice, Ramos must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. This determination must be made in light of "the totality of the evidence before the judge or jury," *id.* at 695, and "[t]he likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112. Although the reasonable-probability standard is, at least in theory, a lower threshold than a requirement of showing that a different outcome was more likely than not, the difference between the two standards is so "slight" as to "matter[] 'only in the rarest case.'" *Id.* at 112 (citation omitted). Thus, it is not

enough for Ramos merely "to show that the errors had some conceivable effect on the outcome of the proceeding," *Strickland*, 466 U.S. at 693—he must establish that counsel's errors were "so serious as to deprive [him] of a fair trial, a trial whose result is reliable." *Id.* at 687.

Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) "is all the more difficult.  The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Richter*, 562 U.S. at 105 (citations and internal quotation marks omitted). If the state court addressed counsel's effectiveness and applied the correct legal standard, a petitioner must show that the state court's decision was objectively unreasonable. *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002).  The U.S. Supreme Court has emphasized that "[a]n *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Id.* (citations and internal quotation marks omitted; emphasis in original).  It therefore "is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied *Strickland* incorrectly," *id.* at 27, because the federal court may not "substitute[] its own judgment for that of the state court." *Id.* at 25; *see also Richter*, 562 U.S. at 101-02 (reversing grant of writ where "it [wa]s not apparent how the Court of Appeals' [*Strickland*] analysis would have been any different without AEDPA").  Rather, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's

11

decision." *Richter*, 562 U.S. at 101 (internal quotation marks omitted). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is *any reasonable argument* that counsel satisfied *Strickland*'s deferential standard." *Id.* at 105 (emphasis added).

## DISCUSSION

Ramos's amended habeas petition alleges a single ground for relief: that trial counsel was ineffective for advising him not to testify at the hearing on his motion to suppress his confession to Detective Nordo. (Am. Habeas Pet. 10-12.) As an initial matter, "it is well settled that [an] amended pleading supersedes and renders moot the initial complaint." *Graziano v. Grace*, 05-2300, 2008 WL 1902191, at *5 n.6 (E.D. Pa. Apr. 29, 2008), *approved and adopted*, 2009 WL 506364 (E.D. Pa. Feb. 26, 2009). "This principle has been likewise applied in the habeas context, and thus an amended habeas petition supersedes the original petition." *Id.* (citing cases). Accordingly, this response addresses the amended habeas petition. To the extent the Court believes that the claims in Ramos's initial, *pro se* petition remain live controversies, respondents would respectfully request the opportunity to demonstrate that they are defaulted and meritless in a supplemental response.

Ramos's amended habeas petition should be denied with prejudice and without a hearing. As demonstrated below, his *Strickland* claim is untimely, but even if it were properly before the Court, the state courts reasonably determined that Ramos had

failed to establish a *Strickland* violation.  Either way, his ineffectiveness claim does not

entitle him to relief

## I.     THE CLAIM THAT TRIAL COUNSEL WAS INEFFECTIVE FOR ADVISING RAMOS NOT TO TESTIFY AT THE SUPPRESSION HEARING IS UNTIMELY.

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") sets forth a

one-year limitations period for federal habeas corpus petitions:

> A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of—
>
> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1).

"[T]he limitation period is subject to both statutory and equitable tolling."  *Jenkins*

*v. Superintendent of Laurel Highlands*, 705 F.3d 80, 85 (3d Cir. 2013).  Statutory tolling

refers to "[t]he time during which a properly filed application for State post-conviction or

other collateral review with respect to the pertinent judgment or claim is pending."  28

U.S.C. § 2244(d)(2).  "[A] petitioner is entitled to equitable tolling only if he shows (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing."  *Holland v. Florida*, 560 U.S. 631, 649 (2010).

Also, "actual innocence, if proved, serves as a gateway through which a petitioner may pass [where the impediment is] expiration of the statute of limitations."  *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013).  To demonstrate actual innocence, "first, a petitioner must present new, reliable evidence and second, show by a preponderance of the evidence that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence."  *Reeves v. Fayette SCI*, 897 F.3d 154, 160 (3d Cir. 2018) (internal quotation marks and citations omitted).[1]

Ramos's conviction became final on October 14, 2012, when the time to petition the Supreme Court for certiorari expired.  The AEDPA limitations period was statutorily tolled from July 30, 2013, when Ramos filed his timely PCRA petition, through August 29, 2018, when the Pennsylvania Supreme Court denied allowance of appeal from the denial of that petition.  *See* CP Docket 12-14, attached as Exhibit A. 289 days elapsed between when Ramos's conviction became final and the date on which he filed his PCRA petition.

---

[1] The amended petition claims no entitlement to equitable tolling.  Nor does it allege that Ramos is factually innocent, much less present the sort of new, reliable evidence that might convince the Court that no reasonable juror would have voted to convict after considering it.  Should Ramos present new timeliness arguments for the first time in a reply brief, respondents would respectfully request the opportunity to address them in a short surreply.

Ramos's *pro se* habeas petition was timely filed 62 days later, on October 30, 2018.  (Habeas Pet. 35 (ECF Numbering).)  But his amended petition was filed on January 29, 2020—442 days after the AEDPA limitations period expired.  (*See* ECF No. 24.)  Under 28 U.S.C. § 2242, a habeas petition "may be amended or supplemented as provided in the rules of procedure applicable to civil actions." Federal Rule of Civil Procedure 15, in turn, provides that "an amendment to a pleading relates back to the date of the original pleading when . . . the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading."  Fed. R. Civ. P. 15(c)(1)(B).

The Supreme Court clarified how Rule 15's relation-back standard applies in the habeas context in *Mayle v. Felix*, 545 U.S. 644 (2005), holding that an amended habeas petition "does not relate back (and thereby escape AEDPA's one-year time limit) when it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth."  *Id.* at 650.  Thus, an amendment will relate back only if it "does not seek to add a new claim or to insert a new theory in the case," but rather simply "clarifies or amplifies a claim or theory" set out in the original, timely-filed petition.  *United States v. Thomas*, 221 F.3d 430, 431 (3d Cir. 2000).

Perhaps anticipating a timeliness issue, Ramos's amended petition states that his timely "*pro se* petition challenged trial counsel's ineffectiveness as to advising Mr.

Ramos not to testify at the pre-trial suppression hearing." (Am. Habeas Pet. 2.) But the *pro se* petition did no such thing.

Ramos's original petition brought three grounds for relief. The first ground is "Newly Discovered Evidence"; it alleges that "the statement from the defendant/petitioner taken by Det. Nordo cannot be used against the petitioner in light of this new evidence [of Nordo's dismissal for misconduct] that we have obtained." (Habeas Pet. 7, 9 (ECF Numbering).) Ground one does not allege or even mention ineffectiveness by trial counsel—in fact, it repeatedly and approvingly quotes testimony elicited by trial counsel on cross-examination. (*Id.* at 10-12.)

The *pro se* petition's second ground for relief is an ineffectiveness claim against Ramos's counsel on PCRA appeal for "failing to raise all of appellant's issues that pertained to the petition for newly discovered evidence about the misconduct and suspension of Detective Phil Nordo." (*Id.* at 18-19.) Unlike ground one, ground two is explicitly labeled "Ineffective Assistance of Counsel" (*id.* at 18)—but it is directed at PCRA counsel's conduct in prosecuting Ramos's appeal from the denial of his PCRA petition.

Finally, ground three alleges "Prosecutorial Misconduct" based on the prosecution's alleged failure to disclose certain statements by Allison Ramirez until shortly before trial.[2] (*Id.* at 22-28.)

---

[2] To be sure, Ramos's *pro se* petition states in the procedural-history section of the standard form that the basis for his PCRA petition and subsequent appeal to the

The facts underlying the *pro se* petition's and amended petition's claims "differ[]

in both time and type." *Felix*, 545 U.S. at 650.  Ground three in the *pro se* petition

bears no relation to the amended petition's ineffective-assistance claim, as it involves

Ms. Ramirez's statements to the prosecutor and the prosecutor's disclosure of that

information to the defense.  Grounds one and two in the *pro se* petition both implicate

Ramos's confession to Nordo, but the similarities end there.  As to time, the amended

petition's ineffectiveness claim involves trial counsel's advice to Ramos not to testify

at the pre-trial suppression hearing.  In contrast, grounds one and two in the *pro se*

petition focus on the revelation in 2018—nine years *after* Ramos's trial—that the PPD

had suspended Nordo for misconduct with intent to dismiss.

The facts supporting these claims also differ in type.  Grounds one and two in

the *pro se* petition focus on the PPD's decision to dismiss Nordo for a pattern of

misconduct and whether that information justifies a new trial for Ramos.  (*See, e.g.,*

---

Superior Court was that counsel was ineffective for advising him not to testify at the
suppression hearing.  (Habeas Pet. 5-6 (ECF Numbering).)  But Ramos's recitation of
the procedural history of his case is not a ground for relief.  It therefore cannot serve
as the basis for relation-back.  *See, e.g., Riggins v. United States*, No. 10-1557, 2011 WL
6210673, at *5 (E.D. Pa. Dec. 14, 2011) (finding untimely claim did not relate back to
timely petition where "neither the form § 2255 motion submitted by [petitioner] nor
the memorandum of law in support thereof gives any indication [petitioner] was
attempting to raise an issue regarding . . . allegedly false testimony or the lack of
evidence of crack cocaine on collateral review.  The form motion mentions these
issues solely as the grounds raised in [petitioner's] direct appeal.  There is no reference
to either issue in the portion of the form motion instructing [petitioner] to 'state every
ground on which you claim that you are being held in violation of the Constitution,
laws, or treaties of the United States'") (citations omitted).

Habeas Pet. 16, 19.)  The amended petition's *Strickland* claim, on the other hand, requires examining trial counsel's conduct in advising Ramos not to testify at the suppression hearing, and what effect that advice had on the verdict.  The after-discovered evidence that forms the basis for grounds one and two in the *pro se* petition is not only of a different type than the evidence underlying the amended petition's *Strickland* claim—it is legally irrelevant to that claim, because trial counsel could not have been ineffective in 2009 based on Nordo's dismissal for misconduct in 2018. Indeed, the Superior Court noted as much when it denied Ramos's remand motion on appeal.  *Ramos*, 2018 WL 1790395, at *5 n.2 ("[T]he recently released information about Detective Nordo's misconduct cannot demonstrate that [Ramos's] trial counsel acted ineffectively by advising [Ramos] not to testify at the suppression hearing. Counsel could not have known that the District Attorney's Office would accuse Detective Nordo of misconduct in March of 2018.").

The Third Circuit's decision in *Whitaker v. Superintendent Coal Twp. SCI*, 721 F. App'x 196, 202 (3d Cir. 2018), is instructive here.  In that case, Whitaker attempted to raise an untimely *Bruton*[3] claim, arguing that it related back to his timely claim that trial counsel was ineffective for failing to object to a remark during the prosecution's closing argument that purportedly undid the redaction of his codefendant's statement,

---

[3] *Bruton v. United States*, 391 U.S. 123 (1968) (holding that admission of non-testifying codefendant's confession violated Confrontation Clause where confession implicated defendant).

in which Whitaker's name had been replaced with the phrase "the other guy."  The Third Circuit concluded that the *Bruton* claim did not relate back under *Felix*.  "As to time," the court noted, the "ineffective assistance claim concerns [petitioner's] counsel's conduct at trial," while "his untimely *Bruton* claim focuses on what happened before trial—whether the trial court improperly admitted Stewart's confession using 'the other guy' in place of Whitaker's name."  *Id.*  And as to type, the "untimely [*Bruton*] claim d[id] not seek to clarify [the] timely ineffective assistance claim; it purport[ed] to introduce a new theory into the case."  *Id.*  That both claims involved the codefendant's confession was insufficient to render the *Bruton* claim timely under relation-back principles.  *Id.*

So too here.  Though Ramos's timely and untimely claims both involve his confession to Nordo, the similarity ends there.  His timely claims invoke new evidence regarding Nordo from 2018 to directly challenge the trial court's admission of his confession.  His amended habeas petition challenges trial counsel's advice that Ramos decline to testify at the suppression hearing.  Nordo's later dismissal and subsequent revelations about sexual improprieties with defendants are simply irrelevant to the *Strickland* inquiry, as trial counsel cannot fairly be deemed incompetent for failing to predict those events.  The amended petition's *Strickland* claim therefore "differs in both time and type" from the claims raised in the *pro se* petition.  *Felix*, 545 U.S. at 650.  Accordingly, it does not relate back to Ramos's timely *pro se* petition and must be denied as untimely.

## II. THE STATE COURTS REASONABLY REJECTED RAMOS'S CLAIM THAT TRIAL COUNSEL WAS INEFFECTIVE FOR ADVISING HIM NOT TO TESTIFY AT THE SUPPRESSION HEARING.

Even if the amended petition's *Strickland* claim were timely, it would still fail on the merits, because the state courts reasonably rejected it. On PCRA review, Judge Robins New stated that there was no reasonable likelihood of a different result had Ramos's statement to Nordo been suppressed. She emphasized that Ramos

> gave two inculpatory statements which were introduced at trial: One to police and one to Alison Ramirez. In the statement to Ms. Ramirez, [Ramos] claimed to be the shooter. In the police statement, [Ramos] said that he was the driver and the co-defendant was the shooter. The greater weight of the evidence convinced this court that the co-defendant was the shooter and [Ramos], knowing his passenger's intent was, in fact, the driver. Accordingly, even had [Ramos] testified at the suppression hearing and convinced the suppression court to grant the motion to suppress his statement to police, this court still would have heard Ramos confess to being the shooter. The end result would not have changed. Under the facts of this case, both the shooter and the accomplice/driver were guilty of third-degree murder and the related offenses.

*Ramos*, 2018 WL 1790395, at *5 (quoting PCRA Ct. Op. 6-7) (cleaned up). Notably, Judge Robins New was both the factfinder at Ramos's non-jury trial and the judge who dismissed his PCRA petition on the basis that suppressing the confession would not have altered the result at trial.

The Superior Court affirmed on appeal. It noted that Ramos had offered little more than a "bald assertion that he would have 'won an acquittal' if his statement to police had been suppressed." *Id.* That notwithstanding, the Superior Court stated that its own independent "review of the record supports the PCRA court's

determination that the evidence admitted at trial, aside from [Ramos's] confession to police, proved [his] involvement in the murder of Marcos Martinez, especially [Ramos's] confession to Ms. Ramirez." *Id.*

To prevail on a *Strickland* claim, a petitioner must establish both that counsel's representation fell below an objective standard of reasonableness and that there was a substantial likelihood of a different result absent counsel's deficient performance.  466 U.S. at 687.  Ramos cannot demonstrate that the state courts unreasonably applied *Strickland*'s prejudice standard here.  The Commonwealth presented testimony at trial from three witnesses to establish that Ramos and his codefendant, Carlos Ruiz, were together, riding in a particular vehicle, immediately before the shooting.  The first witness was Ramos's ex-girlfriend, Alison Ramirez.  She testified that shortly before the shooting, she called for police assistance because Ramos was outside of her home in violation of a PFA.  Ramos and Ruiz (whom Ms. Ramirez knew as "Primo") were in a burgundy Toyota Camry and had told Ms. Ramirez to get in the car.  She refused, but the car remained on her block.  Police arrived moments later.  N.T. 8/5/09 at 88-149.

The Commonwealth also called Officer John Boyle, who had responded to Ms. Ramirez's 911 call.  Officer Boyle testified that he saw Ramos and Ruiz in the burgundy Toyota Camry when he arrived at Ms. Ramirez's house.  She had identified the men to Officer Boyle as Ramos and "Primo."  The car drove off, and five to seven minutes later, Officer Boyle received a radio report of a shooting a few blocks away.

The flash information indicated that the gunmen had fled in a burgundy Toyota Camry.  Officer Boyle went back to Ms. Ramirez's house and asked her where Ramos lived; he then went to Ramos's block and found the burgundy Camry parked on the street.  N.T. 8/5/09 at 245-254.

Shortly after Ms. Ramirez spoke to Officer Boyle, Ramos telephoned Ms. Ramirez and told her that he had just shot someone.  Ms. Ramirez's sister, Marangeli Rivera, testified at trial that she had overheard Ramos admit to shooting someone during this phone call, and that she, too, had seen Ramos and Ruiz in the burgundy Toyota Camry before the shooting.  N.T. 8/5/09, 206-244.  Marangeli Rivera, Alison Ramirez, and Officer Boyle all testified that when Ramos and Ruiz drove away from Ms. Ramirez's street, Ramos was driving and Ruiz was in the passenger seat.  N.T. 8/5/09 at 102-108, 213-214, 248-49.

The Commonwealth also presented an eyewitness to the actual shooting.  Shortly after the shooting, Amil Gonzalez was interviewed by Detective Gonzalez (no relation) and Detective Aitken.  In his statement to the detectives, Gonzalez said that he saw someone get out of a burgundy Toyota Camry, shoot the victim, and get back in the passenger seat before it drove off.  He could not see the driver of the car.  He selected Ruiz from a photo array and identified him as the man who had shot the victim.  Gonzalez recanted his police statement at trial, however, and the prosecutor used the statement and photo arrays bearing Gonzalez's signature under Ruiz's picture to impeach him.  N.T. 8/6/09 at 55-71.  Detective Gonzalez also testified at trial

regarding Amil Gonzalez's statement, explaining that it was an accurate record of what Gonzalez had told him.  *Id.* at 103-124.

Ramos's prejudice arguments are unavailing.  He cites *Arizona v. Fulminante*, 499 U.S. 279 (1991), for the proposition that a confession is damaging to the defense even in the presence of a second confession.  (Am. Habeas Pet. 11-12.)  But *Fulminante* was a due-process claim that was before the Supreme Court on direct review, *id.* at 284, while Ramos presents a *Strickland* claim that is before this Court on habeas review and, as such, is subject to § 2254(d)'s deferential standard of review.  The difference is not merely semantic: because *Fulminante* involved direct review of a due-process deprivation at trial, the Court correctly applied the harmless-error standard of *Chapman v. California*, 386 U.S. 18 (1967), which requires the state to demonstrate that the constitutional error was harmless beyond a reasonable doubt.  *Id.* at 24.  *Strickland*, by contrast, places the burden on the defendant to show a reasonable likelihood that, but for counsel's errors, the result of the proceedings would have been different.  *See Premo v. Moore*, 562 U.S. 115, 130 (2011) (distinguishing *Fulminante* in habeas matter involving *Strickland* claim on grounds that "*Fulminante*'s prejudice analysis arose on direct review following an acknowledged constitutional error at trial.  The State therefore had the burden of showing that it was clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error" (citation and internal quotation marks omitted)); *see also, e.g., Bester v. Warden*, 836 F.3d 1331, 1338 (11th Cir. 2016) (explaining that because petitioner had asserted *Strickland* claim in

23

§ 2254 proceeding, "the state does not have the burden of showing that any error was harmless beyond a reasonable doubt [under *Chapman*], or harmless by any standard at all.  Instead, [petitioner] has the burden of establishing prejudice under the *Strickland* standard").

Indeed, in *Moore*, the Supreme Court reversed the Ninth Circuit for committing the same error Ramos now urges on this Court.  The Ninth Circuit had ruled on habeas review that the state court unreasonably applied *Fulminante* when it rejected the petitioner's ineffectiveness claim arising out of his counsel's advice to plead guilty and failure to move to suppress his confession.  *Moore*, 562 U.S. at 128.  Mirroring Ramos's argument here (*see* Am. Pet. 10-11), the Court of Appeals asserted that "*Fulminante* stands for the proposition that the admission of an additional confession ordinarily reinforces and corroborates the others and is therefore prejudicial."  *Moore v. Czerniak*, 574 F.3d 1092, 1111 (9th Cir. 2009), *rev'd and remanded sub nom. Premo v. Moore*, 562 U.S. 115 (2011).

In reversing, the Supreme Court explained that "[t]he Court of Appeals appears to have treated *Fulminante* as a *per se* rule of prejudice, or something close to it, in all cases involving suppressible confessions.  It is not."  *Moore*, 562 U.S. at 130 (noting that *Fulminante* "made the uncontroversial observation that many confessions are powerful evidence").  Though Ramos attempts to distinguish *Moore* on the basis that the petitioner in that case had pleaded guilty (Am. Habeas Pet. 12), it does not change that, as in *Moore*, it is Ramos's burden to show that fairminded jurists could not

24

disagree on the correctness of the Superior Court's prejudice determination.  *Richter*, 562 U.S. at 101; *Moore*, 562 U.S. at 131 ("Other than for its discussion of the basic proposition that a confession is often powerful evidence, *Fulminante* is not relevant to the present case.  The state postconviction court reasonably could have concluded that Moore was not prejudiced by counsel's actions.  Under AEDPA, that finding ends federal review.").

Ramos cannot meet that heavy burden.  Put simply, the Commonwealth presented significant, persuasive, and untainted evidence of Ramos's guilt at trial— evidence that was more than sufficient to convict him even without his confession to Nordo.  The trial court credited the testimony of Alison Ramirez, Marangeli Rivera, Officer Boyle, and Detective Gonzalez.  Ms. Ramirez and Ms. Rivera both heard Ramos confess to a shooting just moments after the victim was shot.  The flash information indicated that the gunmen had fled in a burgundy Toyota Camry.  Officer Boyle, Ms. Ramirez, and Ms. Rivera had all seen Ramos in the burgundy Toyota Camry just minutes before the shooting.  After the shooting, Officer Boyle located a burgundy Toyota Camry parked outside of Ramos's house.  Even assuming for argument's sake that trial counsel could fairly be deemed ineffective for advising Ramos not to testify at the suppression hearing and that Ramos's statement to Nordo would have been suppressed if Ramos had testified, there was no reasonable

probability of a different result here.[4]  At a minimum, fairminded jurists could disagree whether the Superior Court correctly determined that Ramos had failed to demonstrate prejudice under *Strickland*.  And "[u]nder AEDPA, that finding ends federal review."  *Moore*, 562 U.S. at 131.  Even if this claim were timely, then, it would fail on the merits.

## CONCLUSION

For the foregoing reasons, Ramos's amended habeas petition should be dismissed with prejudice and without a hearing, and no certificate of appealability should issue.

Respectfully submitted,

/s/ *Michael Scalera*

MICHAEL SCALERA
Assistant District Attorney

MAX C. KAUFMAN
Supervisor, Federal Litigation

---

[4] Indeed, while *Strickland* directs federal courts to assess the effect of evidence on an objective factfinder, *Saranchak v. Beard*, 616 F.3d 292, 309 (3d Cir. 2010), it is notable that the same judge who acted as factfinder at Ramos's trial concluded on PCRA review that suppressing his confession to Nordo would not have affected the verdict. *Ramos*, 2018 WL 1790395, at *5 (citing PCRA Ct. Op. 6-7).

## CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of October, 2020, I served a true and correct copy of the foregoing on all counsel of record via filing on the Court's ECF system.

*/s/ Michael Scalera*
Michael Scalera
Assistant District Attorney